# 14-1624-cv

IN THE

# United States Court of Appeals

### FOR THE SECOND CIRCUIT

————

WELLS FARGO BANK, N.A., AS TRUSTEE FOR THE REGISTERED HOLDERS OF BANC OF AMERICA COMMERCIAL MORTGAGE INC., COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-5, ACTING BY AND THROUGH ITS SPECIAL SERVICER, C-III ASSET MANAGEMENT LLC,

*Plaintiff-Appellee,*

- against -

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR DEFENDANT-APPELLANT

GREGORY A. MARKEL
CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
(212) 504-6000

*Attorneys for Defendant-Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellant Bank of America, N.A. ("Bank of America") certifies that, as of this date, it is a wholly-owned indirect subsidiary of Bank of America Corporation.  Bank of America's direct parent company is BANA Holding Corporation, which is 100% owned by BAC North America Holding Company, which is 100% owned by NB Holdings Corporation, which is 100% owned by Bank of America Corporation.  No publicly-held corporation owns 10% or more of Bank of America's stock.

# TABLE OF CONTENTS

**PAGE**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED FOR REVIEW ...................................................2

STATEMENT OF THE CASE ............................................................4

STATEMENT OF FACTS ................................................................10

      A.    Overview Of The Surrey Loan ....................................................10

      B.    Bank Of America's Guidelines..................................................10

      C.    The Assignment And The Carlin Note ....................................12

      D.    The Underwriting, Approval, And Closing Of The Surrey Loan.................................................................................13

      E.    The Securitization Of The Surrey Loan And Plaintiff's "Sole Remedy" For Any Breach Of A RW By Bank Of America ...................................................................................14

      F.    The Borrower's Default, Plaintiff's Repurchase Demand, And The Procedural History Of This Action............................15

**PAGE**

SUMMARY OF ARGUMENT ............................................................16

STANDARD OF REVIEW .............................................................22

ARGUMENT .................................................................................23

POINT I    THE DISTRICT COURT ERRED BY HOLDING THAT
BANK OF AMERICA BREACHED RW-39 BY FAILING TO
REQUIRE THE BORROWER TO CONTRIBUTE 15% OF
THE CONTRACT PRICE ENTIRELY IN CASH............................23

    A.    Section 105(A)(2) Of The Guidelines Cannot Be Read
To Require A 15% "Cash Equity" Contribution .....................24

    B.    The District Court Erred By Interpreting The Contested
Meaning Of The Phrase "Cash Equity" On A Motion For
Summary Judgment ................................................................31

POINT II    THE DISTRICT COURT ERRED BY CONCLUDING THAT
BANK OF AMERICA VIOLATED CUSTOMARY
INDUSTRY STANDARDS AS A MATTER OF LAW....................36

POINT III    THE DISTRICT COURT ERRED BY INCORRECTLY
CALCULATING DAMAGES AND IMPROPERLY
AWARDING STATUTORY PREJUDGMENT INTEREST............41

    A.    The District Court Erred By Ruling That Plaintiff Was
Entitled To Include In Its "Purchase Price" Calculation
More Than $2 Million In Contract Interest And Servicing
Expenses That Bank Of America Advanced Prior To
August 24, 2009 .....................................................................43

    B.    The District Court Erred By Awarding Plaintiff More
Than $14 Million In Statutory Prejudgment Interest...............47

**PAGE**

CONCLUSION ....................................................................................53

CERTIFICATE OF COMPLIANCE ................................................... viii

SPECIAL APPENDIX

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES:**

*10 Ellicott Sq. Ct. Corp. v. Mtn. Valley Indem. Co.*,
  634 F. 3d 112 (2d Cir. 2011)...........................................................25

*Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London Eng.*,
  136 F.3d 82 (2d Cir. 1998)..............................................................30

*Bailey v. Fish & Neave*,
  868 N.E.2d 956 (N.Y. 2007)............................................................26

*Bank of N.Y. v. First Millennium, Inc.*,
  607 F.3d 905 (2d Cir. 2010)............................................................23

*Beacon Hill CBO, II, Ltd. v. Beacon Hill Asset Mgmt. LLC*,
  314 F. Supp. 2d 205 (S.D.N.Y. 2003)................................................27

*Best v. Nurse*
  No. CV 99-3727, 1999 WL 1243055 (E.D.N.Y. Dec. 16, 1999) ....................25-26

*Bynoe v. Target Corp.*,
  548 F. App'x 709 (2d Cir. 2013) .......................................................36

*Chambers v. TRM Copy Ctrs. Corp.*,
  43 F.3d 29 (2d Cir. 1994) ...............................................................22

*Charter Realty & Dev. Corp. v. New Roc Assocs., L.P.*,
  739 N.Y.S.2d 456 (App. Div. 2d Dep't 2002)......................................25

*Curry v. City of Syracuse*,
  316 F.3d 324 (2d Cir. 2003)............................................................34

*Den Norske Bank AS v. First Nat'l Bank of Boston*,
  75 F.3d 49 (1st Cir. 1996)..............................................................34

*Gallo v. Prudential Residential Servs., Ltd. P'ship*,
  22 F.3d 1219 (2d Cir. 1994)...........................................................22

*Iacobelli Constr., Inc. v. Cnty. of Monroe*,
  32 F.3d 19 (2d Cir. 1994) ..........................................................30, 35-36

**PAGE(S)**

*Ideal Steel Supply Corp. v. Anza*,
    652 F.3d 310 (2d Cir. 2011)..............................................................22, 34

*J. D'Addario & Co., Inc. v. Embassy Indus., Inc.*,
    980 N.E.2d 940 (N.Y. 2012).................................47, 48, 50, 51, 52

*Katzman v. Helen of Troy Tex. Corp.*,
    No. 12 Civ. 4220, 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013)...................51, 52

*LaSalle Bank Nat'l Ass'n v. Lehman Brothers Holdings, Inc.*,
    237 F. Supp. 2d 618 (D. Md. 2002)..............................................37-38

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010).........................................................25

*Lucente v. IBM Corp.*,
    310 F.3d 243, (2d Cir. 2002)........................................................34

*Mario v. P&C Food Mkts., Inc.*,
    313 F.3d 758 (2d Cir. 2002).........................................................22

*Miller v. Wolpoff & Abramson, L.L.P.*,
    321 F.3d 292 (2d Cir. 2003).........................................................22

*Novella v. Westchester Cnty.*,
    661 F.3d 128 (2d Cir. 2011)......................................................26-27

*Nuera Commc'ns, Inc. v. Telron Commc'ns USA, Inc.*,
    No. 00 Civ. 9167, 2002 WL 31778796 (S.D.N.Y. Nov. 15, 2002).........................48

*Rand v. Volvo Fin. N. Am.*,
    No. 04-CV-00349, 2007 WL 1351751 DLI KAM (E.D.N.Y. May 8, 2007).......................34

*Scanner Techs. Corp. v. Icos Vision Sys. Corp.*,
    253 F. Supp. 2d 624 (S.D.N.Y. 2003).................................................34

*Terry v. Ashcroft*,
    336 F.3d 128 (2d Cir. 2003).........................................................22

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000).........................................................23

*Town of Orangetown v. Magee*,
    665 N.E.2d 1061 (N.Y. 1996).........................................................47

**PAGE(S)**

*Travelers Cas. & Sur. Co. v. Dormitory Auth.—St. of N.Y.,*
   735 F. Supp. 2d 42 (S.D.N.Y. 2010)..................................................35

*United Bhd. Of Carpenters & Joiners of Am. Local Union No. 747 v. Stone & Webster*
   *Eng'g Corp.,*
   808 F.2d 5 (2d Cir. 1986) .................................................................27

*Velo Holdings Inc. v. Paymentech, LLC* (*In re Velo Holdings Inc.*)*,*
   475 B.R. 367 (Bankr. S.D.N.Y. 2012)................................................25

*Vt. Teddy Bear Co. v. 538 Madison Realty Co.,*
   807 N.E.2d 876 (N.Y. 2004)..............................................................25

*Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n,*
   643 F. Supp. 2d 1014 (S.D. Ohio 2009) ............................................37

*Wells Fargo Bank, N.A. Bank of Am. N.A.*
   No. 10 Civ. 9584, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013) ............8

*Wells Fargo Bank, N.A. v. Bank of Am.,*
   No. 10 Civ. 9584, 2014 WL 476299 (S.D.N.Y. Feb. 6, 2014) ................9

**STATUTES & OTHER AUTHORITIES:**

N.Y. C.P.L.R. 5001(a) (McKinney 2007 & Supp. 2014) ............................47

# <u>JURISDICTIONAL STATEMENT</u>[1]

The United States District Court for the Southern District of New York (the "District Court") had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the matter in controversy exceeded $75,000. *See* Joint Appendix at A-27 ¶¶ 5-7; A-101-02 ¶¶ 5-7. This Court has appellate jurisdiction over this action pursuant to 28 U.S.C. § 1291. The District Court entered a final Judgment on April 25, 2014 resolving all of the parties' claims and awarding plaintiff Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Banc of America Commercial Mortgage Inc., Commercial Mortgage Pass-Through Certificates, Series 2007-5, acting by and through its Special Servicer, C-III Asset Management LLC ("Plaintiff"), a total of $39,905,024.56 in damages. *See* Special Appendix at SPA-1-2.[2] Bank of America timely filed a Notice of Appeal from the Judgment (and all prior decisions and orders on which it was based) on May 9, 2014. *See* A-7480-81.

---

[1]    Citations to documents included in the Joint Appendix are in the form "A-__." Citations to documents included in the Special Appendix are in the form "SPA-__." Citations to documents filed with the District Court that are not included in the Joint Appendix are in the form "ECF # __."

[2]    The Special Appendix is attached hereto pursuant to Local Rule 32.1(c).

-1-

## ISSUES PRESENTED FOR REVIEW

This is an appeal from the District Court's grant of summary judgment for Plaintiff on its claim that Bank of America breached one of the representations and warranties it made in connection with selling a multifamily mortgage loan to a securitization trust in 2007. Following the grant of summary judgment, the District Court entered a judgment awarding Plaintiff more than $39 million in damages, including more than $14 million in statutory prejudgment interest. The following issues are presented by this appeal:

1.     Whether the District Court erred in concluding, as a matter of law, that Bank of America's internal lending guidelines required all borrowers seeking new loans to make a 15% "cash equity" contribution toward the purchase price of the property being acquired, despite the fact that the guideline applicable to new loans does not even mention "cash equity" (much less require a "cash equity" contribution), and the fact that the very next section of those guidelines, which governs refinanced loans, expressly requires borrowers seeking a refinancing to make a 15% "cash equity" contribution.

2.     Whether the District Court erred in concluding, as a matter of law, that the phrase "cash equity" in an inapplicable section of Bank of America's lending guidelines refers exclusively to cash currency, despite substantial evidence in the record (including expert testimony) demonstrating that the phrase "cash

equity" is a term of art in the commercial mortgage lending industry that can include personal notes executed by the principals of a borrower.

      3.    Whether the District Court erred by concluding that a deviation from Bank of America's discretionary lending guidelines was sufficient, by itself, to demonstrate a violation of customary standards in the commercial mortgage lending industry as a matter of law, despite the fact that this conclusion was inconsistent with other court decisions that have addressed this very issue, and even though there was conflicting evidence (including expert testimony) in the record demonstrating that Bank of America complied with customary industry standards with respect to the loan at issue.

      4.    Whether the District Court erred by concluding that Plaintiff was entitled to include in its damages calculation more than $2 million in mortgage interest and servicing expenses that accrued prior to August 24, 2009, even though it was undisputed that Bank of America had timely advanced payment for those expenses as they became due, and Plaintiff was therefore not denied use of those funds.

      5.    Whether the District Court erred by concluding that Plaintiff was entitled to recover more than $14 million in statutory prejudgment interest under N.Y. C.P.L.R. 5001, even though the governing contracts expressly provided that Plaintiff's "sole remedy" for a breach by Bank of America would be a cash

payment determined pursuant to a detailed contractual damages formula that did not provide for the payment of statutory prejudgment interest, and instead provided for contract interest at a substantially lower rate.

## STATEMENT OF THE CASE

This is a breach of contract action arising out of the securitization of 100 commercial mortgage loans (the "2007-5 Loans") that closed in December 2007 (the "2007-5 Securitization").  *See* A-1590; A-27-28 ¶ 9; A-102 ¶ 9.  Each of the 2007-5 Loans was originated, underwritten, closed and funded by Bank of America, and then deposited into a securitization trust (the "Trust"), the beneficial ownership of which is represented by various classes of certificates purchased by sophisticated institutional investors (the "Certificateholders").  *See* A-1597.

In this action, Plaintiff, the special servicer appointed to service and administer those of the 2007-5 Loans that have gone into default, asserted that Bank of America breached certain representations and warranties ("RWs") it made in the contracts governing the 2007-5 Securitization by including one allegedly defective loan in the Trust.  *See* A-39-48 ¶¶ 76-90.  The loan at issue is the $37,179,141 A Note portion of a $39,977,571 mortgage loan (the "Surrey Loan"), secured by a portfolio of multifamily apartment buildings in Hartford, Connecticut (the "Properties"), that Bank of America made to Surrey Group, LLC ("Borrower") in February 2007.  *See* A-28 ¶ 11; A-102 ¶ 11.  The Surrey Loan went into default

-4-

and was transferred to Plaintiff for special servicing in January 2009. *See* A-3603. Plaintiff foreclosed on the Properties in 2010 (*see* A-3684-96) and sold them at a loss in 2012 (*see* A-5011 ¶ 21).

In its Amended Complaint, Plaintiff asserted, *inter alia*, that Bank of America breached RW-39 of the Mortgage Loan Purchase and Sale Agreement ("MLPA") governing the 2007-5 Securitization, which generally provides that Bank of America's origination of the 2007-5 Loans (including the Surrey Loan) met industry standards. *See* A-43-45 ¶ 87. At the conclusion of discovery, Plaintiff filed a motion for summary judgment in which it asserted that Bank of America's origination of the Surrey Loan violated RW-39 because Bank of America failed to require the Borrower to contribute at least 15% of the purchase price of the Properties in "cash equity" (which Plaintiff argued could only mean cash currency) at closing. *See* Plaintiff's Memorandum of Law in Support of its Motion for Summary Judgment [ECF. # 74] ("Pl. MSJ") at 26-27. Plaintiff asserted that this alleged failure constituted a violation of Bank of America's internal lending guidelines (the "Guidelines") and that a violation of such internal Guidelines was sufficient, by itself, to establish a violation of industry standards under RW-39. *See* Pl. MSJ at 26-27.

Bank of America, on the other hand, presented overwhelming evidence (including the plain language of the Guidelines themselves) that its

Guidelines did not contain a "cash equity" requirement for new loans such as the Surrey Loan. *See, e.g.,* Bank of America's Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment and in Support of its Cross-Motion for Partial Summary Judgment [ECF # 81] ("BOA MSJ") at 43; A-3837 at Section 105(A)(2); A-1965. The plain language of the capitalization Guideline applicable to new loans such as the Surrey Loan only required that the loan not exceed 85% of the contract of sale price. *See* A-3837 at Section 105(A)(2). Bank of America's Guidelines did not purport, in purchase and sale transactions such as the one here, to interfere with the freedom of the seller to bargain and contract for whatever form of consideration was acceptable to it for the remaining 15% of the sales price, above the 85% loan proceeds.

Here, the seller determined to accept, as part of the remaining 15% of the Properties' sale price, a combination of a personal note from the principals of the purchasing Borrower and cash. A separate section of the Guidelines, which clearly applied only to refinancings, required the borrower to retain "cash equity" of 15% in the property securing the loan. *See* A-3837 at Section 105(A)(3). This was designed to avoid abusive refinancings, and only refinancings that occurred during the first year after the borrower acquired the collateral property. *See* A-1965. The Surrey Loan, however, was a new loan to provide financing for the Borrower's acquisition of the Properties, not a refinancing. *See* A-1742-43 ¶¶ 1,

-6-

11; A-4524 ¶ 1; A-4526 ¶ 11.  The District Court read a requirement that there be 15% "cash equity" that was contained in the Guideline provision relating to refinancings into the relevant provision relating to new loans.  There is no basis for this reading in either the language of the Guidelines or in the way commercial real estate transactions such as the one at issue here are normally financed.  This error, by applying a requirement from an inapplicable provision of the Guidelines calling for retention of "cash equity" to this new loan, was the fundamental basis for the opinion below and by itself requires reversal of the Judgment.

As an entirely separate point that need not be reached if this Court agrees that the District Court applied the wrong section of the Guidelines, Bank of America further demonstrated that, even if its Guidelines did require a "cash equity" contribution for the Surrey Loan, the principals of the Borrower contributed such "cash equity" in the form of a note executed in their personal capacities plus cash meeting the requirement of 15% of the contract of sale price for the Properties.  *See* A-1966-67; A-3024-25; BOA MSJ at 55-56.  Bank of America further demonstrated that a deviation (or exception) from its internal Guidelines did not demonstrate a breach of customary industry standards, and that the evidence established that it had in fact complied with such industry standards. *See* BOA MSJ at 52-56.

-7-

On March 28, 2013, the District Court (Oetken, J.) issued a Memorandum and Order (the "Summary Judgment Order") in which it granted Plaintiff's motion for summary judgment on its claim that Bank of America breached RW-39, and denied Bank of America's cross-motion for partial summary judgment. *See Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584, 2013 WL 1285289 (S.D.N.Y. Mar. 28, 2013).[3] Although requested, there was no oral argument on the parties' summary judgment motions. In the Summary Judgment Order, the District Court concluded as a matter of law that: (i) Bank of America's Guidelines required every borrower seeking a new, or "acquisition," loan to contribute at least 15% of the property's purchase price in "cash equity"; (ii) the phrase "cash equity" meant cash currency, and could not include any form of debt instrument; (iii) Bank of America's Guidelines were "relevant equivalents to industry standards"; and (iv) Bank of America violated its Guidelines, and therefore customary industry standards and RW-39, by failing to require the Borrower to contribute at least 15% of the purchase price of the Properties in cash currency. *See* SPA-14-19. Each of these conclusions is incorrect.

After issuing its Summary Judgment Order, the District Court requested and received extensive briefing from the parties on the calculation of the

---

[3]    Hereinafter, citations to the District Court's Summary Judgment Order are to the copy of that order included in the Special Appendix. *See* SPA-3-26.

amount of the Judgment based on the "Purchase Price" formula set forth in the Pooling and Servicing Agreement ("PSA") governing the 2007-5 Securitization. In an Opinion and Order dated February 6, 2014 related to prejudgment interest (the "PJI Order"), the District Court held that Plaintiff was entitled to statutory prejudgment interest under N.Y. C.P.L.R. 5001(a) from August 24, 2009 (the date Plaintiff first demanded that Bank of America repurchase the Surrey Loan) until the date of Judgment. *See Wells Fargo Bank, N.A. v. Bank of Am., N.A.*, No. 10 Civ. 9584, 2014 WL 476299 (S.D.N.Y. Feb. 6, 2014).[4] Then, on April 11, 2014, the District Court issued an Order (the "Damages Calculation Order") in which it determined that Plaintiff was entitled to include in its calculation of the "Purchase Price" of the Surrey Loan more than $1.7 million in mortgage interest and more than $300,000 in servicing expenses that accrued between December 2008 and August 24, 2009. *See* SPA-38-43. On April 25, 2014, the District Court entered its final Judgment, which awarded Plaintiff a total of $39,905,024.56 in damages. *See* SPA-1.

---

[4]    Hereinafter, citations to the District Court's PJI Order are to the copy of that order included in the Special Appendix. *See* SPA-27-35.

## STATEMENT OF FACTS

### A.    Overview Of The Surrey Loan

On February 5, 2007, Bank of America loaned the Borrower $39,977,571, evidenced by an A Note in the amount of $37,179,141 and a B Note in the amount of $2,798,430.  *See* A-1742 ¶ 1; A-4524 ¶ 1.[5]  The Surrey Loan was collateralized by, and intended to partially finance the Borrower's acquisition of, the Properties.  *See* A-2648; A-2531.  The Borrower's principals were Martin Carlin, his son Shawn Carlin, and his son-in-law Robert Sandell (collectively, the "Carlins").  *See* A-2646.

### B.    Bank Of America's Guidelines

Bank of America's Guidelines separate the loan generation process into three primary phases: (i) origination; (ii) underwriting; and (iii) closing.  *See* A-3919-23 at Sections 702.1, 702.2, and 702.7.  With respect to the "capitalization" of a loan, Section 105(A) of Bank of America's Guidelines provides different requirements depending upon the type of loan being issued:

> A.    **Capitalization and Re-Capitalization**.  In all Mortgage Loans, the Lender will determine the Borrower's capital basis in the project. In the event of acquisition Loans or the refinance of an existing Loan

---

[5]    The B Note, which was not deposited into the Trust, is not at issue in this action.  *See* A-53.

within the first (12) months of ownership, Loan proceeds
will be restricted in accordance with the following: . . .

> 1. **Construction Loan Takeout (At
> Stabilization).** . . . [not applicable]

> 2. **At Acquisition.** Loan Amount shall be
> limited to a maximum eighty-five percent (85%) of
> the contract price including closing costs limited to
> a maximum fifteen (15%) percent of the contract
> price.

> 3. **For Properties Owned by the Borrower
> for Less than One Year.** A minimum of 15%
> *cash equity* will remain in the capitalization of the
> property. Cash equity will be credited as described
> above.

A-3837 (emphasis added).[6] The Surrey Loan was a new, or "acquisition," loan

subject to Section 105(A)(2) of Bank of America's Guidelines, not a refinanced

loan subject to Section 105(A)(3). *See* A-2531. Therefore the "cash equity"

requirement for refinanced loans in Section 105(A)(3)—no matter what the term

"cash equity" means—is irrelevant and inapplicable to new loans like the Surrey

Loan.

The District Court, however, improperly made a finding on this contested

issue at summary judgment, incorrectly concluding that "cash equity" meant cash

currency and that, under the Guidelines, the buyer of a property must only receive

---

[6] While the phrase "cash equity" is used in Section 105(A)(3) of the
Guidelines, it is not defined anywhere in the Guidelines.

-11-

85% financing from Bank of America, with the remaining 15% of the contract price having to be contributed in hard cash currency by the buyer. *See* SPA-14-19. The District Court held that Bank of America's internal Guidelines required such a financing arrangement for all new loans such as the Surrey Loan as a matter of law (*see* SPA-19), but they simply do not, as shown below.[7]

## C.    The Assignment And The Carlin Note

In its application for the Surrey Loan, the Borrower\buyer represented to Bank of America that the purchase price of the Properties was $45 million, as evidenced by an Agreement of Assignment and Assumption of Contract of Sale dated October 16, 2006 (the "Assignment") between EZ Building, LLC ("EZ") and the Borrower, pursuant to which the Borrower had acquired EZ's right to purchase the Properties from the then-owner. *See* A-2658-87. The Assignment was executed by Nelly Mendez on behalf of EZ and by Martin Carlin on behalf of the Borrower. *See* A-2664.[8] The Borrower deceived Bank of America throughout the

---

[7]    Bank of America's Guidelines are, as their name suggests, just that: *guidelines*. They are not immutable rules. Rather, they allow for the application of discretion and judgment for making adjustments or exceptions based on the circumstances. *See* A-3922-23 at Section 702.6; A-1963; A-1966; *see also* SPA-18.

[8]    Bank of America was induced to believe that Ms. Mendez was the sole principal of EZ, and that Martin Carlin was not affiliated with her or EZ. *See* A-

origination, underwriting, closing, and securitization of the Surrey Loan by hiding the fact that Martin Carlin was also a member of EZ and that he was effectively on both the purchaser and the seller side of the $45 million transaction being financed by Bank of America.  *See* A-1744-46 ¶¶ 16-29.

The Carlins agreed to pay at closing approximately $6.4 million of the Properties' $45 million purchase price to EZ via a promissory note executed in their personal capacities (the "Carlin Note") and $700,000 in cash currency.  *See* A-3024-26.  The Carlin Note was a personal obligation of the Carlins, repayment of which was to be funded by the Carlins' personal assets rather than the income generated by the Properties.  *See* A-3024.  This consideration was acceptable to the seller, EZ (*see* A-3025-26), which Bank of America believed to be an independent entity from the Borrower and the Carlins.

### D.    The Underwriting, Approval, And Closing Of The Surrey Loan

In connection with the underwriting of the Surrey Loan, Bank of America's underwriter, Linda Gallagher, prepared a Credit Approval Package for the Surrey Loan, which was then submitted to Bank of America's credit committee for approval and funding.  *See* A-2721-78; A-2910 at 41:3-21.  The Credit Approval Package stated, among other things, that the Borrower would be

---

1745 ¶ 21; A-2650-56; A-1746 ¶¶ 25-29; A-2658-719; A-2896 at 76:8-12; A-2908-09 at 29:24-30:21.

financing its acquisition of the Properties with the proceeds from the Surrey Loan, the B Note, and the Carlin Note.  *See* A-2724.   At closing, the Borrower contributed $700,000 in cash in addition to the Carlin Note.  *See* A-3026.

**E.      The Securitization Of The Surrey Loan And Plaintiff's "Sole Remedy" For Any Breach Of A RW By Bank Of America**

On December 28, 2007, pursuant to the MLPA and PSA, Bank of America sold and transferred the 2007-5 Loans, including the Surrey Loan, to the Trust.  *See* A-4073.   In the MLPA, Bank of America made a series of RWs regarding various aspects of the 2007-5 Loans.  *See* A-2477-98.  In RW-39, Bank of America warranted that:

> The origination (or acquisition, as the case may be), collection, and the servicing practices used by [Bank of America] with respect to the Mortgage Loan have been in all respects legal and have met customary standards utilized by prudent commercial or multifamily, as applicable, lenders and servicers.

A-2493.

Section 4(c) of the MLPA provides that if Bank of America materially breaches any of its obligations under the MLPA and that breach materially and adversely affects the interests of Certificateholders, Plaintiff may demand that Bank of America cure the breach or repurchase the loan at issue at the related "Purchase Price."  *See* A-2458.  The PSA provides that where, as here, a court orders Bank of America to make a cash payment "in lieu of" repurchasing a loan

(referred to in the PSA as a "Loss of Value Payment"), that "Loss of Value Payment" shall be Plaintiff's "*sole remedy*" for the breach. *See* A-7277. The detailed "Purchase Price" formula set forth in the PSA for calculating a "Loss of Value Payment" does *not* provide for the payment of statutory prejudgment interest. *See* A-2507.

**F.    The Borrower's Default, Plaintiff's Repurchase Demand, And The Procedural History Of This Action**

        In January 2009, the Borrower defaulted on the Surrey Loan and the Loan was transferred to Plaintiff for special servicing. *See* A-3603. On August 24, 2009 and February 8, 2010, Plaintiff sent letters to Bank of America demanding that it repurchase the Surrey Loan on the ground that it had breached several of the RWs in the MLPA, including RW-39. *See* A-487-97.[9] Bank of America refused to repurchase the Surrey Loan and has at all times denied any breaches of the MLPA or PSA. *See* A-147 ¶ 17; A-1782 ¶ 17.

        On September 13, 2010, Plaintiff commenced this action in the United States District Court for the Northern District of Texas seeking to require Bank of

_____

[9]    In the eight-month time period between the Borrower's default and Plaintiff's August 24, 2009 repurchase demand, the Surrey Loan accrued $1,703,324.36 in monthly mortgage interest as well as $313,795.77 in servicing expenses. *See* A-7365; A-7371. It is undisputed that Bank of America advanced payment for all such interest and servicing expenses as they became due. *See* A-7365 (Plaintiff conceding that "it is true that BofA, in its capacity as the Master Servicer for Plaintiff (not the Mortgage Loan Seller), advanced such funds").

-15-

America to repurchase the Surrey Loan.  *See* Complaint [ECF # 1].  On Bank of America's motion, this action was transferred to the District Court on December 23, 2010.  *See* Memorandum Opinion and Order [ECF # 30].[10]  Plaintiff filed its motion for summary judgment on June 26, 2012 [ECF #73] and Bank of America filed its opposition to that motion and its cross-motion for partial summary judgment on July 27, 2012 [ECF # 80].  The District Court issued its Summary Judgment Order on March 28, 2013, granting Plaintiff's motion for summary judgment and denying Bank of America's cross-motion (*see* SPA-3-26).  Judgment for Plaintiff was entered on April 25, 2014 in the amount of $39,905,024.56 (*see* SPA-1) and Bank of America timely filed its Notice of Appeal on May 9, 2014 (*see* A-7480-81).

## SUMMARY OF ARGUMENT

The District Court's Summary Judgment Order should be reversed because the District Court incorrectly found that Bank of America violated customary origination standards (and thus breached RW-39) as a matter of law by approving and funding the Surrey Loan without requiring the Borrower to contribute at least 15% of the Properties' purchase price in "cash equity," which

---

[10]    Upon transfer, this action was assigned to Judge Denise L. Cote.  It was subsequently reassigned to Judge J. Paul Oetken on October 12, 2011.  *See* Notice of Reassignment [ECF # 47].

the District Court concluded meant cash currency.  In reaching its conclusion that Bank of America breached RW-39 as a matter of law, the District Court committed the following errors, each of which is a separate and independent basis for reversal.

*First*, the District Court erred by holding that Bank of America violated its own internal Guidelines by failing to require the Borrower to contribute 15% of the Properties' purchase price in "cash equity."  In reaching its conclusion that the Guidelines contain a 15% "cash equity" requirement, the District Court effectively took language from an inapplicable provision of the Guidelines that only applies to *refinanced* loans, and then grafted a requirement from that provision into a different provision that is the only provision that applies to *new* loans like the Surrey Loan.  The provision of Bank of America's Guidelines that relates to the "capitalization" of new or "acquisition" loans (such as the Surrey Loan) *does not mention "cash equity"*:

> 2.   **At Acquisition.**   Loan Amount shall be limited to a maximum eighty-five percent (85%) of the contract price including closing costs limited to a maximum fifteen (15%) percent of the contract price.

The very next provision, however, which relates to the "capitalization" of *refinanced* loans, *does mention "cash equity"*:

> 3.   **For Properties Owned by the Borrower for Less than One Year.**  A minimum of 15% *cash  equity* will remain in the capitalization of the

-17-

property.  Cash equity will be credited as described
above.

The District Court ignored both the plain language of the relevant provisions and basic principles of contract interpretation by adding a "cash equity" requirement where none existed.  The fact that Bank of America used the phrase "cash equity" in the very next provision of its Guidelines (in a provision related to "capitalization" of refinanced loans, not new loans like the Surrey Loan) demonstrates that Bank of America knew how to provide for a "cash equity" requirement, and did not do so with respect to new loans.  The provision of the Guidelines that related to new loans such as the Surrey Loan required only that 15% of the purchase price of the property be provided by the purchaser and not by the bank.  Here, that additional investment was made up partially of cash and partially by a personal note from the principals of the Borrower that purchased the Properties (*i.e.*, the Carlin Note).  The applicable provision does not specify what type of asset may be used to pay the seller the remaining portion of the purchase price or that such payment must all be in the form of cash or "cash equity."  That is because the form of payment satisfactory to the seller is for the *seller* to decide.  Importantly, as shown below, the record contains ample testimony that payment of the remaining 15% above the 85% bank loan is generally permitted to be made up of notes from parties such as the principals of the borrower, as was the case here with the Carlin Note.

-18-

*Second*, and as an independent ground for reversal, even if Bank of America's Guidelines did contain a "cash equity" requirement for new loans like the Surrey Loan (they do not), the District Court erred by weighing, on a motion for summary judgment, the parties' conflicting evidence (including conflicting expert testimony) regarding the meaning of that term of art in the multifamily lending industry. While Plaintiff argued that the term "cash equity" can only refer to cash currency, Bank of America presented ample evidence (from both fact and expert witnesses) that the term "cash equity" can include a personal note executed by the principals of a borrower—exactly what the Carlin Note was. In light of the conflicting evidence, the District Court should not have determined that the term "cash equity" meant only cash currency and should have denied Plaintiff's motion for summary judgment and allowed this disputed issue to be resolved at trial.

*Third*, the District Court erred by concluding that evidence of a deviation from Bank of America's internal Guidelines was sufficient, by itself, to demonstrate that it violated customary industry standards as a matter of law. The plain language of RW-39 indisputably requires compliance only with customary industry standards, *not* a lender's non-binding internal guidelines that could (and did) vary significantly by lending institution and type of loan. Importantly, exceptions to internal guidelines are properly made by underwriters in the industry when circumstances warrant and often for minor deviations from guidelines. The

District Court nonetheless improperly conflated internal guidelines with customary industry standards.[11]   Moreover, in reaching its conclusion that Bank of America violated customary industry standards as a matter of law, the District Court improperly ignored evidence in the record that created a genuine issue of disputed fact regarding Bank of America's compliance with customary industry standards (including testimony from Plaintiff's own expert witness that lenders in this industry can make exceptions to their own internal guidelines without violating customary industry standards).   Given this disputed issue of material fact, the District Court should have denied Plaintiff's motion for summary judgment.

The District Court's errors were not limited to its determination of Bank of America's liability under RW-39.   The District Court's calculation of damages, as well as its decision to allow Plaintiff to recover statutory prejudgment interest under N.Y. C.P.L.R. 5001(a), were both flawed and should also be reversed (although this Court need not address these errors in the event it finds that the District Court's Summary Judgment Order should be reversed).

The District Court clearly erred by allowing Plaintiff to include in its calculation of the "Purchase Price" of the Surrey Loan more than $2 million in

---

[11]   While certain decisions have suggested that a deviation from a company's internal guidelines may be evidence of a breach of customary industry standards (*see* SPA-19), none of these decisions has held that such evidence is conclusive in and of itself, and the District Court erred by finding such evidence conclusive here.

contract interest and servicing expenses that accrued prior to August 24, 2009 because it was undisputed that Bank of America advanced timely payment for such interest and expenses. There is simply no economic or legal reason to allow Plaintiff to "recover" such interest and expenses in the Judgment. Indeed, allowing Plaintiff to include such amounts in its calculation of the "Purchase Price" of the Surrey Loan as of August 24, 2009, and then recover prejudgment interest on those amounts for nearly five years, resulted in a windfall for Plaintiff, which had use of those previously advanced funds.

In addition, the District Court erred by allowing Plaintiff to recover more than $14 million in prejudgment interest under N.Y. C.P.L.R. 5001(a). Under the MLPA and PSA, Plaintiff was entitled to recover the "Purchase Price" of the Surrey Loan as its "*sole remedy*" for a breach by Bank of America of any of the RWs in the MLPA, and the detailed "Purchase Price" formula set forth in the PSA did *not* include any entitlement to statutory prejudgment interest. The parties expressly agreed to a damages remedy that did not provide for prejudgment interest, and instead provided for payment of contract interest at a much lower interest rate. The District Court disregarded the parties' agreement, however, and committed reversible error in awarding Plaintiff more than $14 million in statutory prejudgment interest.

## **STANDARD OF REVIEW**

This Court reviews *de novo* a district court's decision on a motion for summary judgment. *See Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 763 (2d Cir. 2002). Summary judgment is appropriate only if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003). The district court is "'required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003) (citation omitted). The district court's task "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). The district court "'may not make credibility determinations or weigh the evidence.'" *Ideal Steel Supply Corp. v. Anza*, 652 F.3d 310, 326 (2d Cir. 2011) (citation omitted). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994).

This Court also reviews a district court's interpretation of a contract *de novo*, including "both whether a contract is ambiguous, and, when the district

court finds a contract unambiguous, its interpretation of the contract." *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010). New York law applies to this Court's interpretation and construction of the MLPA and PSA. *See* A-2467 at Section 14 (MLPA contains New York choice of law provision); A-2511 at Section 12.04 (same for PSA); *Terwilliger v. Terwilliger*, 206 F.3d 240, 245 (2d Cir. 2000) (contractual choice of law provisions "'are valid and enforceable in [New York]'") (citation omitted).

## ARGUMENT

### POINT I

### THE DISTRICT COURT ERRED BY HOLDING THAT BANK OF AMERICA BREACHED RW-39 BY FAILING TO REQUIRE THE BORROWER TO CONTRIBUTE 15% OF THE CONTRACT PRICE ENTIRELY IN CASH

The District Court concluded that Bank of America breached RW-39 by approving and funding the Surrey Loan without a 15% "cash equity" contribution by the Borrower. *See* SPA-14-19. According to the District Court, by limiting new loan amounts to 85% of the financed property's contract price, Section 105(A)(2) of Bank of America's internal Guidelines "unavoidabl[y]" required that the Borrower contribute at least 15% of the contract price in "cash equity" (SPA-14), a phrase the District Court determined (after weighing the extrinsic evidence submitted by the parties) meant cash currency (not a note or any

-23-

other form of contribution to the purchase price above the 85% bank loan) (*see* SPA-15-18).    However, the District Court's conclusion that the Guidelines required a 15% contribution of "cash equity" is belied by the words of the Guidelines themselves.

## A.    Section 105(A)(2) Of The Guidelines Cannot Be Read To Require A 15% "Cash Equity" Contribution

The District Court clearly erred, both as a matter of contract interpretation and common sense, by inexplicably holding that Section 105(A)(2) of the Guidelines imposed a 15% "cash equity" requirement for new loans such as the Surrey Loan.  In that regard, Sections 105(A)(2) and (3) provide separate and different requirements for the capitalization of new loans and refinancings:

> 2.    **At Acquisition.**   Loan Amount shall be limited to a maximum eighty-five percent (85%) of the contract price including closing costs limited to a maximum fifteen (15%) percent of the contract price.
>
> 3.    **For Properties Owned by the Borrower for Less than One Year.**  *A minimum of 15% cash equity will remain in the capitalization of the property.*   Cash equity will be credited as described above.

A-3837 (emphasis added).

The phrase "cash equity" plainly does not appear in Section 105(A)(2) (which indisputably applies to new loans like the Surrey Loan), and it is simply

impossible to read the plain language of this provision as containing a "cash equity" requirement.[12]  Thus, the District Court committed a serious and outcome determinative error, in the context of a motion for summary judgment, by adding a "cash equity" requirement to Section 105(A)(2) where none existed.  *See Vt. Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004) (courts may not add or delete contract terms '"under the guise of interpreting the writing"') (citation omitted); *10 Ellicott Sq. Ct. Corp. v. Mtn. Valley Indem. Co.*, 634 F. 3d 112, 125 (2d Cir. 2011) (declining to read term into contract); *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 469 (2d Cir. 2010) (declining to read term "common stock" to implicitly include American Depositary Shares where parties to contract did not expressly do so); *Charter Realty & Dev. Corp. v. New Roc Assocs.*, 739 N.Y.S.2d 456 (App. Div. 2d Dep't 2002) ("a court 'should not . . . imply a term which the parties themselves failed to insert"') (citation omitted).[13]  The phrase "cash equity" is simply irrelevant to new

---

[12]    Indeed, summary judgment should have been granted in *Bank of America's* favor, finding that the Guidelines did not impose any obligation on the Borrower to make a "cash equity" contribution in connection with obtaining the Surrey Loan.

[13]    Principles of contract interpretation are useful in determining the meaning of writings that are not bilateral agreements, such as the Guidelines.  *See Velo Holdings Inc. v. Paymentech, LLC (In re Velo Holdings Inc.)*, 475 B.R. 367, 380 (Bankr. S.D.N.Y. 2012) ("While the January 20 Letter was not a contract, principles applicable to contract interpretation nevertheless are helpful in construing the letter"); *Best v. Nurse*, No. CV 99-3727, 1999 WL 1243055, at *6

loans such as the Surrey Loan, and the District Court had no basis for reading that term into Section 105(A)(2) when purporting to interpret the Guidelines.

Section 105(A)(3) of the Guidelines, on the other hand, explicitly requires a 15% "cash equity" contribution, *but only for refinanced loans* during the first year of the borrower's ownership of the collateral property.  *See* A-3837; *see also* A-1965.  This section is designed to avoid abusive behavior by an existing borrower/property owner.  *See* A-1965.  The refinancing provision has no relevance to the underwriting of new loans such as the Surrey Loan at issue here. Since the Surrey Loan was not a refinancing, Section 105(A)(3) of the Guidelines is totally irrelevant, and the District Court committed an inexplicable error by grafting the 15% "cash equity" requirement from Section 105(A)(3) into Section 105(A)(2).  In fact, the only relevance of Section 105(A)(3) to this case is to demonstrate that Bank of America knew how to impose a "cash equity" requirement for specific types of loans, but did not do so for new loans like the Surrey Loan.[14]

---

(E.D.N.Y. Dec. 16, 1999) ("Although the Agreement is not a contract, principles of contract interpretation help elucidate its meaning").

[14]    Where a particular term is used in one provision of a contract, but excluded from other provisions, the exclusion of the term should be read as purposeful and intentional.  *See Bailey v. Fish & Neave*, 868 N.E.2d 956, 960 (N.Y. 2007) (declining to read language into one section of agreement where such language was used elsewhere in agreement, but not in section at issue); *Novella v. Westchester Cnty.*, 661 F.3d 128, 142 (2d Cir. 2011) ("the presence of that

Moreover, there was substantial evidence in the record, both from an expert and from fact witnesses, that under the Guidelines and under industry standards, the part of the purchase price of the Properties above the 85% bank loan could be in the form of personal notes from parties like the Carlins.  Expert opinion: *see, e.g.,* A-1967 (Bank of America's expert, Timothy Dwyer, explained that a promissory note executed by the principals of the borrower is an acceptable form of equity).  Fact witness testimony: *see, e.g.*, A-2893 at 51:4-25 (Bank of America's closer, Andrew Baltz, testified that a promissory note such as the Carlin Note is considered an acceptable form of equity in the transaction to a bank); A-4033 at 109:15-25 (Borrower's attorney, Zalman Schochet, testified that the Carlin Note "is similar to a purchase money mortgage . . . it's basically if somebody decides to sell a business or a property and they're [going to] hold the note or the mortgage, basically you reference it in a promissory note, because it's still an obligation . . . . There is still an obligation from the [Borrower's] principals to basically pay the difference"); A-4037 at 158:18-59:8 (Schochet testified that there

---

provision applicable to one type of pension makes clear that the omission of that provision in the part of the Plan governing another type of plan was deliberate"); *United Bhd. of Carpenters & Joiners of Am., Local Union No. 747 v. Stone & Webster Eng'g Corp.*, 808 F.2d 5, 7 (2d Cir. 1986) (declining to read word "local" into one clause of agreement where term was used elsewhere in contract but not in clause at issue); *Beacon Hill CBO, II, Ltd. v. Beacon Hill Asset Mgmt. LLC*, 314 F. Supp. 2d 205, 212 (S.D.N.Y. 2003) (declining to read term from one provision of contract into separate provision that did not include the same term).

was nothing unusual about the Borrower's principals contributing the Carlin Note towards the purchase of the Properties).  The District Court's failure to credit this evidence, and its baseless and incorrect finding that Bank of America's Guidelines required cash currency contributions of 15% for all new loans, is clear reversible error.

One of the fundamental misconceptions in the District Court's Summary Judgment Order is its misunderstanding of the purpose of the 85% loan amount limitation in Section 105(A)(2).  This provision simply requires that the bank provide no more than 85% of the purchase price of a new property to the buyer.  The remaining 15% of the purchase price is also paid, from a source other than the bank, to the seller.  In commercial real estate transactions, the seller can determine what form of compensation—for example cash or personal notes or tangible assets such as other real estate—it finds acceptable.  *See* A-4071 at 147:18-48:10 (Bank of America's expert Timothy Dwyer testified that Section 105(A)(2) refers only to an 85% loan amount limitation, not a requirement that a certain type of equity be contributed by the borrower to make up the remaining 15%).[15]  Here, the seller, EZ, agreed to accept a personal note from the Carlins, the

---

[15]    In concluding (incorrectly) that Section 105(A)(2) invariably required the remaining 15% to be made up by a *cash currency* contribution by the Borrower, the District Court relied on the opinion of Plaintiff's expert, who opined that "cash equity," and therefore cash currency, was the required form of 15% equity because

owners of the Borrower, as a portion of the Properties' $45 million purchase price. There is absolutely nothing in Section 105(A)(2)—the Guideline relating to financing by Bank of America of 85% for new, or "acquisition," loans—that regulated what the *seller* could accept as compensation for the remaining 15% of the purchase price of a property. Nor is there anything surprising about this in a commercial real estate transaction.[16]

---

a cash currency contribution ensures that the borrower has "skin in the game." SPA-14. Plaintiff's expert purported to bolster this opinion by contending that Bank of America required the 15% equity to be in the form of cash currency under its own "Guidelines for acquisitions." A-255. The notion that the Borrower's principals here had no "skin in the game" is patently incorrect and inconsistent with Section 105(A)(2).

Here, the Carlin Note was executed by the three principals of the Borrower, who collectively had over 60 years of real estate investment and property management experience and a combined net worth of approximately $43.8 million. *See* A-2725. Moreover, the notion that the Carlins had no incentive to avoid defaulting on the Surrey Loan because they had not put a certain amount of cash currency into the transaction (*i.e.*, had no "skin in the game") is preposterous. The Carlins contributed a personal note of approximately $6.4 million backed by their significant personal assets as collateral. They therefore would and did have every incentive not to default on that note, as default would mean opening up their personal assets to provide $6.4 million in payment of the note and their losing a valuable income-generating portfolio of 23 apartment buildings worth $48.2 million. *See* A-2938.

[16]    As noted above, Section 105(A)(2), which governs acquisition loans, does *not even mention the phrase "cash equity,"* much less require it. *See supra* at 24. Rather, that section only requires that at least 15% of the purchase price be made up in a type of asset acceptable to the seller—be it cash, notes, or any other asset accepted by the seller, any one of which would, in fact, result in a borrower having "skin in the game" or a form of equity in the financed property. *See* A-4071 at 147:18-48:10 (Bank of America's expert Timothy Dwyer testified that Section

On the other hand, in Section 105(A)(3)—the Guideline applicable to

refinanced loans—Bank of America *did* have both an ability to insist on and an

---

105(A)(2) refers only to an 85% loan amount limitation, not a requirement that a certain type of equity be contributed by the borrower to make up the remaining 15%); A-1965 (Bank of America's expert, Timothy Dwyer, explained that, in contrast to Section 105(A)(3), Section 105(A)(2) does not require that a borrower have any specific kind of equity, such as "cash equity," in the transaction); A-1966 (Dwyer stated that Carlin Note constituted "equity"); A-1972 (Dwyer stated that the Borrower contributed "equity," principally in the form of the Carlin Note); A-2893 at 51:4-25 (Bank of America's closer, Andrew Baltz, testified that a promissory note such as the Carlin Note is considered an acceptable form of equity in the transaction to a bank); A-4187 at 47:14-20 (Michael Case, a director in Bank of America's Real Estate Structured Finance Group, testified that a promissory note is "an obligation or a commitment of equity into the transaction"); A-4033 at 109:15-25 (Borrower's attorney, Zalman Schochet, testified that the Carlin Note: "is similar to a purchase money mortgage . . . it's basically if somebody decides to sell a business or a property and they're [going to] hold the note or the mortgage, basically you reference it in a promissory note, because it's still an obligation. . . . There is still an obligation from the [Borrower's] principals to basically pay the difference"); A-4037 at 158:18—59:8 (Schochet testified that there was nothing unusual about the Borrower's principals contributing the Carlin Note towards the purchase of the Properties).

In any event, the District Court never explained why it was appropriate to: (i) consider extrinsic evidence on the meaning of Section 105(A)(2); or (ii) resolve conflicting expert testimony on this issue in Plaintiff's favor on a motion for summary judgment. Since Section 105(A)(2) plainly and unambiguously does *not* contain a "cash equity" requirement, the District Court should not have weighed extrinsic evidence regarding the meaning of Section 105(A)(2). *See Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's, London, Eng.*, 136 F.3d 82, 86 (2d Cir. 1998) (courts should not consider extrinsic evidence when evaluating unambiguous contract terms). Moreover, even if Section 105(A)(2) were ambiguous, the District Court should not have resolved the conflicting expert testimony on the meaning of this provision on a motion for summary judgment. *See Iacobelli Constr., Inc. v. Cnty. of Monroe*, 32 F.3d 19, 25 (2d Cir. 1994) (reversing grant of summary judgment for defendant where district court improperly rejected competing expert opinions of plaintiff's experts).

-30-

interest in what an *existing borrower* was doing in changing the capitalization of the loan in a refinancing within the first year of the loan.  Bank of America thus had a different Guideline with different requirements for such refinanced loans. The District Court effectively conflated the two provisions, not recognizing the different business considerations in the two fundamentally different types of business transactions (perhaps because it did not hold oral argument on the parties' motions for summary judgment).  The District Court failed to credit the evidence submitted by Bank of America that the use of non-cash compensation, such as personal notes as part of the required 15% of the purchase price, met industry standards and its own Guidelines.

Since Section 105(A)(2) does not contain a "cash equity" requirement for new loans (or any equity requirement, for that matter), and the 15% requirement was satisfied by the Carlin Note plus $700,000 in cash currency contributed by the Borrower at closing, Bank of America plainly did not violate its Guidelines, customary industry standards or RW-39, and the District Court's decision to grant summary judgment in Plaintiff's favor is reversible error.

**B.    The District Court Erred By Interpreting The Contested Meaning Of The Phrase "Cash Equity" On A Motion For Summary Judgment**

Even if Section 105(A)(2) of the Guidelines contained a 15% "cash equity" requirement for new, or "acquisition," loans (it does not), it was

nonetheless inappropriate for the District Court to grant summary judgment for

Plaintiff in light of the material dispute regarding the meaning of the phrase "cash

equity."  Bank of America's expert Timothy Dwyer explained that:

> [T]he industry generally defines "cash equity" as the
> difference between the purchase price of an asset, and the
> loan amount.  However, *the composition of cash equity*
> *does not, according to industry standards, need to consist*
> *of currency.   A promissory note, provided by the*
> *principals of a borrower in their personal capacity, can*
> *according to industry standards, also qualify as such*.

A-1967 (emphasis added).   Mr. Dwyer further testified that, because the Carlin

Note was provided by the principals of the Borrower in their personal capacities,

the Carlin Note (together with Borrower's cash deposit of $700,000 at closing)

qualified as "cash equity" and therefore satisfied any obligation to contribute such

"cash equity" under the Guidelines.   *See* A-4058 at 21:14-25; *see also* A-3024

(Carlin Note stated that "in no event shall [EZ] seek reimbursement from the

membership interests or the property contemplated in the [Assignment]"); A-2902

at 145:18-21 (Bank of America's closer, Andrew Baltz, testified that "[t]he cash

equity was the difference between the total costs, the loan which came to the

equity, you had promissory notes and then you had cash"); A-2903 at 149:22-25

(Baltz testified that "when this deal closed, it had cash equity in it"); A-4190 at

132:23-33:20 (Michael Case testified that Bank of America considered the Carlin

Note to be "cash equity"); A-4190 at  133:11-13 (Michael Case testified that "the

[Carlin Note] [was] the majority of the cash equity and the physical cash [was] a minority"). Thus, Bank of America, the non-moving party, submitted substantial evidence supporting its position that the Carlin Note qualified as "cash equity," even if Section 105(A)(2) could be read to require such a contribution.

While Plaintiff offered the opinion of its own expert that the phrase "cash equity" refers exclusively to cash currency (*see* A-1617), that testimony merely created a disputed issue of material fact regarding the meaning of this industry term of art. In light of this dispute, the District Court should have denied Plaintiff's motion for summary judgment for this reason as well and allowed the conflicting evidence to be resolved at trial. Instead, the District Court improperly rejected or ignored the fact and expert testimony submitted by Bank of America, and concluded *as a matter of law* that "cash equity" can only mean a down payment of cash currency. *See* SPA-18 ("'cash equity' means what the term denotes—a cash contribution to the subject asset").[17]

---

[17] The District Court relied on Plaintiff's expert's testimony that, "without some form of equity invested in the property, due to the non-recourse nature of CMBS loans, the borrower will not have an asset behind the loan." SPA-15 n.9. While it is true that the Surrey Loan was non-recourse, the District Court ignored the fact that the Carlin Note was executed by the principals of the Borrower in their personal capacities and, as a note, was more easily enforceable than a recourse loan. The Carlin Note for $6.4 million was backed by the Carlins' significant personal assets as collateral for the down payment and ensured that all of the principals of the Borrower had "skin in the game."

The District Court's weighing of the parties' conflicting evidence (including testimony by an expert and fact witnesses) on the meaning of "cash equity" and resolution of that conflict in Plaintiff's favor on a motion for summary judgment was plainly improper. *See, e.g., Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that '[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are . . . not for the court on a motion for summary judgment'") (citation omitted); *Ideal Steel*, 652 F.3d at 326 (same) (citation omitted); *Lucente v. IBM Corp.*, 310 F.3d 243, 255 (2d Cir. 2002) (reversing grant of summary judgment for plaintiff where "district court resolved numerous factual discrepancies in [plaintiff's] favor" and, in doing so, "usurped the jury's province as fact-finder").[18]

In addition, in ruling that Mr. Dwyer's testimony on the meaning of the phrase "cash equity" was "belied by common sense, the record, and the testimony of its own employees" (SPA-16), the District Court simply ignored the voluminous evidence in the record that supported Mr. Dwyer's testimony. *See* A-

---

[18]    In particular, "[t]he credibility of competing expert witnesses . . . is a matter for the [factfinder], and not a matter to be decided on summary judgment." *Scanner Techs. Corp. v. Icos Vision Sys. Corp.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003); *see also Rand v. Volvo Fin. N. Am.*, No. 04-CV-00349 DLI KAM, 2007 WL 1351751, at *3 (E.D.N.Y. May 8, 2007) ("It is not for the court to decide which expert opinion is more persuasive"); *Den Norske Bank AS v. First Nat'l Bank of Boston*, 75 F.3d 49, 58 (1st Cir. 1996) ("At summary judgment . . . courts normally assume that the trier of fact would credit the expert testimony by the nonmovant").

2902 at 145:18-21 (Bank of America's closer, Andrew Baltz, testified that "[t]he cash equity was the difference between the total costs, the loan which came to the equity, you had promissory notes  and then you had cash"); A-2903 at 149:22-25 (Baltz testified that, "when this deal closed, it had cash equity in it"); A-4190 at 132:23-33:20 (Michael Case testified that Bank of America considered the Carlin Note to be "cash equity"); A-4190 at 133:11-13 (Michael Case testified that "the [Carlin Note] [was] the majority of the cash equity and the physical cash [was] a minority").[19]  Thus, Mr. Dwyer's opinions were supported by substantial evidence in the record, and the District Court clearly erred in rejecting those opinions and determining, as a matter of law, that "cash equity" could only mean hard cash currency.[20]

---

[19]    While certain decisions have held that a party may not avoid summary judgment by submitting an expert opinion that is not supported by facts in the evidentiary record (*see, e.g., Travelers Cas. & Sur. Co. v. Dormitory Auth.—St. of N.Y.*, 735 F. Supp. 2d 42, 65 (S.D.N.Y. 2010)), those decisions have no bearing here, where Mr. Dwyer's testimony was supported by substantial evidence in the record as cited above.  *See Iacobelli*, 32 F.3d at 25.

[20]    The District Court's decision to reject Mr. Dwyer's expert opinion was also improper because the District Court failed to analyze that testimony under the *Daubert* standard, much less determine that Mr. Dwyer lacked the necessary qualifications or that his opinion was inherently unreliable under the *Daubert* standard.   *See Iacobelli*, 32 F.3d at 25 (holding that district court improperly disqualified affidavits of defendants' experts, even when it subjected them to a *Daubert* analysis, because those affidavits "did not present the kind of 'junk science' problem that *Daubert* was meant to address," but rather explained "which documents were reviewed, relevant industry customs and practices, and the general

**POINT II**

**THE DISTRICT COURT ERRED BY CONCLUDING THAT BANK OF AMERICA VIOLATED CUSTOMARY INDUSTRY STANDARDS AS A MATTER OF LAW**

In evaluating whether Plaintiff was entitled to judgment as a matter of law on its claim that Bank of America violated RW-39, the District Court was required to determine whether Plaintiff established that Bank of America's origination of the Surrey Loan failed to meet "customary standards utilized by prudent commercial or multifamily, as applicable, lenders and servicers." SPA-12; *see also* A-2493. In addressing this issue, the District Court conflated internal guidelines with industry standards and stated that "courts have considered internal guidelines as relevant equivalents to industry standards," and then concluded that the evidence supporting Plaintiff's assertion that Bank of America deviated from its own internal Guidelines (by originating the Surrey Loan without requiring the Borrower to contribute 15% "cash equity") was sufficient to establish a violation of customary industry standards under RW-39. SPA-19.

---

bases for their opinions" and came to different conclusion than plaintiff's experts) (citation omitted); *see also Bynoe v. Target Corp.*, 548 F. App'x. 709, 711-12 (2d Cir. 2013) (Summary Order) (reversing grant of summary judgment for defendant where district court "did not explicitly engage in a *Daubert* analysis when it rejected [plaintiff's expert's] opinion, as a result it appears to have either missed the point of certain of [the expert's] findings and conclusions, or failed to view them in the light most favorable to the plaintiff").

-36-

Even if Bank of America had deviated from its Guidelines in connection with the origination of the Surrey Loan, however (it did not), such a violation does not establish a breach of customary industry standards and the District Court's contrary conclusion should be reversed.

Numerous decisions have recognized that, while evidence of a deviation from a company's internal guidelines can be admissible on the question of whether there was a violation of customary industry standards, such evidence is not dispositive, and does not by itself establish that customary industry standards have been violated as a matter of law. *See* A-4813-14 (U.S. District Court for the Western District of Oklahoma denying Plaintiff's motion for summary judgment on a substantially similar representation and warranty and stating that "the Ohio court's ruling that violations of internal guidelines is competent evidence does not support a ruling in Plaintiff's favor that proof of internal guidelines is conclusive evidence that customary industry-wide standards were also violated"); *Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014, 1031 (S.D. Ohio 2009) (determining that evidence that defendant did not meet its own internal underwriting guidelines was "competent" but not dispositive evidence of a breach of industry standards).[21]

---

[21]    In *LaSalle Bank National Association v. Lehman Brothers Holdings, Inc.*, 237 F. Supp. 2d 618 (D. Md. 2002), the court granted summary judgment in the

The reasoning of these decisions is sound, as the representation and warranty at issue in each case required compliance with customary industry standards, *not* non-binding internal guidelines that can vary by lending institution and its goals in creating financial products and by the type of loan. The District Court also erred by ignoring evidence demonstrating that internal Guidelines were not hard and fast rules, but rather expressly gave Bank of America the ability to make exceptions where appropriate. *See* A-3921-23 (Section 702.6 of the Guidelines section providing for exceptions); A-1966 (Dwyer stated that Bank of America's "Guidelines are, as the name implies, guidelines, and judgment must be used in applying them. Exceptions to guidelines are common. In fact, the Guidelines and Procedures clearly delegate authority to the credit risk management team to approve 'non-conforming' loans that exceed the stated guidelines"); A-

---

plaintiff's favor on its claim that defendant's underwriting practices violated both its own internal guidelines and customary industry standards. However, in *Lehman*, the defendant's expert offered *no opinion whatsoever* as to whether defendant's underwriting practices "were prudent and met customary standards." *Id.* at 630-31. Here, unlike in *Lehman*, Bank of America's experts explained that Bank of America's underwriting and closing of the Surrey Loan met customary industry standards. *See* A-1938 (Bank of America's expert Timothy Dwyer opined that Bank of America's underwriting of the Surrey Loan was "in accordance with then-prevailing customary industry standards"); *see also* A-1960-82 (Timothy Dwyer addressed each of Plaintiff's allegations under RW-39 and explained in detail how Bank of America's underwriting practices with respect to the Surrey Loan complied with customary industry standards); A-1903-08 (Bank of America's expert, Amanda Demers, opined that the Surrey Loan "was closed in a manner consistent with customary industry standards").

-38-

2270 (Bank of America's servicing expert stated that guidelines vary from institution to institution and that deviations and exceptions to such guidelines are customary in the commercial lending industry); A-3066-67 at 24:3-26:2, A-3070-71 at 57:18-59:14 (Bank of America's underwriter, Linda Gallagher, testified that exceptions to the guidelines could be made in the course of underwriting a loan if the credit approval team approved the exception).[22]  Plaintiff's own expert witness on origination and underwriting also conceded that such exceptions can be made to a lender's internal guidelines and still be consistent with customary industry standards if those exceptions are disclosed.  *See* A-3981 at 149:11-25.[23]  Thus,

---

[22]    Strangely, the District Court also recognized at one point in its Summary Judgment Order that Bank of America's "internal guidelines are neither law, nor integrated contractual terms of the [MLPA]," and that Bank of America "was of course free to deviate from its own standards in its origination of the Loan," but later ignored this fact.  SPA-18.

[23]    In equating Bank of America's Guidelines with customary industry standards, the District Court relied upon testimony from Mr. Dwyer that, "at least with respect to underwriting, [Bank of America's] [G]uidelines appear to be 'by and large' consistent with industry standards."  SPA-19-20 n.12.  The District Court's reliance on this testimony is misplaced.  The phrase "by and large consistent" does not mean that Bank of America's Guidelines were identical to industry standards.  It means only that, in general, Bank of Americas Guidelines would not permit practices that would violate industry standards.  Guidelines for some institutions are more stringent than industry standards.  Indeed, as Bank of America's expert Timothy Dwyer testified, "there were [other lending institutions] that were doing up to one hundred percent loan-to-value transactions at the time and were successfully selling [those loans] into the market."  A-4071 at 146:10-14.  Thus, guidelines can be more stringent than industry standards where an institution has determined that its own business strategy or judgment calls for it, and therefore

contrary to the District Court's conclusion, a mere deviation from or exception to Bank of America's internal Guidelines does not by itself  demonstrate a violation of customary industry standards.  The evidence submitted by Bank of America created a genuine issue of material fact regarding whether, even if Bank of America failed to comply in all respects with its Guidelines, that fact established a lack of compliance with customary industry standards and therefore RW-39.  For this reason as well, the District Court erred by granting summary judgment in Plaintiff's favor.

The District Court's Summary Judgment Order should be reversed for the reasons discussed above, each of which is a separate and independent basis for reversal.  *See supra* at Points I-II.  Assuming that this Court finds that the Summary Judgment Order should be reversed, it need not reach the District Court's errors with respect to the calculation of Plaintiff's alleged damages.  On the other hand, if this Court affirms the Summary Judgment Order, this Court should correct the District Court's errors in calculating Plaintiff's alleged damages, as discussed below.  *See infra* at Point III.

---

guidelines can be both different from, and at the same time consistent with, industry standards.

**POINT III**

**THE DISTRICT COURT ERRED BY INCORRECTLY CALCULATING DAMAGES AND IMPROPERLY AWARDING STATUTORY PREJUDGMENT INTEREST**

The MLPA and PSA provide that requiring Bank of America to either cure a material breach or repurchase a defective loan at the related "Purchase Price" are Plaintiff's "sole remedies" for any breach by Bank of America of its obligations under the MLPA. *See* A-7231 § 2.03(h) ("The [MLPA] provides the *sole remedy* available to the Certificateholders, or the Trustee on their behalf, respecting any Breach . . . with respect to Mortgage Loans sold by [Bank of America]") (emphasis added); A-7240 § 4(c) ("it is understood and agreed that the obligations of [Bank of America] . . . to cure a Material Breach or a Material Document Defect or repurchase or replace the Defective Mortgage Loan(s), constitute the *sole remedies* available to [Plaintiff] with respect to any Breach or Document Defect") (emphasis added).[24]  The PSA further provides that, if a court orders Bank of America to make a "Loss of Value Payment" in lieu of

---

[24]    As a matter of law and logic, the remedy of repurchase (*i.e.*, specific performance) is only available where the loan at issue is still in existence.  Here, that remedy is unavailable (and indeed impossible) because the mortgage securing the Surrey Loan has been foreclosed and the Properties have been sold.

repurchasing a loan, such "Loss of Value Payment" shall be Plaintiff's "*sole remedy*" for the breach.  *See* A-7232 § 2.03(i) (emphasis added).

If Bank of America repurchases one of the 2007-5 Loans or is ordered to make a Loss of Value Payment, the PSA provides a detailed "Purchase Price" formula for calculating the amount to be paid:

> a price equal to the unpaid principal balance of the [loan] as of the date of purchase, together with (a) all accrued and unpaid interest . . . on the [loan] at the related Mortgage Rate . . . [and other fees but no mention of other types of interest]

A-2507.  Thus the Purchase Price formula includes unpaid principal plus accrued and unpaid interest at the Mortgage Rate but does *not* provide for the payment of prejudgment interest on a defaulted loan.

On February 6, 2014, the District Court determined, pursuant to Section 2.03(i) of the PSA, that Plaintiff's "sole remedy" for Bank of America's breach of RW-39 was a "Loss of Value Payment."  *See* SPA-31.  Despite its recognition that the PSA contained a detailed methodology for calculating this "Loss of Value Payment" which did *not* provide for the payment of prejudgment interest (but did provide for contract interest), the District Court determined that Plaintiff was entitled to recover statutory prejudgment interest under N.Y. C.P.L.R. 5001(a).  *See* SPA-33-34.

On April 11, 2014, the District Court determined that Plaintiff was entitled to include in its calculation of the "Purchase Price" of the Surrey Loan more than $1.7 million in contract interest that had accrued between December 2008 and August 24, 2009, as well as $300,000 in servicing expenses that had accrued during that time period, despite the fact that Bank of America had made payment for this interest and expenses as they became due. *See* SPA-39-40.

Both the District Court's calculation of damages and its decision to award Plaintiff statutory prejudgment interest were flatly inconsistent with the exclusive, "sole remedy" the parties expressly agreed upon in the PSA for a breach of RW-39, and the District Court's rulings on both damages and prejudgment interest should be reversed.

**A.    The District Court Erred By Ruling That Plaintiff Was Entitled To Include In Its "Purchase Price" Calculation More Than $2 Million In Contract Interest And Servicing Expenses That Bank Of America Advanced Prior To August 24, 2009**

In its submissions to the District Court regarding the calculation of damages under the "Purchase Price" formula set forth in the PSA, Plaintiff asserted that it was entitled to recover $1,703,324.36 in monthly mortgage interest payments for the period between December 2008 (when the Borrower initially defaulted on the Surrey Loan) and August 24, 2009 (when Plaintiff first demanded that Bank of America repurchase the Surrey Loan), as well as $313,795.77 in

servicing expenses that accrued during that time period.  *See* A-7365; A-7371; A-7441.  The District Court granted Plaintiff's request to include these amounts in its calculation of the "Purchase Price" of the Surrey Loan on August 24, 2009, which correspondingly allowed Plaintiff to recover prejudgment interest on these amounts from August 24, 2009 until the date of Judgment.  *See* SPA-39-40, 43.  In total, this resulted in Plaintiff recovering an additional $800,000 in prejudgment interest in the Judgment.  *See* A-7381-82.

The District Court's decision to allow Plaintiff to recover in the Judgment contract interest and servicing expenses that accrued prior to August 24, 2009, as well as prejudgment interest on those amounts, was improper because there is no dispute that Bank of America had advanced payment for all such interest and servicing expenses as they became due to the Trust.  *See* A-7365 (Plaintiff conceded that "it is true that [Bank of America] in its capacity as the Master Servicer for Plaintiff (not Mortgage Loan Seller), advanced such funds . . ."); A-7441 (Plaintiff conceded that Bank of America advanced payment for contract interest and servicing expenses as they became due and prior to August 24, 2009).  Since Bank of America advanced interest and servicing expenses to the Trust during the relevant time period, the Trust was not deprived of any funds it was due (or the time value of such funds), and it was unfair and unreasonable to include those amounts in the calculation of the "Purchase Price" of the Surrey

Loan as of August 24, 2009.  For Plaintiff to recover such already paid expenses, as well as more than $800,000 in prejudgment interest on those expenses, would result in Bank of America paying prejudgment interest on those expenses for a time period when the Trust had already been paid and was not losing the time value of such payments.[25]  Accordingly, the Judgment entered by the District Court should be reduced by a total of $2,864,642.17 ($2,017,120.13 for the total "Accrued and Unpaid Interest" and "Servicing Advances" improperly included in the Purchase Price of the Surrey Loan as of August 24, 2009, and $847,522.04 in statutory prejudgment interest on that amount from August 24, 2009 through April 24, 2014).[26]

---

[25]    Significantly, the District Court had previously recognized that, "[b]ecause prejudgment interest functions to compensate a party for lost use of money it is owed, [Plaintiff] is not entitled to prejudgment interest on any amount of money that it had already recovered."  SPA-37.  Under its own rationale, it was plainly improper for the District Court to allow Plaintiff to recover prejudgment interest on the over $2 million that Bank of America had already advanced, because there was no "lost use of money it [was] owed."

[26]    While Plaintiff asserted that it was entitled to include the more than $2 million in contract interest and servicing expenses in its "Purchase Price" calculation because those amounts were advanced by Bank of America in its role as Master Servicer, rather than its role as Mortgage Loan Seller (*see* A-7441-42), that argument is specious.  There is no debate that the Trust received payment for these expenses as they became due, and Plaintiff obviously should not be able to recover such amounts (or prejudgment interest on those amounts) as damages in this action.  The purported role occupied by Bank of America when it advanced payment for those amounts is irrelevant.

In the alternative, if this Court determines that Plaintiff was entitled to include the aforementioned "accrued and unpaid" contract interest in its Purchase Price Calculation as of August 24, 2009 (it was not), Bank of America at the very least should be credited with $893,482.36 in revenues generated by the Properties between the date of Plaintiff's repurchase demand and March 17, 2011, which were improperly excluded from Plaintiff's "Reconciliation of Funds Received and Applied." *See* A-7372. While Plaintiff asserted in a footnote to its Reconciliation that "[t]otal outstanding servicing expenses prior to 06/05/2012 exceeded funds received" (*see* A-7372), Plaintiff failed to explain why Bank of America should not receive credit for the $893,482.36 in revenues generated prior to March 2011 when all of the related expenses incurred during that time period appear to have been included as "Servicing Expenses" in Plaintiff's Purchase Price Calculation. *See* A-7372; A-7445.[27] Thus, the Total Liquidation Proceeds entry on Plaintiff's Purchase Price Calculation should have been increased from $20,099,542.52 to $20,993,024.88, which would result in a corresponding reduction in the Judgment amount. The "Excess Funds Not Used Towards Property/Loan Costs" entry for

---

[27] Plaintiff conceded that the June 5, 2012 Net Property Cash Flow entry for $1,150,841.56 in its Reconciliation "reflects the total amount of net cash flow received between December 9, 2011 and June 5, 2012. . ." A-5012 ¶ 22. It is therefore clear that the $893,482.36 in income generated by the Properties on or before March 17, 2011 is not included in Plaintiff's Reconciliation of Funds Received and Applied.

-46-

June 5, 2012 in Plaintiff's prejudgment interest calculation should have also been increased from $2,944,558.55 to $3,838,040.91, which would result in a reduction of $140,998.86 in the total prejudgment interest awarded to Plaintiff in the Judgment.

## B. The District Court Erred By Awarding Plaintiff More Than $14 Million In Statutory Prejudgment Interest

Pursuant to N.Y. C.P.L.R. 5001(a), a plaintiff that prevails on a breach of contract claim governed by New York law is ordinarily permitted to recover prejudgment interest on the sum awarded.  N.Y. C.P.L.R. 5001(a) (McKinney 2007 & Supp. 2014) ("Interest shall be recovered upon a sum awarded because of a breach of performance of a contract").  However, parties to a contract governed by New York law may "'chart their own course'" and agree to a damages remedy that does *not* include prejudgment interest.  *J. D'Addario & Co. v. Embassy Indus., Inc.*, 980 N.E.2d 940, 943 (N.Y. 2012) (*quoting Town of Orangetown v. Magee*, 665 N.E.2d 1061, 1069 (N.Y. 1996)).

*J. D'Addario* is instructive.  In that case, the parties entered into a real estate contract that expressly provided that the seller's "sole remedy" in the event of a breach by the buyer was to retain the buyer's $650,000 down payment, together with any bank-accrued interest on the down payment.  980 N.E.2d at 941. After the buyer failed to close on the transaction, it commenced an action to

recover its down payment from escrow, but the Supreme Court of the State of New York, Suffolk County, ruled in favor of the seller and awarded the seller the full down payment plus 9% statutory prejudgment interest under N.Y. C.P.L.R. 5001(a).  *Id.* at 942.  The Appellate Division, Second Department, modified the judgment to vacate the award of prejudgment interest, and the New York Court of Appeals affirmed.  In determining that the seller was not entitled to recover statutory prejudgment interest under N.Y. C.P.L.R. 5001(a), the Court of Appeals relied primarily on the fact that the parties' contract expressly provided a "sole remedy" that provided interest pursuant to contract and did not provide for prejudgment interest.  *Id.* at 943; *see also Nuera Commc'ns, Inc. v. Telron Commc'ns USA, Inc.*, No. 00 Civ. 967, 2002 WL 31778796, at *3 (S.D.N.Y. Nov. 15, 2002) ("If the contract provides a rate at which interest is to be calculated, then the contractual rate, rather than the statutory rate of nine percent per year as set forth in CPLR Section 5004, governs").  The Court of Appeals also made clear that a contract need not expressly waive the ability to recover prejudgment interest.  *J. D'Addario*, 980 N.E. at 2d at 943 ("[Plaintiff's] contention that the contract never expressly mentioned statutory interest, and that therefore their right thereto was not waived, is unpersuasive").

Here, as in *J. D'Addario*, the contracts governing the 2007-5 Securitization contain language describing Plaintiff's "*sole remedy*" in the event of

-48-

a breach of an RW by Bank of America, and that "sole remedy" does *not* provide for the recovery of statutory prejudgment interest.  Section 4(c) of the MLPA provides that requiring Bank of America to either cure or repurchase an allegedly defective mortgage loan at the Purchase Price "constitute the sole remedies available to [Plaintiff] with respect to any Breach."  A-2462.[28]  Section 2.03(i) of the PSA further provides that a "Loss of Value Payment" is Plaintiff's "*sole remedy*" if Bank of America is ordered to make a cash payment in lieu of repurchasing a defective mortgage loan.  *See* A-7232 ("Provided that such Loss of Value Payment is made, *the Loss of Value Payment shall serve as the sole remedy available to Certificateholders and the Trustee on their behalf* regarding any such Material Breach or Material Defect . . .") (emphasis added).

The District Court ruled that any "Loss of Value Payment" ordered under Section 2.03(i) of the PSA must be calculated pursuant to the detailed "Purchase Price" formula which is described as the sole remedy in the PSA, and that formula provides for all accrued and unpaid contract interest at the rate provided in the promissory note related to the Surrey Loan (approximately 6%) up to the time of payment and does not provide for statutory interest for the same

---

[28]    Section 2.03(h) of the PSA confirms that "[t]he [MLPA] provides the sole remedy available to the Certificateholders, or the Trustee on their behalf, respecting any Breach or Document Defect with respect to Mortgage Loans sold by [Bank of America]."  A-7231.

period. *See* SPA-34; A-7230; A-2507.[29]  Thus, as in *J. D'Addario*, the parties

expressly agreed to a mechanism to provide Plaintiff with a meaningful rate of

interest on any amounts in dispute, so that Plaintiff would receive "compensation

for the deprivation of its use of the money."  980 N.E.2d at 943.  As in *J.

D'Addario*, the Court should enforce the terms of the parties' agreement, and

reverse the District Court's adoption of the statutory prejudgment interest rate

instead of the agreed-upon contract interest rate.[30]

---

[29]    The PSA generally defines the term "mortgage rate" as the rate specified in
the applicable mortgage or promissory note.  *See* A-5007 ¶ 12 (Michael Nikula,
Plaintiff's corporate representative who prepared Plaintiff's Purchase Price
calculation for the Surrey Loan, stated that he calculated accrued and unpaid
interest according to the interest rate set forth in the Second Amended Promissory
Note).  The Second Amended Promissory Note between Bank of America and
Borrower regarding the Surrey Loan establishes an interest rate of
6.01935483388387%.  *See* A-335.  By applying the 9% statutory prejudgment
interest rate under N.Y. C.P.L.R. 5004 instead of the contract rate, the District
Court improperly penalized Bank of America in the Judgment by more than $4.7
million.

[30]    The District Court's statement that Plaintiff "did not agree to any limits on
how the Court is to calculate the amount of the [Loss of Value P]ayment" (SPA-
31) ignores both the language of Section 2.03 of the PSA as well as the District
Court's own conclusion that Plaintiff's damages must be calculated using the
"Purchase Price" formula set forth in the PSA.  The District Court repeatedly
found that a Loss of Value Payment calculated by use of the purchase price
formula was appropriate in its Orders regarding the calculation of damages in this
action.  *See* SPA-25 (referencing the "purchase price" as the starting point for "the
appropriate damages calculation"); SPA-34 ("[Plaintiff] is entitled to . . . the
purchase price as a remedy for Bank of America's breach"); SPA-38-39 (analyzing
the elements of the "purchase price").  The District Court's assertion in the PJI
Order that it effectively had unfettered discretion in calculating the amount of the

In reaching its conclusion that Plaintiff was entitled to statutory prejudgment interest under N.Y. C.P.L.R. 5001(a), the District Court relied heavily on *Katzman v. Helen of Troy Tex. Corp.*, No. 12 CV 4220, 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013).  *See* SPA-30-31.  That decision, however, is inapposite, and the District Court's reliance on it was misplaced.  In *Katzman*, the sellers in a merger transaction sued the buyer, claiming that the buyer had improperly refused to release approximately $12 million from an escrow account related to the sale. 2013 WL 1496952, at *1.  The buyer asserted that the sellers were not entitled to prejudgment interest on the amounts improperly held in escrow because an indemnification provision in the merger agreement provided that it contained the "sole remedies" for the parties after the closing of the merger.  *Id.* at *4.  The court rejected this argument and allowed the sellers to recover prejudgment interest because: (i) the "sole remedies" included in the indemnification provision of the merger agreement were designed to address breaches of contract by the sellers (not the buyer); and (ii) the "sole remedies" were designed to address pre-closing misconduct (not the post-closing misconduct at issue).  *Id.* at *5.  Thus, the court in *Katzman* distinguished *J. D'Addario*.  The parties in *Katzman* did not expressly

---

Loss of Value Payment is inconsistent with other parts of its opinion as well as the parties' agreements (which the New York Court of Appeals has stated "will always control").  *See J. D'Addario*, 980 N.E 2d at 944.

anticipate a particular form of breach and agree upon an exclusive remedy for that breach.  *Id.* at *6.

Bank of America and Plaintiff expressly anticipated a particular form of breach by Bank of America (*i.e.*, a breach of one of the RWs in the MLPA), and, as the District Court found, agreed upon an exclusive remedy for Plaintiff for that type of breach (*i.e.*, a Loss of Value Payment calculated using the detailed Purchase Price formula set forth in the PSA).[31]  Importantly, the sole remedy provided for contract interest.  Thus, this case both falls squarely under the rule of *J. D'Addario* and is easily distinguishable from *Katzman*.[32]

---

[31]    In its PJI Order, the District Court acknowledged that the use of the phrase "sole remedy" "*may* operate to waive prejudgment interest, where the parties 'chart their own course' by designing a remedy that otherwise compensates the nonbreaching party for lost use of the money she is owed (*e.g.*, interest on an escrowed sum)."  SPA-32 (emphasis in original).  Inexplicably, the District Court went on to conclude that the parties here "did not 'chart their own course,'" a ruling that simply cannot be squared with the facts.  Here, as in *J. D'Addario*, the parties designed and agreed to a remedy that compensated Plaintiff for the lost use of the money it was owed during any dispute (contract interest at 6% on the loan balance), and, by agreeing to that term, the parties "chart[ed] their own course."  980 N.E.2d at 941-42.

[32]    In addition, to the extent *J. D'Addario* and *Katzman* differ, the documents here require the application of New York law, and the authority from the Court of Appeals in *J. D'Addario* is binding precedent under New York law and a higher authority with respect to New York law than the federal district court in *Katzman*.

## <u>CONCLUSION</u>

For the foregoing reasons, Bank of America respectfully requests that the Summary Judgment Order and final Judgment entered by the District Court be vacated and that this case be remanded to the District Court.  In the alternative, Bank of America respectfully requests that the Court vacate the PJI Order and the Damages Calculation Order and reduce the Judgment by $7,607,736.03.

Dated:    New York, New York
          August 22, 2014

Respectfully submitted,

CADWALADER, WICKERSHAM & TAFT LLP

By:  /s/        *Gregory A. Markel*
        Gregory A. Markel
        *greg.markel@cwt.com*

One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Defendant-Appellant*
*Bank of America, N.A.*

-53-

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Gregory A. Markel, hereby certify that, pursuant to Fed. R. App. P. 32(a)(7)(C):

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,400 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 14 point Times New Roman.

Dated:   New York, New York
         August 22, 2014

                        /s/        *Gregory A. Markel*
                             Gregory A. Markel
                             *greg.markel@cwt.com*

SPECIAL APPENDIX

# TABLE OF CONTENTS

**PAGE**

Judgment, dated April 25, 2014 ........................................................ SPA-1

Memorandum and Order, dated March 28, 2013 ............................. SPA-3

Opinion and Order, dated February 6, 2014 ................................... SPA-27

Order, dated March 5, 2014 .......................................................... SPA-36

Order, dated April 11, 2014 .......................................................... SPA-38

**SPA-1**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
WELLS FARGO BANK, N.A., as Trustee for
the Registered Holders of Banc of America
Commercial Mortgage Pass-Through Certificates,
Series 2007-5, acting by and through its Special
Servicer C-III ASSET MANAGEMENT, INC.,

|  |  |
|---|---|
| | USDC SDNY |
| | DOCUMENT |
| | ELECTRONICALLY FILED  4/25/2014 |

10 **CIVIL** 9584 (JPO)

                 Plaintiff,

                 **JUDGMENT**

      -against-

BANK OF AMERICA, N.A.,

                 Defendant.
-----------------------------------------------------------X

       Whereas the parties having previously moved for entry of final judgment calculated in

accordance with the Court's March 5, 2014 Order (Doc. # 130), and the Court having handed

down its Order dated April 11, 2014 (Doc. # 136), which overlooked the fact that the parties had

both provided for periodic adjustments to the balance accruing prejudgment interest since

August 24, 2009, and Defendant Bank of America having moved for reconsideration of the April

11, 2014 Order (Doc. # 137), and this matter having been brought before the Honorable J. Paul

Oetken, United States District Judge, and the Court thereafter, on April 22, 2014, having

rendered its Order (Doc. # 141), granting Defendant's motion for reconsideration, calculating the

proper total judgment amount to be $39,905,024.56, and directing judgment be entered on April

25, 2014, and no objections having been filed by the parties, it is,

       **ORDERED, ADJUDGED AND DECREED:** that for the reasons stated in the

Court's Order (Doc. # 141), dated April 22, 2014, the proper amount of total judgment is

$39,905,024.56 ($39,842,087.76 total as of April 14, 2014 plus $62,936.80 in prejudgment

interest accumulated April 15 through 24, 2014).

**SPA-2**

**DATED:**  New York, New York
             April 25, 2014

**RUBY J. KRAJICK**
_____
**Clerk of Court**

**BY:**

_____
**Deputy Clerk**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :
WELLS FARGO BANK, N.A., as Trustee for the                  :
Registered Holders of Banc of America                       :
Commercial Mortgage Pass-Through Certificates,              :
Series 2007-5, acting by and through its Special            :
Servicer C-III ASSET MANAGEMENT, INC.,                      :        10 Civ. 9584 (JPO)
                                    Plaintiff,              :
                                                            :        MEMORANDUM AND
                                                            :        ORDER
                     -against-                              :
                                                            :
BANK OF AMERICA, N.A.,                                      :
                                    Defendant               :
                                                            :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

  Wells Fargo, N.A. ("Wells Fargo" or "Plaintiff"), as Trustee for the Registered Holders of

Banc of America Commercial Mortgage Pass-Through Certificates, Series 2007-5 ("the Trust"),

acting by and through its Special Servicer C-III Asset Management, Inc., brought this action

against Bank of America, N.A. ("BOA" or "Defendant") for breach of contract.  Before the Court

are Wells Fargo's motion for summary judgment, BOA's cross-motion for summary judgment,

and BOA's motion to preclude the Declaration of Michael Grant.  For the reasons that follow,

Wells Fargo's motion for summary judgment is granted, BOA's cross-motion is denied, and

BOA's motion to preclude the Grant Declaration is denied as moot.

**I.**  **Background**

  **A.**  **Factual Background**

    **1.**  **The Surrey Loan**

  This case concerns a loan in the amount of $39,977,571 ("the Loan") made by BOA to

Surrey Group, LLC ("Surrey"), evidenced by an "A-Note" in the amount of $37,179,141 and a

"B-Note" in the amount of $2,798,430.[1]  The Loan was for the purchase of twenty-three

multifamily buildings located in Hartford, Connecticut ("the Property").  The Loan was subject

to the Amended Restated Loan Agreement, dated February 5, 2007 ("the Agreement"), between

Surrey, as borrower, and BOA as lender.  BOA sold the A-Note to the Trust, pursuant to a

Mortgage Loan Purchase and Sale Agreement, dated December 1, 2007 ("the MLPSA").  The

MLPSA contained certain representations and warranties, the alleged breaches of which are the

subject of the instant case.

On January 1, 2009, Surrey defaulted on the Loan.  On or about August 24, 2009, and

February 8, 2010, Plaintiff gave written notices to BOA of alleged Material Breaches of the

various Warranty Representations ("Reps") in the MLPSA.  Pursuant to Section 2.03 of the

Pooling Services Agreement ("PSA"), Plaintiff requested that BOA either cure the breaches or

repurchase the A-Note portion of the Surrey Loan.  To date, BOA has denied that it breached any

Rep and contends that it has no obligation to cure or repurchase the A-Note.

**2.      The Trust**

On or about December 1, 2007, BOA sold the Loan, along with many other commercial

loans, to Banc of America Commercial Mortgage, Inc. ("BACM") pursuant to the MLPSA.

Pursuant to the PSA, BACM sold and transferred to the Trust 100 commercial real estate

mortgage loans, which also included the Loan.  The PSA, dated December 1, 2007, governed the

Loan.  As a general rule, a trust such as the one at issue here issues bonds or certificates

"represent[ing] the beneficial ownership interests in the trust."   (Plaintiff's Memorandum of

Law in Support of its Motion for Summary Judgment, Dkt. No. 74 ("Pl.'s Mem."), at 3.)

"Throughout the existence of the trust, the loans are serviced in accordance with the pooling and

---

[1] A-Notes are so called because they are less risky than B-Notes.  Losses on a mortgage are
allocated first to B-Note holders and then to A-Note holders.

servicing agreement or PSA." (*Id.*) Wells Fargo is the trustee for the Certificateholders and is acting by and through C-III Asset Management LLC ("C-III"), the special servicer responsible for servicing and administering those loans in the Trust that are in default. "C-III was appointed as special servicer in the 2007-5 Securitization by its affiliated investment fund." (Defendant's Memorandum of Law in Opposition, Dkt. No. 81 ("Def.'s Opp."), at 1.)

### 3.    The Assignments Preceding the Loan

The aforementioned Loan giving rise to the instant suit possesses a complex history. The facts regarding the assignments preceding the Loan are undisputed. The extent to which BOA knew of the nature of the dealings in the months before it agreed to finance the Property, however, is hotly contested, and largely forms the subject of the pending cross-motions for summary judgment.

In December 2004, Coolidge Benton LLC, Coolidge Forrest LLC and Coolidge Woodland LLC (together, "Coolidge") purchased the Property for $32,626,249. (Plaintiff's Statement of Material Facts, Dkt. No. 75 ("Pl.'s SMF"), at ¶ 18.) In 2006, Coolidge offered the Property for sale for a price of $36,775,000. (*Id.* at ¶ 20.) In September 2006, one Martin Carlin ("Carlin") agreed to purchase the Property from Coolidge for $35,000,000. This purchase was governed by an Agreement of Purchase and Sale (the "Purchase Contract"). BOA contends that there are two versions of the Purchase Contract, noting that it received only a redacted version of that agreement, and thus, was unaware that Carlin was a party to this first sale. (Defendant's Statement of Material Facts, Dkt. No. 83 ("Def.'s SMF"), at ¶ 21, n. 2.)

Soon after entering into the Purchase Contract, Carlin ostensibly assigned the agreement to himself, by assigning it to an entity called EZ Building, LLC ("EZ"), which he created and claims to have owned. However, BOA underscores the fact that "[a]part from Carlin's

testimony, there is no evidence that he was a member of EZ; instead, Nelly Mendez formed EZ

and was the sole signatory on all EZ documents publicly available or in Bank of America's

possession." (*Id.* at ¶ 24 (citing Def.'s Ex. H[2] Assignment at WHC00000244 and 273; *see also*

Def.'s Ex. I; Def.'s Ex. M).) In actuality, Nelly Mendez was Carlin's girlfriend and secretary,

and, according to Plaintiffs and Carlin, she served as Carlin's strawperson. As BOA notes,

"[t]he organizational documents of EZ indicated that Nelly Mendez was the only member of

EZ." (*Id.* at ¶ 25; Def.'s Ex. M.) Additionally, "Nelly Mendez was the only signatory on the

Operating Account's Business Depository Resolution, which required the signature of *all*

members of EZ." (Def.'s SMF at ¶ 25; Def.'s Ex. AAAAA.)

     In October 2006, EZ assigned the right to purchase the Property to Surrey. Surrey's

ownership structure was as follows: Robert Sandell—Carlin's son-in-law—owned 24 percent;

Shawn Carlin—Carlin's son—owned 24 percent; Surrey Specialty Corp. owned 0.5 percent; and

Carlin owned 51.5 percent. The parties disagree as to whether there was consideration for the

assignment contract between EZ and Surrey. According to BOA, the Carlins executed a

$9,000,000 promissory note (the "Carlin Note"), which constituted an obligation to pay EZ by

the Carlins, and provided other valuable consideration for the assignment. (Def.'s SMF at ¶ 31.)

Wells Fargo notes that "[t]he purported consideration . . . was not interest bearing, was

unsecured, called for the full payment of the principal balance in one lump-sum payment in one

year, did not include any down-payments and included a calculation which provided credit for

the early payment of the note . . . ." (Pl.'s SMF at ¶ 32.) However, BOA underscores the

characterization of the Carlin Note as valid consideration, emphasizing that the Note "provided

---

[2] The exhibits attached to Defendant's opposition and cross-motion for summary judgment are
all attached to the Declaration of Jason M. Halper, Dkt. Nos. 88 and 97, and are cited as "Def.'s
Ex. _" throughout this opinion with corresponding letters.

that it was not secured by the Property or by the Carlins' membership interests in the Borrower," meaning that the Note was a "personal obligation of the Carlins, repayment of which was to be funded by the Carlins' personal assets rather than the income generated by the Property." (Def.'s Opp. at 6; Def.'s Exs. AA, II; Pl.'s Ex. 20).[3]

In December 2006, Surrey applied for $40,000,000 in financing with BOA to assist in the acquisition of the Property. Surrey, through the assignment contract between itself and EZ, represented to BOA that the purchase price of the Property was $45,000,000, evidencing this in an Agreement of Assignment and Assumption of Contract of Sale ("the Assignment Contract"), dated October 16, 2006. (Def.'s Opp. at 5.) The Assignment Contract was executed by Nelly Mendez, on behalf of EZ, and Carlin on behalf of Surrey, and referenced the Purchase Contract, between Coolidge as seller and EZ as assignee-purchaser. (Id.) Thus, according to BOA, there was no understanding that the assignments preceding the loan request were not at arms' length, as BOA had not received documents indicating that Carlin was on all sides of said transactions. In sum, according to BOA, Surrey's attorney "informed [BOA's] originator that the purchase price of the Property under the Agreement of Purchase and Sale between a prior owner and EZ was $35 million, and that EZ was assigning its rights under the Agreement of Purchase and Sale to the Borrower for an additional $10 million." (Id. at 6.)

The final Settlement Statement prepared by First American Title Company undisputedly states that the purchase price or consideration paid to Coolidge was $35,000,000. (Pl.'s Ex. 28.) Wells Fargo contends that this amount reflects the fact that Carlin artificially inflated the price of the Property through numerous assignments, and that BOA overfunded the Loan by providing

---

[3] The exhibits attached to Plaintiff's motion for summary judgment and reply memorandum all are attached to the Declaration of Colleen M. Mallon, Dkt. Nos. 76 and 95, and are cited as "Pl.'s Ex. _" throughout the this opinion with corresponding numbers.

nearly $40,000,000.00 in financing. (*See* Pl.'s Mem. at 6; Pl.'s SMF at ¶¶ 43, 44, 47, 52, 53.)

However, BOA contests this characterization, arguing instead that the Settlement Statement

"identifies the consideration as $35 million because under Connecticut state law, the real estate

conveyance tax was paid only on the $35 million amount and not on the $10 million

assignment." (Def.'s SMF at ¶ 48.) According to BOA, "[t]he evidence . . . demonstrates that,

[BOA] issued $39,977,571 in loan proceeds to assist [Surrey] in acquiring the Property (the fair

market value of which was $48.2 million) at a purchase price of $45 million." (Defendant's

Reply Memorandum of Law, Dkt. No. 96 ("Def.'s Rep.") at 22.)

###    B.    Procedural Background

Wells Fargo commenced this action against BOA on September 13, 2010. (Dkt. No. 1

("Compl.").) The Complaint was amended on January 6, 2012. (Dkt. No. 58 ("Am. Compl.").)

BOA answered on January 30, 2012. (Dkt. No. 65 ("Ans.").) On June 26, 2012, Wells Fargo

moved for summary judgment. (Dkt. No. 73.) On July 27, 2012, BOA opposed Wells Fargo's

motion and cross-moved for summary judgment. (Dkt. No. 80.) BOA also moved to preclude

the Declaration of Michael Grant. (Defendant's Memorandum of Law in Support of its Motion

to Preclude, Dkt. No. 78 ("Def.'s Mem. Prec.").) On August 13, 2012, Wells Fargo opposed

BOA's motion to preclude. (Dkt. No. 90 ("Pl.'s Opp. Prec.").) BOA replied to Wells Fargo's

opposition to the motion to preclude on August 23, 2013. (Dkt. No. 92 ("Def.'s Rep. Prec.").)

On September 4, 2012, Wells Fargo replied to BOA's opposition to Wells Fargo's motion for

summary judgment, and opposed BOA's cross-motion. (Plaintiff's Reply, Dkt. No. 93 ("Pl.'s

Rep.").) On October 5, 2012, BOA replied to Wells Fargo's opposition to BOA's cross-motion

for summary judgment. (Def.'s Rep.)

II.     **Discussion**

    A.     **Summary Judgment Standard**

    "Pursuant to Federal Rule of Civil Procedure 56, summary judgment 'is appropriate when the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Borghese Trademarks, Inc. v. Borghese*, No. 10 Civ. 5552, 2013 WL 143807, at *6 (S.D.N.Y. Jan. 14, 2013) (citation omitted).  The non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Ricci v. Stefano*, 557 U.S. 557, 586 (2009) (citation omitted).  An issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

    "It is the movant's burden to show that no genuine factual dispute exists," illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A movant does so by coming "forward with evidence on each material element of his claim or defense . . . ." *Figueroa v. Escourse*, No. 09 Civ. 8110, 2011 WL 2419866, at *1 (S.D.N.Y. June 6, 2011).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

    "On summary judgment the inferences to be drawn from the underlying facts contained in such materials must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).   A motion for summary judgment prevails "[o]nly when no reasonable trier of fact could find in favor of the nonmoving party." *White v. ABCO Engineering Corp.*, 221 F.3d 293 (2d Cir. 2000) (quoting *Taggart v. Time, Inc.*, 924 F.2d 43, 46 (2d Cir. 1991) (quotations omitted)); *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere

"conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary

judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S.

at 587); *see also Anderson*, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." (internal citations omitted)).

### B.    Breach of Contract

Wells Fargo moves for summary judgment on four contractual breaches of the Reps,

alleging multiple breaches of express warranties contained in the MLPSA.[4]  In response, BOA

moves for summary judgment on three of the alleged claims, contending that Wells Fargo cannot

prove a breach of those particular Reps.

#### 1.    Breach of Warranty

Wells Fargo asserts contract claims against BOA based on BOA's alleged breach of

express warranties contained in the Reps of MLPSA.  "Under New York common law, upon

showing that: (1) plaintiff and defendant entered into a contract; (2) containing an express

warranty by the defendant with respect to a material fact; (3) which warranty was part of the

basis of the bargain; and (4) the express warranty was breached by defendant, plaintiff is entitled

to be indemnified for any damages incurred as a result of such breach." *Promuto v. Waste*

*Management*, 44 F. Supp. 2d 628, 642 (S.D.N.Y. 1999); *accord Lasalle Bank Nat'l Ass'n v.*

*Lehman Bros. Holdings, Inc.*, 237 F. Supp. 2d 618, 626 (D. Md. 2002) ("A buyer may hold a

seller accountable for breach of an express warranty upon a showing: (1) that the plaintiff and

defendant entered into a contract; (2) that the contract contained an express warranty by the

---

[4] Wells Fargo seeks summary judgment on Reps 15, 31, 39, and 49.  Alleging that there was no
breach of the warranties in Reps 15, 30, and 49, BOA seeks summary judgment on those Reps.
Alternatively, BOA also seeks summary judgment on all of Wells Fargo's claims on a theory that
none of the purported breaches had a material adverse effect on the certificateholders.  This
theory is discussed infra in Section II.B.4.

defendant with respect to a material fact; (3) that the warranty was part of the basis of the

bargain; and (4) that the defendant breached the express warranty.").

Here, there is no dispute that (1) the parties entered into a contract—namely the MLPSA

and the PSA; (2) the MLPSA contained certain express warranties in the form of the Reps; or (3)

the warranty constituted the "basis of the bargain."  Accordingly, the only issue before the Court

is whether BOA materially breached any of the express warranties in the MLPSA.[5]

## 2.    Contract Interpretation Principles Under New York Law

"Because the parties disagree as to the meaning of a number of the disputed warranties,

the Court must seek 'to effectuate the intention of the parties as evidenced by the language they

used, and [is] therefore bound to enforce the terms of the agreement as set down in an integrated,

written instrument.'"  *Lasalle Bank Nat'l Ass'n v. Merrill Lynch Mortg. Lending, Inc.*, No. 04

Civ. 5452, 2007 WL 2324052, at *8 (S.D.N.Y. Aug. 13, 2007) (quoting *Scholastic, Inc. v.

Harris*, 259 F.3d 73, 82 (2d Cir. 2001)).  "When interpreting unambiguous contract terms,

'[e]vidence outside the four corners of the document . . . is generally inadmissible to add to or

vary the writing.'"  *Wells Fargo Bank, N.A. v. Bank of America*, No. 11 Civ. 4062, 2013 WL

372149, at *4 (S.D.N.Y. Jan. 31, 2013) (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77

N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (Ct. App. 1990)).  However, whenever

contractual terms are ambiguous, meaning they are "reasonably subject to differing

interpretations," courts are free to "turn to evidence extrinsic to the agreement's four corners to

ascertain the intent of the parties."  *Scholastic*, 259 F.3d at 82.  Though the meaning of an

---

[5] The PSA defines the term "breach" as "[w]ith respect to any Mortgage Loan, any breach of
representation or warranty made by the Mortgage Loan Seller pursuant to Section 4(b) of the
Mortgage Loan Purchase and Sale Agreement."  (Def.'s Ex. C at BANA_HART_282407.)

ambiguous contract that turns on factual issues is a determination reserved for the factfinder, *whether* a contract is ambiguous is a question of law for the Court. *Id.*

### 3.    Analysis of Rep 39

Wells Fargo seeks summary judgment on its claim that BOA breached Rep 39, which provides:

> (39) <u>Origination, Servicing and Collection Practices</u>. The origination (or acquisition, as the case may be), collection, and the servicing practices used by the Seller and its affiliates or contractors engaged by it with respect to the Mortgage Loan have been in all respects legal and have met customary standards utilized by prudent commercial or multifamily, as applicable, lenders and servicers.

(Pl.'s SMF at ¶ 158; Pl.'s Ex. 3 at Schedule II, 000041.)  With respect to Rep 39, Wells Fargo alleges, *inter alia*, that BOA failed to comply with its own origination procedures, by originating a loan where the borrower did not provide 15% cash equity and where the LTC ratio was greater than 86%, thus evincing a failure to meet "customary standards" within the industry.  (Pl.'s Mem. at 26-27.)  BOA counters by contending: (1) that the term "origination" is ambiguous as to whether it includes the practices to which Wells Fargo refers in asserting its claims; (2) that BOA's internal guidelines are neither binding, nor reasonable indicators of customary standards within the industry; (3) that the term "cash equity" is not mentioned in the applicable internal guideline; and (4) that, in any event, "cash equity" is a term of art subject to multiple interpretations within the industry, rendering the Loan's conformance a disputed issue of material fact.  (*See* Def.'s Opp. at 48-49, 52-55.)

Though the Court agrees with BOA that the record reflects competing evidence as to whether "origination" constitutes the underwriting and closing aspects of the loan process,[6] the term nevertheless unambiguously refers to the steps by which a loan is, in fact, originated.  By way of background, so-called origination refers by its terms to "the first and necessary step which not only finances (or refinances) the purchase or improvement of a home or other asset but also creates a stream of cash flows which generates the returns to investors in mortgage or asset-backed securities."  Ronald Greenspan & William Nolan, Mortgage and Asset Backed Securities Litigation Handbook § 1:11.  As a general rule, "[t]he origination process includes a due diligence analysis of the collateral property, the character, credit and financial capacity of the proposed borrower and current and potential future market conditions that will affect the potential value of the collateral."  *Id.*  "[T]he originator will negotiate with its prospective borrower the appropriate principal amount, interest rate, terms and conditions of the loan," and in turn, these conditions are, at bottom, designed to "mitigate, to the extent possible, general and specific risk factors associated with the proposed loan, minimize the likelihood and severity of

---

[6] Wells Fargo's origination expert stated in his deposition that "origination refers to the process of making a loan, which includes underwriting and closing."  (Pl.'s SMF at ¶ 180; Pl.'s Ex. 1 at 136-137, 139-140, 141-142.)  Wells Fargo also notes that "in every instance in which the MLPA uses the term 'origination' it refers to the date on which the loan closed or the process of originating the loan, which necessarily includes underwriting and closing."  (Pl.'s Mem. at 23; (Pl.'s Ex. 2, at Schedule II, Reps 2, 12, 16, 23, 25, 26, 28, 30, 31, 32, 33, 36, 39, 46, 48, 49, 51.)  However, BOA counters with the report of its own expert, Timothy Dwyer, which notes: "Since underwriting and closing are separate aspects of the loan process from origination, servicing and collection, many of the other R&Ws in the MLPA (other than R&W 39) specifically address underwriting and closing issues.  *If*, as Plaintiff asserts, R&W (39) purports to cover all facets of underwriting and closing, it would be unnecessary to address underwriting and closing issues in other R&Ws as well."  (Declaration of Timothy W. Dwyer in Support of Defendant's Cross-Motion, Dkt. No. 85 ("Dwyer Decl."), Ex. A, at 34 (emphasis in original).)  Moreover, BOA points out that even its own internal guidelines separate origination, underwriting, and closing as separate stages of the loan process.  (Def.'s Opp. at 49; Def.'s Ex. OOOO at BANA_HART_284907, BANA_HART_284911.)

possible monetary loss, and maximize the probability that the loan can be sold to the ABS[7] trust as anticipated." *Id.*

> BOA's internal guidelines undisputedly state that, with respect to capitalization:[8]

>> In all Mortgage Loans, the Lender will determine the Borrower's capital basis in the project. In the event of acquisition Loans or the refinance of an existing Loan within the first (12) months of ownership, Loan proceeds will be restricted in accordance with the following: . . .
>>
>> **2. At Acquisition.** Loan Amount shall be limited to a maximum eighty-five percent (85%) of the contract price including closing costs limited to a maximum fifteen (15%) percent of the contract price.

(Pl.'s Ex. 24, at BANA_HART_284827, 105(A)(2).) Wells Fargo asserts that, since the guidelines state that the Loan Amount shall not exceed 85% of the contract, any given borrower must provide at least 15 percent cash equity. BOA disagrees, noting that (1) "cash equity" is not mentioned in Section 105(A)(2) of the guidelines; and, alternatively (2) "cash equity" constitutes a term of art that does not necessarily refer to "cash." BOA's first argument is disposed of easily. The unavoidable consequence of a loan amount that is limited to 85% of the contract price is that the remaining 15% must be made up by cash equity provided by the Borrower. This conclusion is underscored by the policy behind limiting a loan amount to less than 100% of the purchase price; put another way, the incentives of a borrower who fails to contribute any cash equity—whatever the definition of cash equity, whether literally *cash* or a term of art—to a purchase price or contract price are perverted, as it has no "skin in the game." (Pl.'s Ex. 2 at

---

[7] ABS refers to "Asset-Backed Securities."

[8] Capitalization refers to the capital basis in a given loan proposal. "The cash equity is usually defined in the approval package for a loan and is then verified at the loan closing when the money is disbursed." (Pl.'s Ex. 2 at 23.) Thus, the capitalization of a particular proposal is an aspect of origination in the sense that the lender will not originate a particular loan, and thus proceed to underwriting and later, closing, until a capital structure is determined and approved.

24);[9] *see also Verex Assur., Inc. v. John Hanson Sav. and Loan, Inc.*, 816 F.2d 1296, 1302 (9th

Cir. 1987) ("In evaluating the risk of insuring a loan, the mortgage guaranty insurer considers (1)

the borrower's credit and cash equity to determine likelihood of repayment[.]").

     BOA's second argument—that "cash equity" does not constitute cash—requires further

elucidation.  It is undisputed that Surrey did not provide the remaining 15% on the contract price

in the form of a cash payment.  Instead, this remaining amount was made up by the Carlin Note,

which was a personal obligation of the Carlins to pay EZ.  (*See* Def.'s Opp. at 6 ("Pursuant to the

terms of the Assignment, the Carlins agreed to pay $9 million to EZ via an unsecured promissory

note executed in their personal capacities (the 'Carlin Note.'").)  The terms of the Carlin Note

provided that the assignor, EZ, could not, under any circumstances, "seek reimbursement from

the membership interests or the property contemplated in the [Assignment]."  (Def.'s Ex. II at

BANA _ HART 000840.)  Later, at closing, Carlin contributed $700,000 in cash as a deposit;

another $2,500,000, which was included in the loan amount, went to pay down the Carlin Note;

and the Carlin Note remained as a $6,356,080.67 obligation of the Carlins to assignor EZ.

(Def.'s Ex. AA at BANA_HART_210152.)  This financing structure is confirmed by the Closing

Statement (*id.*), together with an email from Andrew Baltz, BOA's senior closer, in which he

confirmed that the approximate capitalization of the Loan was as follows: Total Costs of

---

[9] Plaintiff's expert makes the point that commercial mortgage-backed securities ("CMBS") loans "are non-recourse[,] which  means that the loan is collateralized by the property and the borrower is rarely personally liable except for fraud, misrepresentation, or waste." (*Id.*)  That is, without some form of equity invested in the property, due to the non-recourse nature of CMBS loans, the borrower will not have an asset behind the loan.  (*Id.*)  To the extent that BOA contends that Wells Fargo's expert's reports are inadmissible as unsworn (*see, e.g.*, Def.'s SMF at ¶ 1), the Court rejects BOA's contention, as "Plaintiff submitted the deposition testimony of its experts where they testified under oath that their opinions are reflected in their reports" (Pl.'s Rep. at 38 n. 42), and Wells Fargo also provided supporting declarations of its experts as exhibits to its reply.  (*Id.*; *see also* Pl.'s Exs. 121 and 122.)

$47,050,000; BOA Loan of $40,000,000; Personal Note of $6,350,000; and Cash of $700,000.[10] (*Id.* at BANA_HART_210146.)

Wells Fargo would have it that "cash equity" means what it says: cash. Accordingly, since Surrey, the borrower, contributed only a nominal 1.5% of the purchase price as a deposit on the Property ($700,000), Wells Fargo asserts that BOA failed to adhere to its internal guidelines which reflect a requirement that a borrower have at least 15% cash equity as an asset in the subject of a given loan. (Pl.'s Ex. 24, at BANA_HART_284827, 105(A)(2).) BOA counters that "cash equity" is a term of art in the CMBS industry that refers to the "difference between the purchase price of an asset and the loan amount." (Def.'s Opp. at 34.) BOA's expert has opined that promissory notes may qualify as "cash equity" of a borrower if the note constitutes a "personal obligation of the borrower's principals." (*Id.*; *see also* Dwyer Decl., Ex. A, at 39 ("[T]he composition of cash equity does not, according to industry standards, need to consist of currency. A promissory note, provided by the principals of a borrower in their personal capacity, can according to customary industry standards, also qualify as such.").) According to BOA, so long as a borrower remains personally liable with respect to a promissory note, such debt is a permissible "cash equity" contribution to the capitalization of a loan.

BOA's argument is belied by common sense, the record, and the testimony of its own employees. First, as a matter of logic, a putative borrower who contributes to the purchase price of an asset with an unsecured promissory note contributes a promise to pay, rather than cash equity. And while the existence of a promissory note executed on behalf of a borrower undoubtedly reflects that cash has been provided by someone—namely, the payee—in such a

---

[10] The Baltz email actually states "$700M" as the cash contribution, but this appears to be a clerical error, as the Closing Statement notes that the down payment constituted $700,000, and all parties agree as to this number.

circumstance, the borrower necessarily has not generated that cash, and accordingly, such a note does not reflect a *borrower's* cash contribution to an asset price. (Pl.'s Ex. 2 at 23 ("Cash equity is the amount of cash that the purchaser pays for a property that is not borrowed.").) Second, to the extent that BOA and its expert contend that "cash equity" is a term of art, this assertion is rendered unreasonable by exchanges among BOA's own employees that include the term. For example, in a January email, Baltz noted that the financing or capitalization of the purchase price was to be as follows: "$36,000,000 in cash and assignor [EZ] is taking a $9MM unsecured note from the principals of our borrower." (Pl.'s Ex. 31 at BANA_HART_ 247993-247994.)[11] Later, in October 2007, David Fallick, Managing Director in BOA's CMBS group noted: "The problem was the prescreen / credit approval (it should not have happened) . . . I will say it again, the NO cash equity was the icing on the cake of an already very tough deal." (Pl.'s Ex. 32 at BANA_HART_288238.) In explaining the Fallick email, BOA claims that the comments were an "expression of frustration" and in no way "suggest . . . that there was no equity in the deal." (Def.'s Opp. at 44 n. 29.) This argument is unavailing. Though Fallick's email may well have constituted an expression of frustration, he unequivocally stated that there was no "cash equity" in the deal.

Additionally, the BOA credit approval package ("CAP") confirms that no one at BOA reasonably construed the promissory note as "cash equity." For example, the CAP stated as follows: "The result is a purchase price of $45,550,000 to be funded by the $38,214,571 in net loan proceeds . . . , *$4.2MM in personal note and $3,113,000 in cash equity*." (Pl.'s Ex. 36 at BANA_HART_207182 (emphasis added).) This language, though it does not reflect the final

---

[11] Baltz also reiterated in his deposition that Surrey did not contribute any cash to the capitalization. (*See* Pl.'s Ex. 12 at 73:7-13 ("Q: You know for a fact, as you sit here today, the borrowers had cash in the deal? A: As I sit here today means everything I know today? Q: Yes. A: I think everything that – that as – as of today, they didn't.")

terms of the Loan's capitalization at closing, is highly suggestive of the conclusion that BOA did

not, in fact, view a promissory note as equivalent to cash equity, given that it separated the two

in its CAP language.  Moreover, other courts have come to similar conclusions with respect to

the meaning of cash equity.  *See Firstier Morg. Co. v. Investors Mortg. Ins. Co.*, 708 F. Supp.

1224, 1229 (W.D. Okla. 1989) (holding that where borrowers had not contributed down

payments or "earnest deposits" they therefore had no cash equity in the subject properties);

*accord Verex*, 816 F.3d at 1302 ("The difference between loan and sales price reflected the

amount of cash equity each borrower would provide and the down payment Verex assumed

would be paid.").  In sum, "cash equity" means what the term denotes—a cash contribution to

the subject asset backed by a given loan—and the origination of the Loan undisputedly did not

reflect such a financing arrangement.  And, in so doing, the origination of the Loan departed

from BOA's internal guidelines, which, as discussed *supra*, underscores the importance of a cash

equity contribution on the part of a putative borrower.  The contention of BOA's expert that

"cash equity" is a term of art in the industry is insufficient to create a genuine issue of material

fact as to the meaning of the term in light of the record and case law.

      BOA next argues that even if (1) "cash equity" refers to cash, rather than a promissory

note, *and* (2) BOA departed from its own guidelines in originating a loan where the borrower did

not provide such cash equity, there was nevertheless no breach of Rep 39, as its guidelines are

neither mandatory, nor representative of customary standards within the multifamily lending

industry.  The Court agrees that BOA's internal guidelines are neither law, nor integrated

contractual terms of the MLPSA.  As such, BOA was of course free to deviate from its own

standards in its origination of the Loan.  However, the fact that these internal guidelines may

well be discretionary does not, *a fortiori*, mean that they do not accurately reflect customary

industry standards, as described in Rep 39.  In fact, courts have considered internal guidelines as relevant equivalents to industry standards.  *See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n*, 643 F. Supp. 2d 1014, 1031 (S.D. Ohio 2009) ("This Court concludes that evidence that LaSalle did not meet its own internal underwriting guidelines is competent evidence it did not meet customary industry standards for underwriting. Indeed, it comes close to judicial estoppel on this point, which the Court declines to find because it has not been argued by Wells Fargo."); *Lehman Bros.*, 237 F. Supp. 2d at 630 (finding that proof that Lehman did not adhere to its own underwriting guidelines was relevant to industry standards and granting summary judgment in Plaintiff's favor on the issue of whether Lehman breached its warranty that "[t]he origination, servicing and collection practices used by [Lehman] or any prior holder of the Mortgage Note have been in all respects legal, proper and prudent and have met customary industry standards" (alteration in original)).  Therefore, the record evidence that BOA failed to meet its own internal guidelines in originating the Loan is competent evidence that it failed to adhere to industry standards, as required by Rep 39.  Accordingly, BOA breached Rep 39 when it originated the Loan without 15% cash equity, and summary judgment for Wells Fargo is appropriate on the issue of breach.[12]

---

[12] BOA does cite several cases in which courts declined, as a matter of law, to equate internal guidelines with industry standards, but the cases are not directly on point.  *See, e.g.*, *Didzbalis v. Sheridan Transp. Co.*, No. 00 Civ. 4329, 2002 WL 31619071, at *2 (S.D.N.Y. Nov. 19, 2002) (noting that "[g]enerally, expert testimony is necessary for the introduction of custom and practice evidence" as to the customs and practices used in the mooring a particular vessel); *Am. Mfrs. Mut. Ins. Co. v. Payton Lane Nursing Home, Inc.*, No. Civ. 05-5155, 2010 WL 741971, at *4-5 (E.D.N.Y. Feb. 23, 2010) (discussing the difference between lay and expert testimony, and concluding that the latter is necessary when testimony extends beyond first-hand knowledge and includes custom and practice).  Moreover, BOA correctly points out that courts are loathe to grant summary judgment in the context of dueling expert reports.  *See Harris v. Provident Life and Acc. Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) ("[W]here, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." (alteration in original) (quotations omitted)).  However, BOA's expert has opined that at least with respect to

### 4.    Repurchase Remedy

In order to invoke the remedy of repurchase, Wells Fargo must show both (1) a breach of a Rep and (2) that such breach was material.[13]  As noted, the PSA defines a *breach* as "any breach of representation or warranty made by the Mortgage Loan Seller pursuant to Section 4(b) of the Mortgage Loan Purchase and Sale Agreement."  (Def.'s Ex. C at BANA_HART_282407.) In order to be material, however, such a breach must be one that "materially and adversely affects the interests of the Certificateholders, . . . with respect to the affected Mortgage Loan, including but not limited to a material and adverse effect on any of the distributions payable [associated with] any of the Certificates or on the value of such Certificates or such Mortgage Loan."  (*Id.* at BANA_HART_282442.)  The MLPSA has a similar provision.[14]  Moreover, the

---

underwriting, BOA's guidelines appear to be "by and large" consistent with industry standards (Pl.'s Ex. 25 at 145), a point with which Wells Fargo's expert agrees.  And BOA, while disputing that the experts agree, has stated that "Bank of America's Guidelines in effect at the time of the Loan were not inconsistent with customary industry standards."  (Def.'s SMF at ¶ 42.)

[13] Section 2.03(c) of the PSA states, in pertinent part:

> Promptly upon its becoming aware of any Material Document Defect or *Material Breach with respect to any Mortgage Loan*, the Master Servicer shall (and the Special Servicer may) notify the Mortgage Loan Seller in writing of such Material Document Defect or Material Breach, as the case may be, and direct the Mortgage Loan Seller that it must, not later than 90 days from the receipt by such parties of such notice (such 90-day period, the "Initial Resolution Period"), correct or cure such Material Document Defect or Material Breach, as the case may be, in all material respects, or repurchase the Defective Mortgage Loan (as, if and to the extent required by the Mortgage Loan Purchase and Sale Agreement), at the applicable Purchase Price.

(Def.'s Ex. C at BANA_HART_282496 – 97 (emphasis added).)

[14] The MLPSA provides in pertinent part:

> Upon discovery of any Material Breach or Material Document Defect, the Purchaser or its designee shall notify the Seller thereof in writing and request that the Seller correct or cure such Material breach or Material Document Defect. Within 90 days of the earlier

PSA establishes a contractual damages amount in the form of the Purchase Price, which it defines as follows:

> With respect to any Mortgage Loan, a price equal to the unpaid principal balance of the Mortgage Loan as of the date of purchase, together with (a) all accrued and unpaid interest . . . , (b) all related unreimbursed Master Servicing Fees, Special Servicing Fees, Trustee Fees . . . and Servicing Advances . . . , (c) all accrued and unpaid Advance Interest in respect of related Advances, (d) any Additional Trust Fund Expenses in respect of such mortgage Loan . . . , (e) Liquidation Fees (if any) payable in connection with a purchase of a Mortgage Loan and (f) any cost, fees and expenses of enforcement (including attorneys fees) of a repurchase obligation pursuant to Section 2.03(h).

(Pl.'s Ex. 8 at BANA_HART_282458.)

BOA contends that Wells Fargo "has failed to demonstrate that its claimed damages were caused by Bank of America's alleged breaches of the MLPA, as opposed to other factors such as Carlin's fraud, the precipitous decline in the real estate market or Plaintiff's failure to promptly market and sell the Loan and/or Property." (Def.'s Opp. at 15.) Accordingly, BOA has moved for summary judgment on all of Wells Fargo's alleged breaches, arguing that any breach is immaterial as a matter of law, and thus, fails to give rise to the remedy of repurchase that Wells Fargo advances as appropriate. Additionally, BOA contends that Wells Fargo's request that the Court compel repurchase is a "request for specific performance to which Plaintiff is not entitled." (Def.'s Opp. at 59.) Specifically, BOA notes that (1) repurchase of the Loan—is impossible in this case, because the mortgage securing the Loan has been foreclosed and almost all of the

---

> of discovery or receipt of written notice by the Seller that there has been a Material Breach or Material Document Defect (such 90-day period, the "Initial Resolution Period"), *the Seller shall* (i) cure such Material Breach or *(ii) repurchase each affected Mortgage Loan or REO Loan (each, a "Defective Mortgage Loan") at the related Purchase Price* in accordance with the terms hereof and, if applicable, the terms of the Pooling and Servicing Agreement. . . .

(Pl.'s Ex. 3, MLPSA at § 4(c) (emphasis added).)

Property has been sold; and, alternatively, (2) Wells Fargo has not made the "required showing that money damages would not be an adequate remedy." (*Id.*)  In response, Wells Fargo argues, *inter alia*, that the repurchase remedy is a liquidated damages provision, and, even if construed as a specific performance remedy, reflects a provision that is "routinely enforced" in CMBS loan cases.  (Pl.'s Mem. at 41.)

### a.    Material Adverse Effect

Material Adverse Effect ("MAE"), as defined in the PSA, refers to a breach that materially and adversely affects the interests of the Certificateholders.  As BOA notes, "material means significant; adverse means harmful; and, *effect means to cause*."  (BOA Rep. at 23 (quoting Def.'s Ex. AAAAAA at 22) (emphasis added).)  The failure of BOA to comply with its own origination procedures resulted in the closing of a loan whose borrower had not provided any cash equity to the Property's purchase price.  The risks of such a decision are evident and manifest; as discussed *supra*, a buyer who is unable to contribute a cash deposit towards the acquisition of the slated asset is one who is more likely to default, as (1) without any personal exposure associated with an otherwise non-recourse CMBS loan, a borrower lacks direct incentive to avoid default, and (2) one unable to front the cash deposit is potentially one who is too illiquid to maintain loan payments over time.  These risks in particular are among those which originally gave rise to origination requirements such as those described in BOA's internal guidelines.[15]  To argue that the lack of cash equity in this deal is insignificant is to ignore the

---

[15] As Wells Fargo's expert notes:

> The requirement of cash equity began with discussions with insurance companies and banks that experienced significant losses in the 1980s.  They would visit the rating agencies to explain the reasons for the losses.  The absence of cash equity in the deals was one of the main reasons for defaults and delinquencies . . . . [The insurance companies and banks that had suffered losses] frequently

essential purpose behind the requirement. Moreover, such a dearth of capital is necessarily

harmful to the interests of the Certificateholders. In keeping with other courts' approaches, the

Court declines to equate MAE with causing the loan to default. While the terms of the PSA do

indeed reflect a causal requirement, the breach need only cause harm, though not necessarily

default. *See Syncora Guarantee Inc. v. EMC Mortg. Corp.*, 874 F. Supp. 2d 328, 335 (S.D.N.Y.

2012) ("Contrary to EMC's argument, the parties' written agreements do not provide that

breaches of representations or warranties must cause any HELOC loan to default, before the

Note Insurer can enforce its remedies under the repurchase provision. Had the parties intended

this requirement, they could have included such language. They did not, and the Court will not

do so now 'under the guise of interpreting the writing.'" (quoting *Reiss v. Fin. Performance

Corp.*, 97 N.Y.2d 195, 199, 738 N.Y.S.2d 658, 764 N.E.2d 958 (Ct. App. 2001) (citation

omitted))).

### b.    Remedy

"When specific performance is contemplated by the contract, courts tend to find that

irreparable harm would be suffered unless specific performance is granted." *Wells Fargo*, 2013

WL 372149, at *8 (citing *Ticor Title Ins. Co. v. Cohen,* 173 F.3d 63, 69 (2d Cir. 1999)). Here,

"[t]he Court agrees with Defendant that Plaintiff would not be entitled to the 'extraordinary

remedy' of specific performance—because . . . repurchase of the mortgage loans at issue is

impossible." *Wells Fargo Bank, N.A. v. LaSalle Bank Nat. Ass'n*, No. Civ. 08-1125-C, 2011 WL

3739170, at *2 (W.D. Okla. Aug. 23, 2011). This is because "the mortgage securing the Loan

has been foreclosed and almost all of the Property has been sold." (Def.'s Opp. at 59.)

---

commented that borrowers who had no skin in the game defaulted
quicker than borrowers who had cash invested in their property.
(Pl.'s Ex. 2 at 23-24.)

However, "[t]he CMBS case law and the parties' contract make clear that a 'repurchase provision is designed to shift the risk to the selling party in the event that a dispute arises,' and that such a provision is the appropriate method of making Plaintiff whole once a breach of warranty is established." *Wells Fargo (Okla.)*, 2011 WL 3739170, at *3 (applying New York Law) (quoting *Resolution Trust Corp. v. Key Financial Servs., Inc.*, 280 F.3d 12, 18 (1st Cir. 2002) (same)). Moreover, though not unheard of, *see LaSalle Nat'l Bank Ass'n v. Capco Am. Sec. Corp.*, No. 02 Civ. 9916, 2005 WL 3046292, at *6 (S.D.N.Y. Nov. 5, 2005), the Court need not determine that the instant damages provisions constitute a liquidated damages clause in order to find that Wells Fargo should nevertheless be made whole by application of the purchase price calculation. *See, e.g.*, *Wells Fargo (Okla.)*, 2011 WL 3739170, at *4 ("Because Plaintiff relies on only one case as support for its conclusion, it does not explain why damages would be difficult to calculate or why the contract's language requiring an assessment of reasonableness is for a certain amount, the Court is not persuaded by Plaintiff's argument that the purchase price is a liquidated damages clause. . . . Accordingly, the purchase price provision is not a liquidated damages clause; this conclusion, however, does not disrupt the prior finding that such clause is the appropriate method of calculating damages so as to make Plaintiff whole.").

The parties bargained for the purchase price calculation as defined in the PSA, and BOA's contention that this calculation applies only where repurchase is *possible* is unavailing in light of the case law. *See id.* at *3; *Resolution Trust*, 280 F.3d at 18 ("[Defendant] claims that repurchase is [Plaintiff's] sole remedy under the contract, and therefore, awarding general contract damages provides [Plaintiff] with a windfall. [Defendant's] argument is misplaced. Whether or not [Plaintiff] committed an independent breach by failing to repurchase on demand, the district court was free to make [Defendant] whole, and it did so in terms of the obligation

imposed by the contract." (internal footnote omitted)); *Lehman Bros.*, 237 F. Supp. 2d at 638 (concluding that the purchase price as defined in the PSA was an appropriate damages calculation where it was not possible for Defendant to repurchase the applicable loan); *Capco*, 2005 WL 3046292, at *5 ("The parties agreed to a method of calculating the repurchase price. PSA, § 1.01. By awarding damages in the amount that Capco agreed to pay in the event of breach, the court will make LaSalle whole."). Here, repurchase is impossible, given the foreclosure and subsequent sale of the Property; however, the PSA specifically provides that, in the event of a material breach of the MLPSA, the purchase price, offset by any proceeds generated by Plaintiff's liquidation of the Properties that are not provided as reimbursement to the Trust for reasonable servicing advances, represents the appropriate damages calculation. Moreover, given the risk allocation behind repurchase provisions such as the one at issue here, a general mitigation defense, as advanced by BOA, is inapplicable to these circumstances. *See Wells Fargo (Okla.)*, 2011 WL 3739170, at *6; *cf. Resolution Trust*, 280 F.3d at 18 ("[Defendant] and [Plaintiff], two sophisticated parties, negotiated how the risks and costs of this transaction would be distributed, and resolved the issue by drafting § 3.1. [Defendant's] cries of injustice fall on deaf ears, as [Defendant] freely contracted for the obligations by which it now finds itself bound.").

    **C.**    **The Grant Declaration**

    BOA also moves to preclude the Declaration of Michael Grant, which was omitted from discovery and only later attached by Wells Fargo to its motion for summary judgment. (Def.'s Mem. Prec. at 2.) According to BOA, the Grant Declaration "purports to establish that Bank of America was aware that [an outside company] was managing the Property for a fee," in

contravention of Rep 15.  (*Id.* at 6.)  As the Court has already determined that BOA breached

Rep 39, and did not rely on the Grant Declaration in so doing, this motion is denied as moot.

## III.    Conclusion

For the foregoing reasons, Wells Fargo's motion for summary judgment is GRANTED;

BOA's motion for summary judgment is DENIED; and BOA's motion to preclude the

Declaration of Michael Grant is DENIED as moot.

The Clerk of the Court is directed to close the docket entries at numbers 73, 77, and 80.


SO ORDERED.


Dated:  New York, New York
        March 28, 2013

_____
        J. PAUL OETKEN
     United States District Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                  :

WELLS FARGO BANK, N.A., as Trustee for the  :
Registered Holders of Banc of America       :
Commercial Mortgage Pass-Through Certificates,  :
Series 2007-5, acting by and through its Special   :
Servicer C-III ASSET MANAGEMENT, INC.,    :          10 Civ. 9584 (JPO)
                            Plaintiff,  :
                                   :      OPINION AND ORDER
                -v-                   :
                                   :

BANK OF AMERICA, N.A.,                :
                       Defendant.  :
                                   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

      This case involves violation of certain representations in a mortgage loan sale agreement.

The Court has previously granted summary judgment for Wells Fargo Bank on liability.  The

Court has yet to rule on three disputes between the parties with respect to the calculation of

damages.  The Court holds that Wells Fargo has not waived its right to statutory prejudgment

interest under N.Y. C.P.L.R. § 5001(a).  The Court reserves judgment on two further issues until

Bank of America has had the opportunity for additional discovery.

**I.      Background**

      On March 28, 2013, the Court granted the Wells Fargo's motion for summary judgment

as to Defendant Bank of America's liability.  (Dkt. No. 98.)  Familiarity with that decision is

assumed here.  The Court held that Wells Fargo is entitled to the purchase price, as defined in the

Pooling Services Agreement, offset by any proceeds from the liquidation of the properties that

were not applied to reimburse the Trust for reasonable servicing advances.  (*Id.* at 23.)  Wells

Fargo moved for a money judgment for the amount of the purchase price offset by $1,883,872.45 in unapplied proceeds from liquidation of the properties. (Dkt. No. 104, Ex. A at 2, 3.)

Bank of America sought discovery on three points: first, the calculation of net cash flow from the properties; second, the results of Wells Fargo's audit of the accounting records for net cash flow from properties; and third, the reasons why Wells Fargo granted $2.2 million in tax and due diligence waiver credits toward the sale price of the properties. (Dkt. Nos. 107, 112.) The Court heard the parties on these issues at a telephone conference and ruled that Bank of America would not be entitled to reopen discovery in general; however, the Court reserved judgment as to reopening discovery regarding the $2.2 million in sale price credits and requested further documentation on that point from Wells Fargo. (Dkt. No. 116 at 21:11–21.)

At the close of the conference, Wells Fargo's counsel asked the Court: "Do you do the prejudgment interest calculation or do you need us to do that as well?" (*Id.* at 25:03–04.) The letter briefs the parties exchanged before the conference had not discussed prejudgment interest. (Dkt. Nos. 104–05, 107–110, 112.)

The parties exchanged letter briefs regarding the $2.2 million in sale price credits, and a dispute developed as to whether Wells Fargo is entitled to statutory prejudgment interest. (Dkt. Nos. 118– 121.) The Court held a telephone conference to discuss the prejudgment interest issue and reserved judgment. (Dkt. No. 126.) The parties then exchanged three further letters regarding the balance of the loan as of August 2009. (Dkt. Nos. 123–25.)

The facts relevant to the prejudgment interest issue are as follows. The Mortgage Loan Purchase and Sale Agreement (MLPSA), which conveyed mortgage loans to Wells Fargo, and the Pooling Services Agreement (PSA), which governs the servicing of those loans, both provide for specific remedies for breach of the MLPSA. First, if Bank of America breaches a warranty

representation about a mortgage loan it conveyed to Wells Fargo, Bank of America must

repurchase or cure the defective mortgage loan upon notice of the breach.  MLPSA § 4(c) (Dkt.

No. 124-3).  If Bank of America cures or repurchases a defective mortgage loan, the cure or

repurchase is Wells Fargo's sole remedy for breach of a warranty representation.  PSA § 2.03(h)

(Dkt. No. 124-1).

Second, if a court orders Bank of America to make a cash payment in lieu of

repurchasing a defective mortgage loan, the amount of that payment may be determined by

"mutual agreement . . . or . . . judicial decision."  PSA § 2.03(i).  Such a payment is defined as a

"loss of value payment."  *Id.*  If Bank of America makes a loss of value payment, the payment is

Wells Fargo's sole remedy for Bank of America's breach.  *Id.*

New York law governs interpretation of these agreements.  MLPSA § 14; PSA § 12.04.

## II.    Discussion

### A.      Prejudgment Interest

New York law requires courts to award prejudgment interest on damages resulting from a

breach of contract.  N.Y. C.P.L.R. § 5001(a); *U.S. Naval. Inst. v. Charter Commc'ns, Inc.*, 936

F.2d 692, 698 (2d Cir. 1991) ("[A] plaintiff who prevails on a claim for breach of contract is

entitled to prejudgment interest as a matter of right.").  Prejudgment interest is intended to

compensate the nonbreaching party for lost use of money owed by the breacher.  *J. D'Addario &*

*Co., Inc. v. Embassy Inds., Inc.*, 20 N.Y.3d 113, 117 (2012).  For this reason, a plaintiff is

entitled to prejudgment interest even if the underlying contract itself provides for interest on

overdue payments—in other words, a plaintiff can recover prejudgment interest on unpaid

principal *and* unpaid interest.  *Spodek v. Park Prop. Dev. Assocs.*, 96 N.Y. 2d 577, 581 (2001).

Whether the amount owed represents principal or accrued interest, the plaintiff was entitled to

**SPA-30**

the money just the same, and prejudgment interest compensates the plaintiff for lost use of her money. *Id.* at 581–82; *see also NML Capital v. Republic of Argentina*, 17 N.Y.3d 250, 266–67 (2011) ("The application of statutory interest on unpaid interest payments compensates [the plaintiff] for a distinct injury—[] failure to timely make interest payments.").

But parties can waive the right to statutory prejudgment interest. *J. D'Addario*, 20 N.Y.3d 113. In *J. D'Addario*, parties to a commercial real estate transaction agreed on a specific remedy for any potential default by the buyer. 20 N.Y.3d at 121 n.\*. The parties designated funds in escrow as liquidated damages, provided for interest on the escrowed funds, and referred to the funds as the "sole remedy" for default. 20 N.Y. 3d at 118. The buyer ultimately breached the contract. *Id.* at 117. The New York Court of Appeals held that the seller was not entitled to prejudgment interest because, as "establish[ed]" by the foregoing contract terms, the seller waived its right to prejudgment interest. *Id.* at 118 ("The use of the terms 'sole remedy,' 'sole obligation,' and 'no further rights' by the parties, together with the provision for interest on the escrowed sum, was sufficiently clear to establish for purposes of this transaction that interest paid at the statutory rate was not contemplated by the parties at the time the contract was formed."). This holding was based on longstanding New York precedent that parties to a civil contract may waive statutory or constitutional rights in a contract, so long as the waiver does not violate public policy. *Id.* at 119 (quoting *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 54 (1996)).

A recent federal district court opinion, *Katzman v. Helen of Troy Texas Corporation*, No. 12 Civ. 4220 (PAE), 2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013), discussed *J. D'Addario* at length. The court looked to New York Court of Appeals decisions governing waiver of other rights and, consistent with those decisions, read *J. D'Addario* to establish a "clear-statement

rule" governing waivers of the right to statutory prejudgment interest.  *Id.* at *6 (citing *Fundamental Portfolio Advisors, Inc. v. Toqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006); *Gilbert Frank Corp. v. Fed. Ins. Co.*, 70 N.Y.2d 966, 968 (1988)).  This Court agrees with the analysis in *Katzman*; a waiver of the right to statutory prejudgment interest must be clear.[1]

In this case, Wells Fargo agreed that it would accept any of three alternative remedies as its "sole remedy" for Bank of America's breach of a warranty representation.  Two of those remedies—cure on demand and repurchase on demand—are discussed in § 2.04(h) of the PSA.  The third remedy—the remedy at issue here—is a cash payment.  PSA § 2.04(i).  This payment is termed a "loss of value payment," defined in relevant part as "a cash payment . . . in lieu of [] repurchase," "pursuant to . . . judicial order,"  the amount of which "shall be determined . . . by judicial decision."[2]  *Id.*  In short, Wells Fargo agreed to accept a court-ordered cash payment from Bank of America, in an amount determined by the Court, as its sole remedy.  Wells Fargo did not agree to any limits on *how* the Court is to calculate the amount of the payment.  Wells Fargo's agreement to accept a court-ordered cash payment as its sole remedy is not a clear waiver of its right to prejudgment interest.[3]

---

[1] The Court does not agree, however, that a waiver of prejudgment interest must be express.  *See id.* at *6.  The waiver in *J. D'Addario* was not express, but the New York Court of Appeals held that the waiver was valid.

[2] The PSA's provision allowing a loss of value payment as an alternative sole remedy distinguishes this case from other cases where cure and repurchase are the sole remedies contemplated by the PSA.  Courts have divided over whether money damages are appropriate in such cases.  *Compare MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Secs., Inc.*, No. 12 Civ. 7322 (HB), 2013 WL 4399210, *2–*4 (S.D.N.Y. Aug. 15, 2013) (declining to foreclose possibility of money damages in lieu of specific performance and citing two cases allowing the same), *with MASTR Assed Backed Secs. Trust 2006-HE3 ex rel. U.S. Bank Nat'l Assoc. v. WMC Mortg. Corp.*, 843 F. Supp. 2d 996, 1001 (D. Minn. 2012) (holding money damages unavailable).

[3] The Court also notes that because of the impenetrable construction of § 2.03(i)—and of the PSA and MPLSA in their entirety—it would be disingenuous to hold that Wells Fargo clearly

Bank of America argues that use of the words "sole remedy" in § 2.03(i) waived Wells

Fargo's right to prejudgment interest.  (Dkt. No. 124 at 1–2.)  This is a misreading of *J.*

*D'Addario*.  Use of the words "sole remedy" is not code for "I waive prejudgment interest."

Rather, use of the words "sole remedy" means that the parties agree on one remedy for a breach

of contract.  This *may* operate to waive prejudgment interest, where the parties "chart their own

course" by designing a remedy that otherwise compensates the nonbreaching party for lost use of

the money she is owed (*e.g.*, interest on an escrowed sum).  *J. D'Addario*, 20 N.Y.3d at 118–19

---

waived its right to prejudgment interest.  There is very little about these agreements that the
Court would describe as "clear."  The text of § 2.03(i) is reproduced below for the reader's
reference and amusement:

> In the event that either pursuant to a settlement agreed to by the
> Mortgage Loan Seller and the Special Servicer on behalf of the
> Trust (it being understood that the provisions of this Section
> 2.03(i) shall not constitute a waiver of the Trust's rights under
> Section 2.03(h) unless the Special Servicer, on behalf of the Trust,
> has agreed to accept a loss of value payment in lieu of the Trust's
> rights under Section 2.03(h)) or a judicial order, the Mortgage
> Loan Seller makes a cash payment, either as a cure of a Material
> Breach or a Material Defect, or in lieu of a repurchase of a
> Mortgage Loan on which a Material Breach or a Material Defect
> exists or is alleged to exist (each such payment, a "Loss of Value
> Payment") with respect to such Mortgage Loan, the amount of
> each such Loss of Value Payment shall be determined either (i) by
> mutual agreement of the Special Servicer on behalf of the Trust
> with respect to such Material Breach or Material Defect, as the
> case may be, and the Mortgage Loan Seller or (ii) by judicial
> decision. Provided that such Loss of Value Payment is made, the
> Loss of Value Payment shall serve as the sole remedy available to
> the Certificateholders and the Trustee on their behalf regarding any
> such Material Breach or Material Defect in lieu of any obligation
> of the Mortgage Loan Seller to otherwise cure such Material
> Breach or Material Defect or repurchase the Defective Mortgage
> Loan based on such Material Breach or Material Defect under any
> circumstances. In the event there is a Loss of Value Payment made
> by the Mortgage Loan Seller in accordance with this Section
> 2.03(i), the amount of such Loss of Value Payment shall be
> deposited into the Loss of Value Reserve Fund to be applied in
> accordance with Section 3.05(g).

(holding waiver was clear because designation of the sole remedy as a specific sum of money, *together with* a provision for the time value of the money, demonstrated a clear intent to waive prejudgment interest).

Here, the parties did not "chart their own course." The parties agreed that, in the event that Bank of America made a court-ordered cash payment in lieu of repurchase, such payment would be Wells Fargo's sole remedy. The value of such payment is to be determined "by judicial decision." The parties did not supplant the statutory scheme by creating their own plan to compensate Wells Fargo for the time value of the purchase price if Bank of America wrongfully refused to repurchase. Instead, the parties delegated calculation of those damages to the Court, which is bound by statute. The parties' chosen remedy does not entail waiver of Wells Fargo's right to statutory prejudgment interest.

Other courts agree with this analysis. Consider the purpose of the repurchase provision. Interpreting a similar set of agreements under New York law, the First Circuit held that a repurchase provision is intended to shift risk to the seller, such that "from the moment a proper repurchase demand was made, [the seller]—not [the buyer]—should have borne the risk of any market fluctuations." *Resolution Trust Corp. v. Key Fin. Svcs., Inc.*, 280 F.3d 12, 18 & n.14 (1st Cir. 2002). To give effect to the intended allocation of risk between the parties, the Court must shift the risk of market fluctuations back to Bank of America as of the date that Wells Fargo made its repurchase demand. Wells Fargo is therefore entitled to the purchase price as of the date it demanded repurchase. If Wells Fargo had bargained away its right to prejudgment interest, there would be little incentive for Bank of America to cure or repurchase under any circumstances. Bank of America could roll the dice at minimal cost by forcing Wells Fargo to file suit—if Bank of America "lost," it would still pay the same amount in damages. It is

doubtful that the parties intended such an arrangement.  *Cf. Katzman*, 2013 WL 1496952, at *6 ("[S]uch an agreement would give [defendants] impunity . . . . [T]he money would stay in the escrow account until it was ordered to be paid . . . , but under no circumstances would [defendants] face financial consequences (e.g., prejudgment interest) for having invented bogus claims to keep it there.").

Wells Fargo is entitled to the deal it bargained for: the purchase price as a remedy for Bank of America's breach.  To make Wells Fargo whole, the Court must restore Wells Fargo to the position it would have been in if Bank of America had actually repurchased the loans.  The correct calculation of damages is therefore the amount that Bank of America would have paid if it had repurchased the loans when it was supposed to have done so, plus statutory prejudgment interest from that date, plus costs of mitigation and servicing, less unapplied income from the loans and the properties between the date of the repurchase demand and the date of judgment.  *See Resolution Trust Corp.*, 280 F.3d at 18 n.15, *aff'g F.D.I.C. v. Key Fin. Servs., Inc.*, No. 89 Civ. 2366, 1999 WL 34866812 (D. Mass. Dec. 23, 1999).

### B.    Sale Price Credits

A party moving for summary judgment must demonstrate each element that she would need to prove at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986).  If the moving party makes this showing, the burden shifts to the nonmoving party to identify specific facts showing that there is a genuine issue for trial; in other words, specific facts showing that reasonable jurors could differ about the evidence. Fed. R. Civ. P. 56; *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (defining "genuine issue"); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986) (discussing burden on nonmoving party).  The Court may not grant summary judgment

unless the nonmoving party has had an opportunity to discover information essential to its opposition. *Anderson*, 477 U.S. at 250 n.5.

Wells Fargo has produced evidence in support of its calculation of damages. Bank of America disputes $2.2 million in credits that Wells Fargo granted toward the sale price of the properties. It is Bank of America's burden to set forth specific facts showing a genuine issue about the propriety of these credits. But before the Court can impose that burden, Bank of America must be permitted to investigate the sale of the properties through discovery. Discovery in this case closed in May 2012, which was before Wells Fargo granted the sale credits. The Court is prepared to allow Bank of America 45 days of discovery on this issue.

The Court observes that, over a 45-day period of discovery, prejudgment interest will continue to accrue against Bank of America. Bank of America may therefore wish to concede these credits and proceed to judgment.

## III.    Conclusion

Wells Fargo is entitled to the purchase price as of August 24, 2009, plus statutory prejudgment interest from that date, plus costs of mitigation and servicing between the date of the repurchase demand and the date of judgment, less unapplied income from the loans and the properties between the date of the repurchase demand and the date of judgment.

Within one week, Bank of America shall inform the Court whether it prefers to conduct discovery on the $2.2 million in sale price credits or waives the issue.

SO ORDERED.

Dated: New York, New York
       February 6, 2014

_____
J. PAUL OETKEN
United States District Judge

9

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                          :
WELLS FARGO BANK, N.A., as Trustee for the :
Registered Holders of Banc of America          :
Commercial Mortgage Pass-Through Certificates, :
Series 2007-5, acting by and through its Special :
Servicer C-III ASSET MANAGEMENT, INC.,   :          10 Civ. 9584 (JPO)
                                    Plaintiff,    :
                                                          :              ORDER
            -v-                                      :
                                                          :
BANK OF AMERICA, N.A.,                      :
                                    Defendant.  :
                                                          :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

  Bank of America filed a letter February 13, 2014 indicating that it no longer contests the

$2.2 million in sale price credits and raising three additional issues.  (Dkt. No. 129.)  First, Bank

of America asks whether it will receive credit for the sale of the loan properties in 2012.  Second,

Bank of America asks when that credit will be applied for purposes of calculating prejudgment

interest.  Finally, Bank of America objects to the fact that Wells Fargo will receive prejudgment

interest plus contract interest for the period from August 2009, when Wells Fargo made its

repurchase demand, through final judgment.  Wells Fargo has not filed a response.

  The Court will calculate damages in this case as "the purchase price as of August 24,

2009, plus statutory prejudgment interest from that date, plus costs of mitigation and servicing

between the date of the repurchase demand and the date of judgment, less unapplied income

from the loans and the properties between the date of the repurchase demand and the date of

judgment."  (Dkt. No. 128 at 9.)  The Court will take Bank of America's last concern first: Wells

Fargo is not receiving contract interest from the date of the repurchase demand through the date

of final judgment.  The Court awarded Wells Fargo the purchase price as of August 24, 2009.

This is a fixed amount.  The Court will not calculate damages based on the purchase price as of a

later date, and therefore, references to contract interest included in a calculation of the purchase

price as of June 14, 2013 are irrelevant.

The Court intended that "income" from the properties include all money that Wells Fargo

received from the properties, including the sale price.  "Unapplied income" means income that

Wells Fargo kept for itself rather than paying it toward maintenance of the properties or costs

associated with the outstanding loan.  Because prejudgment interest functions to compensate a

party for lost use of money it is owed, Wells Fargo is not entitled to prejudgment interest on any

amount of money that it had already recovered.  Bank of America is correct that, whenever the

properties generated income (including the sale price) that Wells Fargo was not forced to pay

toward property maintenance or loan costs, the balance that was accruing prejudgment interest

should be correspondingly lowered.

The parties are directed to meet and confer on a proposed final judgment within two

weeks.  If the parties cannot agree on a final judgment, Wells Fargo shall submit its proposed

judgment by March 19, 2014, and Bank of America may respond with its own proposed

judgment by March 26, 2014.

SO ORDERED.

Dated: New York, New York
       March 5, 2014

_____
J. PAUL OETKEN
United States District Judge

**SPA-38**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                           :
WELLS FARGO BANK, N.A., as Trustee for the                 :
Registered Holders of Banc of America                      :
Commercial Mortgage Pass-Through Certificates,             :
Series 2007-5, acting by and through its Special           :
Servicer C-III ASSET MANAGEMENT, INC.,                     :          10 Civ. 9584 (JPO)
                                        Plaintiff,         :
                                                           :               ORDER
              -v-                                          :
                                                           :
BANK OF AMERICA, N.A.,                                     :
                                        Defendant.         :
                                                           :
-----------------------------------------------------------X

J. PAUL OETKEN, District Judge:

The Court previously held that Wells Fargo was entitled to a contractually defined loss of value payment, calculated as the amount that Bank of America would have paid if it had repurchased the loans when it was supposed to have done so, plus statutory prejudgment interest from that date, plus costs of mitigation and servicing, less unapplied income from the loans between the date of the repurchase demand and the date of judgment.  The parties have both filed proposed final judgments calculating this amount.  There are four points of disagreement between them.

**I.      Liquidation Fees**

First, the parties dispute whether Wells Fargo is entitled to include liquidation fees of $392,882.84 in the purchase price. While the purchase price is defined to include "liquidation fees," the parties' definition of "liquidation fee" included the following caveat: "Notwithstanding the foregoing and for the avoidance of doubt, no Liquidation Fee shall be payable in connection with . . . a Loss of Value Payment by the Mortgage Loan Seller."  (Def.'s Mar. 26 Letter Ex. 4 at

47–48, 170–71 (PSA Excerpt), Dkt. No. 132-4.)  The Court therefore agrees with Bank of America that the loss of value payment cannot include liquidation fees, and $392,882.84 must be subtracted from the purchase price as calculated in Wells Fargo's March 19, 2014 filing.

## II.  Accrued and Unpaid Interest

Second, the parties dispute whether accrued and unpaid interest and servicing expenses should be included in the purchase price, whether Wells Fargo is entitled to prejudgment interest on that amount, and the date on which the accrued and unpaid interest should be calculated.

The purchase price is specifically defined to include accrued and unpaid interest and servicing expenses.  It is not relevant that Wells Fargo's loan servicer—which happened to be Bank of America—advanced interest and servicing expenses to Wells Fargo.  No matter what arrangements Wells Fargo made with Bank of America as loan servicer, Bank of America had a preexisting contractual obligation to pay Wells Fargo the purchase price, including accrued and unpaid interest, in the event of a breach.  Bank of America wrongfully refused to fulfill that obligation.  The advance that Bank of America paid to Wells Fargo was not a partial satisfaction of the repurchase obligation; it was a separate transaction that incurred a corresponding obligation from Wells Fargo.  Wells Fargo is therefore entitled to prejudgment interest on the entire purchase price.

The parties also dispute the amount of accrued and unpaid interest to include in the purchase price.  Bank of America argues that the interest should be calculated up to but not including August 1, 2009, and Wells Fargo argues that the interest should be calculated as of August 24, 2009.  The Court previously held that the starting point for calculating the loss of value payment would be the purchase price as of August 24, 2009.  The purchase price is defined to include "all accrued and unpaid interest . . . up to but not including the Due Date in the

Collection Period of purchase." (PSA Excerpt at 67.) A Collection Period is determined by reference to Distribution and Determination Dates, both of which are defined by contract. Bank of America purports to determine the Collection Period of purchase in Exhibit 5 to its March 26, 2014 letter (Dkt. No. 132-5). But that exhibit discusses the Collection Period spanning July 6, 2009 through August 4, 2009. That period is not the Collection Period of purchase—the purchase date, August 24, 2009, does not fall within that period. Rather, the Collection Period of purchase is the period spanning August 5, 2009 through September 4, 2009.[1] Accordingly, the relevant Due Date is September 1, 2009.[2] The purchase price as of August 24, 2009 would include accrued and unpaid interest up to but not including September 1, 2009; however, Wells Fargo has not presented evidence of the accrued and unpaid interest up to that date. Wells Fargo is entitled to judgment only in the amount supported by its evidence. The purchase price will be calculated using accrued and unpaid interest that is supported by Wells Fargo's evidence, *i.e.*, interest as of August 24, 2009.

---

[1] To determine the duration of a Collection Period, one must determine a range of Distribution Dates and Determination Dates. A Distribution Date is the tenth of every calendar month, or, if that day is not a business day, the business day immediately following the tenth of every calendar month. (PSA Excerpt at 39.) The Determination Date for each Distribution Date is the earlier of (i) the sixth of the same calendar month, or, if that day is not a business day, the immediately preceding business day, or (ii) the fourth business day before the Distribution Date. Each Distribution Date has a Collection Period. (*Id.* at 37.) The Collection Period is the period following the Determination Date of the previous calendar month up to and including the Determination Date of the same calendar month. (*Id.* at 26.)

August 24, 2009 falls within the Collection Period for the Thursday, September 10, 2009 Distribution Date. That period spanned from Wednesday, August 5, 2009 ("immediately following the Determination Date of the preceding calendar month") to Friday, September 4, 2009 ("ending on and including the Determination Date in the calendar month in which such Distribution Date occurs"). (*Id.*) The Due Date for the Surrey Loan was the first of each month. (Def.'s Mar. 26, 2014 Letter Ex. 5.) Therefore, the Due Date in the relevant collection period is September 1, 2009.

[2] *Supra* n.1.

3

III.    **Loan Property Revenue Prior to March 2011**

Third, the parties dispute whether, in Wells Fargo's calculation of revenue from the loan properties, the entry for "net unapplied funds received prior to sale" properly accounts for $893,482.36 in revenue from the loan properties generated between August 24, 2009 and March 17, 2011.  (Pl.'s Mar. 19, 2014 Letter Ex. B (Reconciliation of Funds Received and Applied), Dkt. No. 131-2.)  The entry for unapplied funds received from the properties is $1,150,841.56—the same amount that Wells Fargo has claimed as the net cash flow from the loan properties for the past ten months.  (Decl. of Michael Nikula in Support of Money Jdgmt. at 9, Dkt. No. 105.)  This amount is supported by the documentation that Wells Fargo filed last June in support of its proposed judgment.  Bank of America did not raise any objection to this calculation throughout the multiple telephone conferences and series of letters that the parties have exchanged to narrow the issues to be resolved before final judgment.  Bank of America may not raise new issues at this stage—and, even if the Court were to entertain new arguments against Wells Fargo's prior calculations, Bank of America has not raised any genuine issue of material fact to challenge those calculations.  (*See* Pl.'s Mar. 31, 2014 Letter at 2 & n.2, Dkt. No. 133.)  Wells Fargo's calculation of revenue from the properties grants Bank of America all the credits to which it is entitled.

IV.    **Trustee Fees**

Fourth and finally, the parties dispute whether Wells Fargo has filed any evidence in support of its claim for $65,791.57 in trustee fees.[3] The documentation that Wells Fargo submitted last June calculated the purchase price as of June 5, 2013; because Wells Fargo had

---

[3] Wells Fargo seeks trustee fees of $11,144.33 incurred prior to August 24, 2009, and $54,647.24 incurred after August 24, 2009.  (Reconciliation of Funds Received and Applied.)

already been reimbursed for trustee fees as of June 5, 2013, Wells Fargo did not file any

documentation supporting a discrete calculation of trustee fees.  No such documentation was

included with Well's Fargo's March 19, 2014 proposed judgment; rather, Wells Fargo merely

asserts that it is entitled to $65,791.57 in trustee fees.  Bank of America alerted Wells Fargo to

this problem in its March 26, 2014 letter, but rather than providing the necessary documentation,

Wells Fargo has simply reiterated its position that it is entitled to the trustee fees it claims.  In the

absence of any evidence supporting this calculation of fees, the Court must grant judgment in

Bank of America's favor on this point.

**V.      Final Judgment Calculation**

Wells Fargo calculated the August 24, 2009 purchase price to be $39,681,166.44.  This

amount must be reduced by $11,144.33, which represents trustee fees that are not supported by

any evidence, and $392,882.84, which represents liquidation fees to which Wells Fargo is not

entitled.  The resulting August 24, 2009 purchase price is $39,277,139.27.

Wells Fargo also calculated the costs of mitigation and servicing following August 24,

2009 to be $6,460,395.25.  This amount must be reduced by $54,647.24, which represents trustee

fees that are not supported by any evidence.  The resulting total cost of mitigation and servicing

following August 24, 2009 is $6,405,748.01.

Wells Fargo correctly calculated the total liquidation proceeds to be $20,099,542.52.

Accordingly, Wells Fargo is entitled to judgment in the amount of $39,277,139.27, plus

statutory prejudgment interest on that amount from August 24, 2009 to the date of judgment,

plus $6,405,748.01 in mitigation and servicing costs, less $20,099,542.22 in unapplied income

from the properties.

**VI.     Conclusion**

The Clerk of Court is directed to enter judgment for the Plaintiff in the amount of

$39,277,139.27, plus statutory prejudgment interest on that amount at the simple rate of 9% per

annum from August 24, 2009 to the date of judgment, minus $13,693,794.21.

The Court retains jurisdiction with respect to enforcement of the final judgment and

determination of costs.

SO ORDERED.

Dated: April 11, 2014
        New York, New York

_____
J. PAUL OETKEN
United States District Judge