# 14-1624-cv

## United States Court of Appeals

*for the*

## Second Circuit

WELLS FARGO BANK, N.A., as Trustee for the Registered Holders of Banc
of America Commercial Mortgage Inc., Commercial Mortgage pass-through
certificates, Series 2007-5, Acting by and Through its Special Servicer
C-III Asset Management LLC,

*Plaintiff-Appellee,*

– v. –

BANK OF AMERICA, N.A.,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-APPELLEE

GREGORY A. CROSS
COLLEEN M. MALLON
VENABLE LLP
*Attorneys for Plaintiff-Appellee*
750 East Pratt Street, Suite 900
Baltimore, Maryland 21202
(410) 244-7400

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 26.1, Appellee Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Banc of America Commercial Mortgage Pass-Through Certificates, Series 2007-5 (the "**Trust**"), acting by and through its Special Servicer C-III Asset Management LLC, being a private non-governmental party, hereby certifies that the Trust has no parent corporation, the Trust does not issue stock and there is no publicly held corporation that owns ten percent or more of the Trust's beneficial interests.

# TABLE OF CONTENTS

**PAGE**

STATEMENT OF ISSUES ...................................................................1

PRELIMINARY STATEMENT ..........................................................2

STATEMENT OF THE CASE.............................................................4

STATEMENT OF FACTS ...................................................................6

A.  Overview of CMBS Transactions..............................................6

B.  Overview of the Loan ................................................................8

C.  The Structure of the Acquisition that the Loan Financed ...........9

D.  BOA's Origination of the Loan ...............................................11

    1.  The Loan Was Oversized and the Borrower Did *Not*
        Contribute Cash Equity ....................................................12

    2.  The Acquisition Was *Not* an Arm's Length Transaction...............15

    3.  The Loan that BOA Approved Was *Not* the Loan that
        BOA Closed ......................................................................17

E.  BOA's Internal and External Representations About the Loan ...............19

SUMMARY OF ARGUMENT .........................................................20

ARGUMENT ...................................................................................23

I.  Standard of Review...................................................................23

II. BOA Breached Rep 39 by Failing to Originate the Loan in Accordance with Its Own and Customary Industry Standards .................24

    A. BOA's Origination Procedures and Customary Industry Standards Precluded Acquisition Loans with a LTC Ratio Greater Than 85% and Required the Borrower to Contribute 15% Cash Equity ..........................................................25

    B. BOA's Admissions, the Record, and Case Law Confirm that Cash Equity Means Cash and Surrey Contributed Zero Cash ........28

    C. BOA and Its Origination Expert Admitted that BOA's Origination Procedures Were Consistent with Customary Industry Standards ........................................................33

III. The Trust Is Entitled to Damages Pursuant to the Purchase Price Calculation Plus Mandatory Statutory Prejudgment Interest ...................34

    A. The Purchase Price Definition Includes Interest and Servicing Advances ..................................................................34

    B. The Trust Has a Statutory Right to Prejudgment Interest ..............37

IV. BOA's Arguments for Reversal of the District Court's Grant of Summary Judgment Lack Merit .................................................................40

    A. The District Court Did *Not* Conflate BOA's Origination Procedures with Customary Industry Standards ............................40

    B. The District Court Did *Not* Apply the Wrong Section of BOA's Origination Procedures ........................................................43

    C. BOA's Efforts to Create a Dispute of Fact Are Inconsistent with the Record ...............................................................................45

    D. The Trust Did Not Receive a Windfall when It Was Awarded Amounts that It Was Contractually Entitled to Receive ................48

    E. There Was No Error by the District Court in Awarding the Trust Statutorily Mandated Prejudgment Interest ...........................50

V.   The District Court's Grant of Summary Judgment Is Supported by Additional Grounds ..................................................................52

CONCLUSION ..................................................................54

8751939

# TABLE OF AUTHORITIES

**CASES**                                                    **PAGE(S)**

Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256 (2d Cir. 2002)..........46

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)......................................23

Aurora Commercial Corp. v. Lenox Fin. Mortg. Corp.,
     2014 WL 4678285 (E.D. Cal. Sept. 19, 2014) ..........................................30

Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.,
     910 F. Supp. 2d 629 (S.D.N.Y. 2012) .......................................................47

British Telecomms. PLC v. Prodigy Commc'ns Corp.,
     217 F. Supp. 2d 399 (S.D.N.Y. 2002) .......................................................24

Chandok v. Klessig, 632 F.3d 803 (2d Cir. 2011)..............................................24

Citibank, N.A. v. K-H Corp., 745 F. Supp. 899 (S.D.N.Y. 1990)................ 31, 32

City of N.Y. v. State of N.Y., 40 N.Y.2d 659 (N.Y. 1976)..................................38

Civil Serv. Emps. Ass'n, Inc. v. Newman, 450 N.Y.S.2d 901
     (N.Y. App. Div. 1982), aff'd, 61 N.Y.2d 1001 (N.Y. 1984)....................38

Delulio v. 320-57 Corp., 472 N.Y.S.2d 379 (N.Y. App. Div. 1984)..................37

Donerail Corp. v. 405 Park LLC, 958 N.Y.S.2d 645(table),
     2011 WL 489188 (N.Y. Sup. Ct. Feb. 2, 2011) ........................................30

E. 56th Plaza, Inc. v. Abrams, 458 N.Y.S.2d 953 (N.Y. App. Div. 1983).........38

Ed Peters Jewelry Co. v. C & J Jewelry Co.,
     51 F. Supp. 2d 81 (D.R.I. 1999) ...............................................................32

F.D.I.C. v. Key Fin. Servs., Inc., 1999 WL 34866812
     (D. Mass. Dec. 23, 1999), aff'd sub nom. Resolution Trust Corp. v.
     Key Fin. Servs., Inc., 280 F.3d 12 (1st Cir. 2002) ............................ 40, 52

iv

F.D.I.C. v. Law Office of Rafael Ubieta, P.A.,
    2012 WL 5307152 (S.D. Fla. Oct. 29, 2012) ...............................44

F.D.I.C. v. Prop. Transfer Servs., Inc.,
    2013 WL 5535561 (S.D. Fla. Oct. 7, 2013) ................................44

Firstier Mortg. Co. v. Investors Mortg. Ins. Co.,
    708 F. Supp. 1224 (W.D. Okla. 1989).................................. 31, 32

Gross v. Rell, 585 F.3d 72 (2d Cir. 2009) ...........................................25

Gudmundsson v. U.S., 634 F.3d 212 (2d Cir. 2011) ...........................23

J. D'Addario & Co. v. Embassy Indus., Inc.,
    20 N.Y.3d 113 (N.Y. 2012) ................................................ 50, 51

Katzman v. Helen of Troy Tex. Corp,
    2013 WL 1496952 (S.D.N.Y. Apr. 11, 2013) ...........................50

Kulak v. City of New York, 88 F.3d 63 (2d Cir. 1996)........................23

LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.,
    237 F. Supp. 2d 618 (D. Md. 2002)............................... 33, 35, 41

Lehman Bros. Holdings, Inc. v. Cal. Fin. Grp., Inc.,
    2011 WL 4375724 (C.D. Cal. Apr. 25, 2011) .................... 40, 52

Lehman Bros. Holdings, Inc. v. PMC Bancorp,
    2013 WL 1095458 (C.D. Cal. Mar. 8, 2013) ............... 39, 40, 52

LNV Corp. v. Outsource Serv. Mgmt., LLC,
    2014 WL 5106866 (D. Minn. Oct. 10, 2014)............................44

Major League Baseball Props., Inc. v. Salvino, Inc.,
    542 F.3d 290 (2d Cir. 2008) .....................................................24

Moore v. Int'l Paint, L.L.C., 547 F. App'x 513 (5th Cir. 2013).......... 46, 47

8751939

Morgan Guar. Trust Co. v. Bay View Franchise Mortg. Acceptance Co.,
   2002 WL 818082 (S.D.N.Y. Apr. 30, 2002) ...................................... 35, 36

NFL Enters. LLC v. Comcast Cable Comm'cns LLC,
   851 N.Y.S.2d 551 (N.Y. App. Div. 2008)...................................30

Ricci v. DeStefano, 557 U.S. 557 (2009) ...........................................23

Rotham Realty Co. v. Gabel, 16 N.Y.2d 517 (N.Y. 1965)................................32

Spodek v. Park Prop. Dev. Assocs., 96 N.Y.2d 577 (N.Y. 2001) ......................37

Sw. Inv. Co. v. U.S., 63 Fed. Cl. 182 (Fed. Cl. 2004),
   aff'd, 158 F. App'x 283 (Fed. Cir. 2005), cert. denied,
   547 U.S. 1163 (2006)............................................................ 29, 30

U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts.,
   2014 WL 4290642 (S.D.N.Y. Aug. 28, 2014) ................................... 39, 52

U.S. v. Carlin, 948 F. Supp. 271 (S.D.N.Y. 1996) ...................................... 19, 20

U.S. v. Chew, 497 F. App'x 555 (6th Cir. 2012).......................................... 27, 44

U.S. Naval Inst. v. Charter Commc'ns, Inc., 936 F.2d 692 (2d Cir. 1991)........37

Vargas v. Transeau, 514 F. Supp. 2d 439 (S.D.N.Y. 2007), aff'd sub nom.
   Vargas v. Pfizer, Inc., 352 F. App'x 458 (2d Cir. 2009)......................... 24

Verex Assurance, Inc. v. John Hanson Sav. & Loan, Inc.,
   816 F.2d 1296 (9th Cir. 1987) ............................................................. 27, 32

Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n,
   643 F. Supp. 2d 1014 (S.D. Ohio 2009)............................................ 33, 41

Wells Fargo Bank, N.A v. LaSalle Bank Nat'l Ass'n,
   2011 WL 3739170 (W.D. Okla. Aug. 23, 2011)......................................35

Wells Fargo Bank, N.A v. LaSalle Bank Nat'l Ass'n,
   2011 WL 1303949 (W.D. Okla. Apr. 1, 2011)........................................30

8751939

<u>Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n</u>,
    2010 WL 2873661 (S.D. Ohio July 19, 2010) ...........................................35

<u>Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n</u>,
    Case No. CIV-08-1125-C (W.D. Okla. Dec. 10, 2010) ...........................42

**RULES**

N.Y. C.P.L.R. 5001 ..................................................................... passim

N.Y. C.P.L.R. 5004 ...........................................................................52

**SECONDARY SOURCE**

Investopedia, <u>http://www.investopedia.com/terms/</u>
    (last visited Nov. 20, 2014) ............................................................ 32, 44

8751939

## STATEMENT OF ISSUES

1.      Did the District Court, in its March 28, 2013 Memorandum and Opinion, correctly decide that Defendant-Appellant Bank of America, N.A.'s ("**BOA**") violation of its origination guidelines and procedures was sufficient to establish a breach of customary industry standards, when BOA's origination expert opined that BOA's origination guidelines and procedures were consistent with customary industry standards and BOA admitted they were consistent?

2.      Did the District Court, in its March 28, 2013 Memorandum and Opinion, correctly decide that BOA's origination guidelines and procedures required BOA to originate the subject loan with a maximum 85% loan-to-cost ratio with the remaining 15% made up by cash equity contributed by the borrower, when BOA agrees that, for acquisition loans, its guidelines and procedures required that such loans not exceed 85% of the acquisition price and that 15% of the acquisition price be "skin in the game" provided by the borrower?

3.      Did the District Court, in its March 28, 2013 Memorandum and Opinion, correctly decide that cash equity means cash, that the loan was originated with a loan-to-cost ratio greater than 85%, and that the borrower did not contribute any cash equity, when BOA's own employees admitted that cash equity means cash, the borrower did not contribute any cash equity, and the structure of the underlying

transaction was an acknowledged flip transaction that BOA concedes even now to have been fraudulent?

4.    Did the District Court, in its April 11, 2014 Order, correctly decide that Plaintiff-Appellee Wells Fargo Bank, N.A., as Trustee for the Registered Holders of Banc of America Commercial Mortgage Pass-Through Certificates, Series 2007-5 (the "**Trust**"), was contractually entitled to recover accrued and unpaid interest and unreimbursed servicing advances, when BOA agrees that the Trust's damages are measured by the contractually defined "Purchase Price" calculation and these two components are expressly included in such definition?

5.    Did the District Court, in its February 6, 2014 Opinion and Order, correctly decide that the Trust was statutorily entitled to prejudgment interest pursuant to N.Y. C.P.L.R. ("**CPLR**") 5001, and that the Trust did not waive its statutory right to such interest?

## PRELIMINARY STATEMENT

This breach of contract action is about BOA's substandard origination of a $40 million loan that even BOA described as a "scratch and dent loan."  The Managing Director of BOA's CMBS group summed it up best:  "***The problem was the prescreen / credit approval (it should not have happened) . . . I will say it again, the NO cash equity was the icing on the cake of an already tough deal.***"  BOA sold the defective loan to the Trust pursuant to a contract in which BOA made certain

2

representations and warranties that were untrue. This is precisely the type of loan that BOA contractually agreed to repurchase, yet BOA refused and as a result the Trust has incurred (and continues to incur) millions of dollars in litigation costs pursuing the repurchase of a "scratch and dent loan" that BOA concedes "should not have happened."

*Remarkably, although BOA now concedes what the evidence indisputably showed – that the underlying transaction it financed was fraudulent – BOA's brief portrays the transaction as though it were legitimate.* It was instead a sham transaction in which the borrower of the loan artificially inflated the acquisition price of the property, received from BOA more than 100% financing, and cashed out at closing to the tune of $2.5 million. BOA's concession that the transaction was fraudulent confirms the District Court's conclusion below. Significantly, while there is substantial evidence in the record that demonstrates beyond dispute that BOA knew the transaction was fraudulent but nonetheless sold the loan to the Trust, the District Court did not render a finding on that issue. Instead, the District Court carefully decided BOA's liability based on BOA's admissions, the additional undisputed evidence in the record, and applicable case law. It also correctly awarded the Trust damages in accordance with the express terms of the contract, and statutory prejudgment interest.

The District Court's thoughtful, thorough decisions and judgment based firmly on undisputed evidence and case law should be affirmed.

## STATEMENT OF THE CASE

On September 13, 2010, the Trust filed its original complaint against BOA in which it alleged that BOA had breached the terms of the Mortgage Loan Purchase and Sale Agreement ("**MLPA**") and the Pooling and Servicing Agreement (the "**PSA**") and sought damages as measured by the contractually defined Purchase Price (defined <u>infra</u>) and prejudgment interest. (A-4).[1] The Trust amended the original complaint and filed an Amended Complaint on January 6, 2012, alleging that during the origination, servicing and sale of the Loan (defined <u>infra</u>), BOA breached MLPA representations and warranties (each a "**Rep**") 15, 30, 31, 39, and 49, and that such breaches, individually and collectively, as required by the PSA had a material and adverse impact on, among other things, the value of the Loan. (A-25-55). On January 30, 2012, BOA answered and denied existence of and responsibility for its breaches of the Reps and for the defective Loan. (A-100-19).

After discovery closed, the parties filed cross-motions for summary judgment. The Trust moved for summary judgment based on BOA's breaches of Reps 15, 31, 39, and 49 of the MLPA, and also moved for summary judgment on the remedy. (A-

---

[1] References to the Joint Appendix shall be cited as ("**A-**__".). References to the Special Appendix shall be cited as ("**SPA-**__".).

140; Docket No. 74). BOA moved for summary judgment as to all of the Trust's claims. (A-1740; Docket No. 81). On March 28, 2014, the District Court denied BOA's summary judgment motion, and granted the Trust's motion for summary judgment, finding that BOA breached Rep 39 of the MLPA, which Rep generally provides that BOA's origination of the Loan met customary industry standards. (SPA-3-26).[2] Specifically, the District Court concluded that: (i) BOA's internal guidelines required BOA to originate the Loan with a maximum 85% loan-to-cost ratio with the remaining 15% made up by cash equity contributed by the Borrower; (ii) the Borrower did not contribute the required 15% cash equity; (iii) BOA's guidelines were consistent with customary industry standards, and, therefore, BOA's origination of the Loan breached Rep 39. (SPA-12-19). The District Court awarded the Trust damages as determined by the Purchase Price (as defined in the PSA). (SPA-25).

Thereafter, the District Court ordered briefing relating to the calculation of the Purchase Price. (A-4998-5001). During the briefing, BOA challenged the Trust's statutory right to prejudgment interest under CPLR 5001(a), contending that the Trust had waived its right to such interest. (A-7187-88). On February 6, 2014, the District Court rejected BOA's contention that the Trust had waived its right to prejudgment interest, concluding that the Trust was entitled to "the purchase price

---

[2] The District Court did not address the breaches by BOA of Reps 15, 31 or 49. (Id.).

as of August 24, 2009, plus statutory prejudgment interest from that date, plus the costs of mitigation and servicing between the date of the repurchase demand and the date of judgment, less unapplied income from the loans and the properties between the date of the repurchase demand and the date of judgment." (SPA-35).

The District Court ordered the parties to submit a proposed judgment applying the Purchase Price calculation based on its February 6, 2014 opinion. (SPA-36-37). Unable to agree on the judgment, the parties submitted their own proposed judgments, and, on April 11, 2014, the District Court entered an Order that resolved their disputes with respect to the Purchase Price calculation. (SPA-38-43). On April 25, 2014, the District Court entered Judgment in the amount of $39,905,024.56. (SPA-1-2).

## STATEMENT OF FACTS

### A.     Overview of CMBS Transactions

Commercial mortgage-backed securities ("**CMBS**") transactions involve parties with specialized roles that act in accordance with generally standardized practices and procedures. The lender is the company that originates and services the loan until securitization. (A-143-44; 236). It also funds the loan and warehouses it (keeps it on its balance sheet) along with other loans for inclusion in a Real Estate Mortgage Investment Conduit trust. (Id.).

8751939

The loans are sold by the lender to a trust, which issues bonds or certificates to investors that are layered by loss position. (A-144; 236-37). When the loans are sold, the lender is referred to as the mortgage loan seller, and in this capacity the lender makes various representations and warranties regarding the loans. (A-237). These representations and warranties are found in the mortgage loan purchase and sale agreement. (Id.). Throughout the existence of the trust, the loans are serviced in accordance with the agreement that creates the trust and governs its management, the pooling and servicing agreement. (Id.).

The certificates, which represent the beneficial ownership interests in the trust, are sold to various institutional and high-yield investors depending on their risk tolerance and yield requirements. (A-144; 236-37). Losses from the loans are allocated with the highest yielding certificate absorbing the first loss. (Id.). The subordinate certificates that receive the first allocations of losses are commonly referred to as B-Pieces, and these investors are commonly referred to as B-Piece Buyers. (Id.). When determining whether to invest in the trust, investors rely upon the representations and warranties provided by the mortgage loan seller who originated the loans as detailed in the mortgage loan purchase and sale agreement, the ratings assigned by the rating agencies, and statements contained in the Prospectus and Prospectus Supplements. (A-144; 237). ***The trust performs no due diligence on the loans prior to securitization***. (A-145; 237). This is by design. It

is not economically feasible or efficient for the trust to re-underwrite hundreds of loans pooled together, and thus it relies on the representations and warranties given by the mortgage loan seller.  (Id.).

## B.    Overview of the Loan

The loan at issue is a $39,977,571 commercial mortgage loan (the "**Loan**") made by BOA to Surrey Group, LLC ("**Surrey**" or "**Borrower**") in 2007 to finance the acquisition of 23 Class B/C apartment buildings located in Hartford, Connecticut (the "**Property**").  (A-145; 28, 31; 102-103).  The Loan is evidenced by two promissory notes:  (1) the A-Note in the amount of $37,179,141.00, and (2) the B-Note in the amount of $2,798,430.00.  (A-145; 325-343).  The Loan was made subject to and in accordance with the terms of an Amended and Restated Loan Agreement dated as of February 5, 2007 (the "**Loan Agreement**").  (A-145; 345-64).

After laboring for ten (10) months to sell the A-Note portion of the Loan, BOA eventually sold it to the Trust pursuant to a Mortgage Loan Purchase and Sale Agreement dated December 1, 2007 (the "**MLPA**").  (A-146; 279-323).  As is typical, BOA made certain representations and warranties ("**Rep**" or "**Reps**").  In connection with making the Reps included in the MLPA, BOA was required to check with its employees who have knowledge about the facts underlying the individual Reps in order to confirm that BOA was able to make such Reps.  (A-146; 397).  The

8

Loan was one of the loans in the Trust, which was created pursuant to a Pooling and Servicing Agreement on December 1, 2007, the same day the loans were sold by BOA (the "**PSA**"). (A-146; 403-435).

The Loan went into payment default on or about January 1, 2009, just one year after it was sold to the Trust. (A-146; 48, 112). On or about August 24, 2009 and February 8, 2010, the Trust gave written notices to BOA of its material breaches of Reps 15, 31, 39 and 49 BOA made in the MLPA and requested that BOA either cure the breaches or repurchase the A-Note portion of the Loan, as required pursuant to Section 2.03 of the PSA. (A-147; 417-22, 487-97). In response, BOA denied that it had breached any Rep and refused to cure or repurchase the A-Note. (A-147; 50, 114).

## C.    The Structure of the Acquisition that the Loan Financed

In December 2004, Coolidge Benton LLC, Coolidge Forrest LLC and Coolidge Woodland LLC (collectively, "**Coolidge**") purchased the Property for $32,626,249. (A-147; 31, 103). In 2006, Coolidge listed the Property for sale through a broker for $36,775,000. (A-147; 550). On September 22, 2006, Martin Carlin entered into an Agreement of Purchase and Sale with Coolidge (the "**Purchase Contract**") to buy the Property for $35,000,000. (A-147; 552-650).

Immediately thereafter, Carlin assigned the Purchase Contract to himself through a company he created and owned called EZ Building, LLC ("**Easy**"). (A-

9

148; 460-62).[3]  No written document exists that memorializes this assignment.  (Id.).

Then, on October 16, 2006, Carlin, acting through Easy, assigned the Purchase

Contract to another company he created and owned called Surrey – the Borrower –

for a purported additional $10 million by means of an Agreement of Assignment and

Assumption of Contract of Sale (the "**Assignment Contract**").  (A-148; 696-725).

Through the Assignment Contract that he entered into only one month after

purchasing the Property, ***Carlin artificially inflated the purchase price of the***

***Property from $35 million to $45 million***.[4]  (A-147-149; 473-74; 478-79; 552-650;

696-725).

Carlin was the majority owner of Surrey, which he co-owned with his son

(Shawn Carlin) and son-in-law (Robert Sandell).  (A-149; 351, 448).  It is undisputed

that ***no cash or other consideration was exchanged between Easy and Surrey for***

***the $10 million assignment***.  (A-149; 768).  Instead, the purported consideration for

the Assignment Contract was an IOU from the principals of Surrey (Carlin)

promising to pay Easy (Carlin) $9 million in accordance with the terms of a

promissory note (the "**Easy Note**").  (A-149-150; 745-48; 770-71).  ***The Easy Note***

***did not require any monthly installments and it was unsecured and non-interest***

---

[3] Carlin was the majority owner of Easy, which he testified he co-owned with his former girlfriend/secretary.  (A-148; 449-450 & 453).

[4] Easy and Surrey were created on the same day within two hours of each other.  (A-149; 727-735).

*bearing*. (A-770-71). The full amount was due in one lump sum one year later, and it included a formula that provided a 20% credit if the note was paid down early. (Id.). Andrew Baltz, ***BOA's Senior Closer*** for the Loan, ***admitted that the structure of this acquisition*** (the $35 million purchase price and the $9 million note) ***was highly unusual and that he had never seen any capitalization like it during his 33-year career***. (A-150; 533). Easy never received any cash payment from the Borrower's principals on the Easy Note. (A-150; 468-69; 768; 773-874). The chart below illustrates the chain of assignments, which happened between September 22 and October 16, 2006:

| Coolidge sells the Property to Carlin for $35 million pursuant to the Purchase Contract. → | Carlin assigns the Purchase Contract to his company, Easy, for $0. → | Carlin, through Easy, assigns the Purchase Contract to another Carlin created and owned company, Surrey, for a purported $10 million to artificially inflate the purchase price of the Property to $45 million. |
| --- | --- | --- |

## D.    **BOA's Origination of the Loan**

In December 2006, Surrey sought a loan from BOA to finance the acquisition of the Property. (A-150; 876-92). The origination of the Loan was governed by customary industry standards and BOA's policies and procedures (the "**Origination Procedures**"), both of which: (i) precluded loans with a loan to cost or "**LTC**" ratio greater than 85%; (ii) required the borrower to contribute at least 15% cash equity

for acquisition loans; and (iii) required BOA to close the loan that its Credit Committee had approved (A-151; 252-63; 896-904).[5]

### 1. The Loan Was Oversized and the Borrower Did *Not* Contribute Cash Equity

Before BOA funded and closed the approximately $40 million Loan on February 5, 2007 (the "**Closing Date**" or "**Closing**"), BOA knew that the price Surrey paid to acquire the Property from Coolidge was $35 million. (A-151-53; 445-47; 756; 949; 953-58; 967; 969). Carlin faxed a copy of the Purchase Contract before the Loan closed to BOA's originator, Harris Lukashok, and spoke to Lukashok's boss, Chris LaBianca (BOA's Managing Director), who confirmed that BOA had received his fax. (A-151-52; 443-47; 483-85). According to Carlin, BOA knew he had a contract with Coolidge to buy the Property for $35 million before the Closing Date. (A-152; 443-47). ***BOA confirmed that, to its knowledge, Carlin did not make any misrepresentations to BOA during its origination of the Loan.*** (A-152; 937-38).[6]

Carlin's attorney, Zalman Schochet, sent an email to Lukashok in November 2006 in which he explained the acquisition structure and specifically referenced the $35 million purchase price. (A-152; 949). On or about January 18, 2007, Schochet

---

[5] BOA's Origination Procedures were consistent with customary industry practices. (A-151; 252-63; 896-904; 917-18).

[6] BOA has never sued Surrey or its principals for fraud or any similar type of claim with regard to the Loan. (Id.).

12

told Lukashok and Baltz that the purchase price to acquire the Property was $35 million, that Surrey was not contributing much, if any, cash equity, and that the transaction involved a series of assignments. (A-152; 751-56).

The final Settlement Statement for the closing that was prepared at BOA's direction by First American Title Company (the "**Settlement Statement**"), which *was approved by BOA* and is part of the "Mortgage File" as that term is defined in the MLPA and PSA, also explicitly states that the total consideration paid to Coolidge was $35 million. (A-152; 161; 953-58; 302; 412-15; 1230-34).[7] Additionally, the payment breakdown in the Assignment Contract itself makes clear that the purchase price was $35 million (plus costs). (A-153; 696-97).[8]

Before the Loan closed (and thus before it was securitized and sold to the Trust), BOA also knew that Surrey contributed little, if any, cash equity, even though one of the three main selling points to BOA's Credit Committee for approval of the Loan was the amount of cash equity. (A-153-54; 749-62; 953-58, 969, 972-73, 975-81, 983-87, 989). Cash equity means cash, and it represents the difference between the purchase price plus acquisition expenses less the amount of money loaned for

---

[7] Schedule II of the MLPA states, "*All information* contained in documents which are part of or required to be part of the Mortgage File shall be deemed to be within the knowledge *and actual knowledge* of the Seller." (A-153; 302). BOA's origination expert also admitted that the Settlement Statement is part of the Mortgage File. (A-153; 908).

[8] There are additional emails that demonstrate that BOA was aware of the $35 million purchase price. (A-153; 949; 967; 969).

13

the investment. (A-154; 254). In the approval summary submitted to BOA's Credit Committee, it was expressly noted that Surrey was contributing between $3.1 million and $6.46 million of cash equity. (A-154; 997, 999, 1008).

BOA, however, knew that Surrey was not contributing any cash equity and at most was contributing as little as its $700,000 earnest money deposit. (A-153-54; 749-62, 953-58, 969, 972-73, 975-81, 983-87, 989). As early as January 2007, Baltz (BOA's Senior Closer) accurately described the acquisition as a flip of the Property and warned that Surrey was going to walk away from the Closing with cash:

> ***This is an assignment of an existing contract (ie a "flip" of the portfolio). We should get a copy of the underlying contract which is referenced in this assignment***. Also you should note in your write-up that the purchase price of $45,000,000 is being paid as follows: $36,000,000 in cash and assignor is taking a $9MM unsecured note from the principals of our borrower. ***Since our loan is $40,000,000 it appears the borrowers are walking away from the closing with cash . . . .***

(A-154; 969). Baltz confirmed that Surrey did not contribute any cash equity. (A-154; 515).

The Settlement Statement shows that Carlin, through entities he owned and controlled, pocketed roughly $2.5 million at Closing, and Carlin acknowledged that he made money on the deal. (A-154-55, 953-58, 478-79). In an October 2007 email from the Managing Director of BOA's CMBS group, David Fallick, BOA admitted that the Loan should not have been approved and that there was no cash equity: "***The problem was the prescreen / credit approval (it should not have happened) . . . I***

14

**will say it again, the NO cash equity was the icing on the cake of any already very**

**tough deal.**"  (A-155; 972).  Even in the February 5, 2007 Opinion Letter prepared

by Schochet (attorney for Easy, Carlin and Surrey) and reviewed by BOA before the

Closing, Schochet confirmed that the Loan was being used to acquire the Property

"**and for working capital.**"  (A-155; 1059).

   2.   The Acquisition Was *Not* an Arm's Length Transaction

   **BOA concedes that the structure of the underlying transaction it financed**

**was fraudulent**.  (BOA Br. 12-13).  Carlin provided BOA with a copy of the

Purchase Contract, which identifies him as the Purchaser of the Property for $35

million.  (A-151-52; 443-44, 483-85).  BOA knew Carlin had a contract with

Coolidge to buy the Property for $35 million.  (A-151-52; 443-47; 483-85; 949; 967;

969).  Before the Loan closed on February 5, 2007, Carlin told BOA that he was an

owner of Easy, thereby disclosing that Carlin was on both sides of the assignments

which artificially inflated the purchase price of the Property from $35 million to $45

million.  (A-147-49 & 155; 454-459, 552-650, 696-725).[9]

---

[9] Indeed, numerous internal BOA emails raise questions about the ownership structure of Easy and its involvement in the transaction:  "***Who is EZ Building, LLC?***"  (A-155; 967; 1087).  According to LaBianca, in a transaction involving assignments it is critical to find out whether the intermediary (Easy) and purchaser (Surrey) are related in order to determine whether the transaction is arm's length.  (A-156; 1096-97).  ***LaBianca confirmed that if those entities are related then the transaction would not be arm's length***.  (Id.).

Additional evidence that was available to BOA made clear that the assignment between Easy and Surrey was not an arm's length transaction. The same attorney represented Easy, Surrey and Carlin in the transaction: Zalman Schochet of the Altman Schochet, LLC firm. (A-149; 464-65, 700). Easy and Surrey were created on the same date. (A-149; 727-35). No cash or other consideration was exchanged between Easy and Surrey at the time of the Assignment Contract. (A-149; 768). The purported consideration for the Assignment Contract was an IOU in the form of the $9 million Easy Note given by the principals of Surrey to Easy that was ***non-interest bearing***, was unsecured, called for the full payment of the principal balance in one lump-sum payment in one year, and included a calculation that provided credit for the early payment of the note. (A-149-50; 745-48, 770-71). The transaction involved a flip of the Property for a purported increase in value of $10 million in less than one month, and Surrey did not contribute any cash equity. (A-147-49, 153-54; 552-650, 696-725, 749-62, 768, 770-71, 953-58, 969, 972-81, 983, 989). Surrey walked away from the transaction with approximately $2.5 million in cash. (A-156-57, 953-58).

BOA concedes that, prior to the Closing Date, it performed no due diligence to determine if the assignment between Easy and Surrey was an arm's length transaction. (A-156-57; 537-38, 1096-97, 1195-207). BOA's underwriter confirmed that she performed no due diligence on Easy, had only a "vague

16

understanding" of what an arm's length transaction was, and did not fully grasp the concept of a related entity. (A-157; 1195-207). Without such information, LaBianca confirmed that it was not possible for BOA to ensure that the Loan was within the 85% LTC ratio of BOA's Origination Procedures and customary practices. (A-158; 902, 1095).[10]

### 3. The Loan that BOA Approved Was *Not* the Loan that BOA Closed

Customary industry practices and BOA's Origination Procedures task BOA with closing the loan that BOA had approved. (A-158, 199; 210-13, 246, 260-61, 904, 947). Specifically, BOA's Origination Procedures mandate: "[t]he closing of the [Loan] should fully capture all terms representative of the Conduit Program and the specific Loan Approval." (A-158, 904).[11] In 2007, the loan approval process at BOA involved a review by the Credit Committee of a memorandum detailing the terms of the loan known as a Credit Approval Package ("**CAP**"). (A-158; 994-1051). According to the CAP dated February 2, 2007, a loan of $39,977,571 (A-Note of $37,179,141 and B-Note of $2,798,430) was approved by BOA. (A-158; 996).

---

[10] LaBianca's testimony is consistent with the Trust's origination expert: "Independent arm's length transactions are important to document as a lender and investor of commercial real estate loans when determining LTC ratios." (A-158, 238).

[11] BOA's corporate representative agreed that BOA's Origination Procedures required BOA to close the loan that had been approved. (A-158; 904, 947).

A purchase price of $45 million plus costs and escrows is highlighted in BOA's approval, **and the cash equity contributed by Surrey is identified three (3) different times in three different amounts: $3,113,000, $4,876,000 and $6,467,475**. (A-159; 997, 999, 1008). Cash equity and Carlin are identified as strengths of the transaction. (A-159; 999).

According to BOA's underwriter, the $39.9 million loan that BOA approved was based solely on the Assignment Contract between Easy and Surrey, with Easy as the Seller of the Property for a purchase price of $45 million plus closing costs. (A-159; 929-30, 1193-94). Based upon these wrong assumptions, BOA's underwriter concluded that the LTC ratio was approximately 86% and the cash equity contributed by Surrey was $6.5 million. (A-159; 928, 997, 1008, 1208-209). In fact, the $39.9 million loan that BOA closed, according to the Settlement Statement, confirmed that the Seller of the Property was Coolidge for a purchase price of $35 million plus closing costs. (A-160; 953-58). The recorded deeds confirm that title to the Property went from Coolidge to Surrey. (A-161; 652-63). At all times prior to the Closing Date, title to the Property was held by Coolidge. (A-148; 451-52; 652-63). **Easy never acquired title to the Property**. (A-161; 652-63; 451-52, 477).

Thus, contrary to the loan that it originated, **the Loan that BOA closed had a LTC ratio of approximately 114%, Surrey contributed zero cash equity, and in fact**

*__Surrey's majority owner, Carlin, took cash out of the transaction__*.  (A-161; 478-79; 953-58).

## E. <u>BOA's Internal and External Representations About the Loan</u>

BOA concedes that the CAP and Asset Summary Reviews ("**ASRs**") contain important information that investors use to make decisions about the Trust and loans being placed into the Trust.  (A-169; 1249-50).  Prior to the securitization of the Loan, BOA provided the CAP to C-III Asset Management LLC, among others, even though BOA knew the CAP contained false information.  (A-169; 939-40, 1490-518, 1522).

Specifically, the CAP falsely represented that: (i) the purchase price of the Property was $45 million plus closing costs, when it was $35 million plus closing costs; (ii) that Surrey invested cash equity in the Property between $3.1 and $6.5 million, when it invested zero cash equity; (iii) that cash equity was a strength of the transaction, when there was none; and (iv) that Martin Carlin was a strength of the transaction, when Carlin had disclosed in his loan application to BOA a $29,000 judgment against him, (A-169-70; 1493; 1495; 1503-504), and BOA failed to determine that the Martin Carlin identified in <u>U.S. v. Carlin</u>, 948 F. Supp. 271, 278-

79 (S.D.N.Y. 1996), where Carlin was found liable for fraud and tax evasion, was in fact him.  (A-176-77; 475-76, 890, 925-26, 1606, 1608).[12]

## SUMMARY OF ARGUMENT

I.    The District Court correctly concluded that Rep 39 of BOA's Origination Procedures required BOA to originate the Loan with a maximum 85% LTC and therefore a minimum 15% cash equity contribution by the Borrower, Surrey did not contribute the required 15% cash equity, BOA's Origination Procedures were consistent with customary industry standards, and, thus, BOA's origination of the "scratch and dent" Loan breached Rep 39 of the MLPA.  Its conclusion is supported by BOA's admissions, additional undisputed evidence in the record, and case law.  Further, the District Court's awards of damages as determined by the Purchase Price (as defined in the PSA) and statutory prejudgment interest were appropriate.

II.    BOA's theories for reversal of the District Court's grant of summary judgment on Rep 39 and awards of damages and prejudgment interest are meritless:

A.    There is no dispute that BOA's Origination Procedures were consistent with customary industry standards.  Both parties' origination experts

---

[12] Additionally, in ASRs that BOA provided to the other B-Piece Buyers, BOA continued to market the Loan with false information regarding the purchase price for the Property, the amount of cash equity, and that cash equity and Carlin were strengths of the transaction.  (A-170-171; 1525-26, 1528, 1539-40, 1542, 1546, 1553-54, 1556, 1560, 1567-68, 1570, 1574).

agree on this issue, and BOA admits as much. Thus, BOA's violation of its Origination Procedures does establish a breach of customary industry standards.

B.     Contrary to BOA's assertion, in interpreting Section 105(A)(2) of BOA's Origination Procedures, the District Court did not apply the 15% cash equity requirement from an inapplicable provision of its Origination Procedures relating to re-financings, i.e., Section 105(A)**(3)**, to the relevant provision relating to acquisition loans, i.e., Section 105(A)**(2)**.  The District Court never even cites to or quotes from the refinancing guidelines in Section 105(A)(3).  BOA's attempt at sowing confusion by intentionally misrepresenting the District Court's analysis should be rejected.

C.     The District Court correctly interpreted Section 105(A)(2) of BOA's Origination Procedures as requiring BOA to originate the Loan with a maximum 85% LTC with the remaining 15% made up by cash equity contributed by the Borrower.  It is undisputed that BOA originated the Loan with a LTC in excess of 100%, BOA overfunded the Loan, and the Borrower pocketed $2.5 million. Although BOA takes issue with the District Court's interpretation, BOA agrees that, for acquisition loans such as the Loan at issue, Section 105(A)(2) required that the Loan "not exceed 85% of the contract sale price" and therefore that "15% of the purchase price be provided by the purchaser and not by the bank."  (BOA Br. 6 &

21

18). Thus, BOA's interpretation of Section 105(A)(2) is actually consistent with the District Court's interpretation.

       D.    There is no evidence in the record to support BOA's litigation contention that the Easy Note constituted cash equity. BOA's admissions, the undisputed record, and case law demonstrate that the Easy Note did not constitute cash equity and there was no cash equity in the transaction.

       E.    The Trust did not receive a windfall when it was awarded amounts – unpaid interest and unreimbursed Servicing Advances – that it was contractually entitled to receive. If this Court were to deduct these amounts from the Trust's damages, it would be BOA (not the Trust) that would receive a windfall, and the Trust would incur a significant loss as a result.

       F.    The Trust did not waive its right to prejudgment interest by agreeing that its damages would be calculated in accordance with the Purchase Price calculation set forth in the PSA. None of the terms of the MLPA or PSA reflects any intention by the Trust to waive its statutory right to prejudgment interest under CPLR 5001, let alone a clear, unmistakable and unambiguous intention of the type required thereby.

       III.    The District Court's grant of summary judgment on the issue of BOA's breach can be affirmed for additional reasons in the record. As admitted by BOA, its Origination Procedures required BOA to close the loan that it had approved. In

this instance, BOA breached Rep 39 because the loan that it approved was not the Loan that it closed. Additionally, BOA breached the No Fraud representation and warranty found in Rep 49 because BOA repeatedly made intentional material misrepresentations with respect to the Borrower, the Loan and the Property to the Trust and other investors in order to sell the Loan.

## ARGUMENT

### I.   Standard of Review

Summary judgment orders are reviewed de novo. Gudmundsson v. U.S., 634 F.3d 212, 216 (2d Cir. 2011). The non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). An issue of fact is genuine if the evidence "is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must also advance more than "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment. Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996); see also Anderson, 477 U.S. at 249-50 ("If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

8751939

Expert opinions that are conclusory, without factual basis, and based on speculation or conjecture are not appropriate to consider on a motion for summary judgment. See Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008); Vargas v. Transeau, 514 F. Supp. 2d 439, 445-46 (S.D.N.Y. 2007) (opinion of expert was conclusory and thus insufficient to defeat summary judgment), aff'd sub nom. Vargas v. Pfizer, Inc., 352 F. App'x 458 (2d Cir. 2009); British Telecomms. PLC v. Prodigy Commc'ns Corp., 217 F. Supp. 2d 399, 417 (S.D.N.Y. 2002) (same).

This Court may also affirm on any ground for which there is support in the record. Chandok v. Klessig, 632 F.3d 803, 813 (2d Cir. 2011).

## II. BOA Breached Rep 39 by Failing to Originate the Loan in Accordance with Its Own and Customary Industry Standards

In Rep 39 of the MLPA, BOA represented and warranted:

(39) Origination, Servicing and Collection Practices. The origination (or acquisition, as the case may be), collection, and the servicing practices used by the Seller and its affiliates or contractors engaged by it with respect to the Mortgage Loan have been in all respects legal and have met customary standards utilized by prudent commercial or multifamily, as applicable, lenders and servicers.

(A-318). The District Court granted the Trust summary judgment because it correctly concluded that: (i) BOA's Origination Procedures required BOA to originate the Loan with a maximum 85% LTC with the remaining 15% made up by

24

cash equity contributed by the Borrower; (ii) Surrey did not contribute the required 15% cash equity; (iii) BOA's Origination Procedures were consistent with customary industry standards; and, therefore, (iv) BOA's origination of the Loan breached Rep 39.[13] (SPA-12-19). The District Court's decision is supported by applicable case law and the undisputed record.

    A.     BOA's Origination Procedures and Customary Industry Standards Precluded Acquisition Loans with a LTC Ratio Greater Than 85% and <u>Required the Borrower to Contribute 15% Cash Equity</u>

Consistent with customary industry standards, Section 105(A)(2) of BOA Origination Procedures states that, with respect to capitalization:

> In all Mortgage Loans, ***the Lender will determine the Borrower's capital basis in the project***. In the event of acquisition Loans or the refinance of an existing Loan within the first (12) months of ownership, Loan proceeds will be restricted in accordance with the following: . . .

>> **2.     At Acquisition**. Loan Amount shall be limited to a maximum eighty-five percent (85%) of the contract price including closing costs limited to a maximum fifteen (15%) percent of the contract price.

---

[13] The District Court correctly determined that the term "origination" in Rep 39 includes underwriting and closing aspects of the loan process. (SPA-13-14). This conclusion is not at issue in this appeal, as BOA did not identify it in its Statement of Issues or address the issue in its brief. <u>See, e.g.</u>, <u>Gross v. Rell</u>, 585 F.3d 72, 95 (2d Cir. 2009) (arguments not addressed in an appellant's opening brief are waived; furthermore, "[m]erely mentioning the relevant issue in an opening brief is not enough; issues not sufficiently argued are in general deemed waived and will not be considered on appeal. Simply stating an issue does not constitute compliance with Federal Rule of Appellate Procedure 28(a): an appellant or cross-appellant must state the issue *and* advance an argument.") (internal citations omitted). Accordingly, the Trust will not address it.

(A-902) (emphasis added by italics and underline). The District Court interpreted Section 105(A)(2) as follows:

> [t]he unavoidable consequence of a loan amount that is limited to 85% of the contract price is that the remaining 15% must be made up by cash equity provided by the Borrower. This conclusion is underscored by the policy behind limiting a loan amount to less than 100% of the purchase price; put another way, *the incentives of a borrower who fails to contribute any cash equity – whatever the definition of cash equity, whether literally cash or a term of art – to a purchase price or contract price are perverted, as it has no 'skin in the game*.'

(SPA-14-15) (emphasis added). This interpretation is supported by the opinions of the origination experts for **both** BOA and the Trust. **BOA's origination expert opined** that "the industry generally defines 'cash equity' as the difference between the purchase price of an asset, and the loan amount." (A-1967). The Trust's expert agrees that "[c]ash equity is the amount of cash that the purchaser pays for a property that is not borrowed. Simply defined, it is the difference between the purchase price plus acquisition expenses less the amount of money leveraged for the investment." (A-254). Further, BOA **admitted** that "[c]ash equity is the difference between the purchase price of an asset and the loan amount." (A-1803). Simply put, there is no genuine dispute as to the meaning of Section 105(A)(2) of BOA's Origination Procedures.

The District Court's straightforward interpretation of Section 105(A)(2) recognized that, in non-recourse CMBS loans such as the Loan at issue, the borrower

must have a tangible stake invested in the property because that is the only asset behind the loan.[14] (A-255). The requirement that the borrower have "skin in the game" is standard in the CMBS industry and essential for the origination of non-recourse CMBS loans. (A-254-55). See, e.g., U.S. v. Chew, 497 F. App'x 555, 562 (6th Cir. 2012) (explaining that it is most important to a lender in gauging risk that the "down payment on the purchase of investment property come from the borrower's own funds" and thus have "skin in the game"); Verex Assurance, Inc. v. John Hanson Sav. & Loan, Inc., 816 F.2d 1296, 1302 (9th Cir. 1987) ("In evaluating the risk of insuring a loan, the mortgage guaranty issuer considers (1) the borrower's credit and cash equity to determine likelihood of repayment").

BOA's admission and the opinions of the origination experts for BOA and the Trust are wholly consistent with the District Court's reading of Section 105(A)(2) to require a maximum LTC of 85% and therefore a minimum 15% cash equity contribution by the borrower for acquisition loans. There is no evidence in the record to the contrary. ***In fact, in its brief, BOA agrees that BOA's origination of the Loan should not have exceeded 85% of the acquisition price of the Property, and that 15% of the acquisition price was required to be paid by the Borrower***. (BOA

---

[14] "Generally, CMBS loans are non-recourse which means that the loan is collateralized by the property and the borrower is rarely personally liable except for fraud, misrepresentation or waste. Because the borrower is not personally liable for the loan, it is very important that the borrower have cash invested in the property (skin in the game) because this is the only asset behind the loan." (A-180; 255).

Br. 6 & 8). The District Court's interpretation of Section 105(A)(2) of BOA's Origination Procedures is correct.

### B. BOA's Admissions, the Record, and Case Law Confirm that Cash Equity Means Cash and Surrey Contributed Zero Cash

The District Court correctly held that cash equity "means what the term denotes – a cash contribution to the subject asset backed by a given loan" – and that Surrey made no cash contribution. (SPA-18). It based its holdings on BOA's admissions, the undisputed record, and case law. (SPA-16-18).

The District Court determined that the assertion by BOA's origination expert – that cash equity is a "term of art" and that promissory notes may qualify as cash equity if the note constitutes a "personal obligation of the borrower's principals" – had no factual support in the record and in fact conflicted with contemporaneous statements by BOA's own employees who used the term. (SPA-17-18). ***Indeed, BOA repeatedly admitted that there was no cash equity in the transaction and that the Easy Note was not cash equity.*** BOA's Senior Closer for the Loan, Andrew Baltz, noted that the financing or capitalization of the acquisition price for the Loan was as follows:

> ***$36,000,000 in cash and assignor [Easy] is taking a $9MM unsecured note from the principals of our borrower***. Since our loan is $40,000,000 it appears ***the borrowers are walking away from the closing with cash*** . . . .

28

(A-969).  The Managing Director of BOA's CMBS group, David Fallick, ***admitted***

that there was no cash equity:

> The problem was the prescreen / credit approval (it should not have
> happened) . . . ***I will say it again, the NO cash equity was the icing on
> the cake of an already very tough deal***.

(A-972) (emphasis added).  Mr. Baltz also confirmed during his deposition that

Surrey did not contribute any cash to the capitalization:

> Q:    ***You know for a fact, as you sit here today, the borrowers had
>       cash in the deal***?
> A:    As I sit here today means everything I know today?
> Q:    Yes.
> A:    I think everything that – that as – as of today, ***they didn't***.

(A-515) (emphasis added).

The foregoing admissions by BOA are corroborated by the balance of the

record.  It is undisputed that BOA originated the Loan at a LTC greater than 85% by

allowing Surrey to cash out more than $2.5 million at Closing, rather than having to

come out of pocket with 15% cash equity plus closing costs.  (A-161-62; 953-58,

246-47).  Surrey purchased the Property from Coolidge for $35 million, and the Loan

provided by BOA was roughly $40 million.  (A-953-58).  The Loan plainly exceeded

the acquisition costs, resulting in a LTC of approximately 114%, in violation of

BOA's Origination Procedures.  (Id.; A-902).  See Sw. Inv. Co. v. U.S., 63 Fed. Cl.

182, 187 (Fed. Cl. 2004) (noting that "the ***borrower had no cash equity*** invested in

the project" where "the mortgages acquired . . . equaled 106% of the sales price")

(emphasis added), <u>aff'd</u>, 158 F. App'x 283 (Fed. Cir. 2005), <u>cert. denied</u>, 547 U.S. 1163 (2006).[15]

Surrey did not contribute 15% cash equity or anywhere near the $3.1 to $6.47 million BOA indicated Surrey would contribute in the CAP. <u>Compare</u> A-997, 999, 1008 <u>with</u> A-953-58, 969, 972, 975, 983, 989. At most, Surrey contributed a nominal 1.5% of the purchase price as a deposit on the Property ($700,000) (<u>Id.</u>), but that was immediately repaid at Closing because Surrey received more than 100% financing from BOA. (A-953-58). The Settlement Statement indisputably demonstrates that Surrey received approximately $2.5 million in Loan proceeds instead of contributing any cash equity: $2.5 million cash *to* Borrower, and no cash *from* Borrower. (<u>Id.</u>).

---

[15] To the extent BOA argues in its Reply brief that it did not know at the time it originated the Loan that Easy and Surrey were related and that the assignment between Easy and Surrey was fraudulent, BOA's knowledge *vel non* of the relationship between Easy and Surrey is not relevant to a determination of whether BOA breached Rep 39. Indeed, unlike other Reps in the MLPA, there is no "actual knowledge" or "knowledge" requirement in Rep 39. <u>Compare</u> A-318 (Rep 39) <u>with</u> A-309-10 (Rep 15), A-316 (Rep 31). The absence of these terms distinguishes it from other Reps in the MLPA. <u>See</u> <u>Donerail Corp. v. 405 Park LLC</u>, 958 N.Y.S.2d 645(table), 2011 WL 489188, at *9 (N.Y. Sup. Ct. Feb. 2, 2011) (distinguishing terms in mortgage agreement "because the Agreement uses different terms and because these terms have distinct legal meanings") (citing <u>NFL Enters. LLC v. Comcast Cable Comm'cns LLC</u>, 851 N.Y.S.2d 551, 557 (N.Y. App. Div. 2008) (holding use of different terms in same agreement strongly implies that words are to be accorded different meanings)). This distinction was recognized in other CMBS repurchase cases where courts precluded the mortgage sellers from presenting evidence of their lack of knowledge as a defense to their breach of the origination representation. <u>See, e.g.</u>, <u>Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n</u>, 2011 WL 1303949, at *9 (W.D. Okla. Apr. 1, 2011); <u>Aurora Commercial Corp. v. Lenox Fin. Mortg. Corp.</u>, 2014 WL 4678285, at *3 (E.D. Cal. Sept. 19, 2014) (explaining that "whether or not Defendant [loan seller] *knew* that misrepresentations or other defects existed in the loan is without consequence"). ***Moreover, BOA's admissions that there was no cash equity are fatal to even BOA's "we didn't know" post hoc litigation contention.***

30

Thus, Surrey had no "skin in the game" because it did not contribute the required 15% cash equity, much less any equity (cash equity or otherwise).

The District Court also noted that, when the Loan was originated, the Easy Note was never described by BOA as cash equity, but was in fact viewed as something very different from cash equity. Even BOA's false portrayal of the Loan did not describe the Easy Note as cash equity. BOA instead observed: "The result is a purchase price of $45,550,000 to be funded by the $38,214,571 in net loan proceeds . . . , *$4.2MM in personal note and $3,113,000 in cash equity*." (A-997). The fact that BOA distinguished between the note and cash equity as two separate funding sources as it approved the Loan in 2007 supports the District Court's conclusion that BOA did not, in fact, view the Easy Note as the equivalent of cash equity. Further, BOA concedes that the Easy Note was fraudulent and thus could not possibly constitute cash equity. (BOA Br. 12-13). The assertion by BOA's origination expert that the Easy Note may qualify as cash equity is mere *ipse dixit*. (SPA-18). BOA's admissions and the other evidence in the record support the District Court's determination that there was no cash equity in this deal and that BOA did not consider the Easy Note to be cash equity.

Courts across the country have routinely observed that cash equity means cash. See, e.g., Citibank, N.A. v. K-H Corp., 745 F. Supp. 899, 904 (S.D.N.Y. 1990) (explaining *that cash equity means cash*); Firstier Mortg. Co. v. Investors Mortg.

Ins. Co., 708 F. Supp. 1224, 1231 (W.D. Okla. 1989) (granting summary judgment and concluding that because the borrowers had not contributed down payments or "earnest deposits" they had no cash equity in the subject properties); Ed Peters Jewelry Co. v. C & J Jewelry Co., 51 F. Supp. 2d 81, 94 (D.R.I. 1999) (referring to the amount of "cash transferred in the deal" as cash equity); Verex Assurance, Inc., 816 F.2d at 1302 (explaining "[t]he difference between loan and sales price reflected the amount of cash equity each borrower would provide and the down payment Verex assumed would be paid"); Rotham Realty Co. v. Gabel, 16 N.Y.2d 517, 519 (N.Y. 1965) (referring to cash payment portion of purchase price as cash equity); see also Investopedia, http://www.investopedia.com/terms/c/cash-equity.asp (last visited Nov. 20, 2014) (defining "cash equity" as "[i]n real estate, the amount of money an owner has invested in the property"). Thus, the District Court's conclusion also draws support from the case law.

The District Court also correctly concluded that the Easy Note was not cash equity because it constituted a debt obligation with a promise to pay cash by the principals of the Borrower sometime in the future. (SPA-16-17). See K-H Corp., 745 F. Supp. at 904 (noting that cash equity means cash and concluding that *a promissory note is not cash equity*). It was also not a contribution made by the Borrower. No equity was generated by the Borrower through the Easy Note because no cash or other consideration was exchanged between Easy and the Borrower or

even the principals of the Borrower for the $10 million assignment. (A-150; 468-69, 768, 773-874). Thus, as the District Court accurately found, the Easy Note neither reflected a cash contribution to the acquisition of the Property, nor reflected the ***Borrower's*** contribution because the Borrower was not even a party to the Easy Note. (A-979-80).

C. **BOA and Its Origination Expert Admitted that BOA's Origination Procedures Were Consistent with Customary Industry Standards**

BOA's failure to meet its own Origination Procedures in originating the Loan is competent evidence that BOA failed to adhere to customary industry standards, as required by Rep 39. (SPA-18-19). ***A lender's failure to adhere to its own guidelines is a per se breach of industry standards.*** See LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc., 237 F. Supp. 2d 618, 630 (D. Md. 2002) (finding that proof that the seller did not follow its own origination guidelines was sufficient proof of a breach of the representation relating to customary industry standards to merit summary judgment); Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n, 643 F. Supp. 2d 1014, 1031 (S.D. Ohio 2009) (concluding that evidence that LaSalle did not meet its own internal underwriting guidelines is competent evidence that it did not meet customary industry standards).

BOA's origination expert opined that with respect to origination, BOA's Origination Procedures were consistent with customary industry standards:

33

> Q:      Did you find [the Origination Procedures] to be consistent with industry standards?
>
> A:      I mean generally, yes.  I mean industry standards can vary, and certain programs can vary, but by and large, I think that they were consistent.

(A-917-18).  BOA conceded as much:  "Bank of America's Guidelines in effect at the time of the Loan were not inconsistent with customary industry standards."  (A-1795).   The Trust's expert agreed that BOA's Origination Procedures were consistent with industry standards.  (A-252-63).  There is no evidence in the record demonstrating that BOA's Origination Procedures were inconsistent with or different from customary industry standards.  Based on the record, the District Court correctly determined that BOA's breach of its own Origination Procedures established a breach of customary industry standards, and properly granted summary judgment for the Trust on the issue of breach.

## III.    The Trust Is Entitled to Damages Pursuant to the Purchase Price Calculation Plus Mandatory Statutory Prejudgment Interest

The Trust is contractually entitled to accrued and unpaid interest and unreimbursed Servicing Advances, and statutorily entitled to prejudgment interest.

### A.    The Purchase Price Definition Includes Interest and Servicing Advances

Under the MLPA and the PSA, BOA's obligation to repurchase the Loan was triggered by its breach of Rep 39.  (A-175-76; 283, 418).  Under the PSA, the price at which BOA must repurchase the Loan is contractually established as the Purchase

34

Price in Section 1.01. (A-175; 416). The PSA defines how the Purchase Price is calculated:

> With respect to any Mortgage Loan, a price equal to the unpaid principal balance of the Mortgage Loan as of the date of purchase, together with (a) *all accrued and unpaid interest* . . . (b) *all related unreimbursed* Master Servicing Fees, Special Servicing Fees, Trustee Fees and *Servicing Advances* . . . (c) all accrued and unpaid Advance Interest in respect of related Advances, (d) any Additional Trust Fund Expenses in respect of such mortgage Loan . . . (e) Liquidation Fees (if any) payable in connection with a purchase of a Mortgage Loan and (f) any cost, fees and expenses of enforcement (including attorneys fees) of a repurchase obligation pursuant to Section 2.03(h).

(Id.) (emphasis added). The District Court correctly determined that, even though BOA could not repurchase the Loan because the mortgage securing the Loan had been foreclosed and the Property sold, the appropriate measure of damages was the Purchase Price: "the PSA specifically provides that, in the event of a material breach of the [MLPA], the purchase price, offset by any proceeds generated by [the Trust's] liquidation of the Properties that are not provided as reimbursement to the Trust for reasonable servicing advances, represents the appropriate damages calculation." (SPA-25).[16]

---

[16] Other courts involving CMBS claims have uniformly ruled that the purchase price is the appropriate method of determining damages caused by a mortgage loan seller's breach of a mortgage loan purchase agreement. See Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n, 2011 WL 3739170, at *3 (W.D. Okla. Aug. 23, 2011); Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n, 2010 WL 2873661, at *1 (S.D. Ohio July 19, 2010); Lehman Bros. Holdings, 237 F. Supp. 2d at 638 (stating that even "if it is not possible for defendant Lehman to repurchase the . . . mortgage loan because of the pending bankruptcy proceedings, plaintiff may still recover traditional contract damages in this case" and determining those damages using the purchase price calculation). See also Morgan Guar. Trust Co. v. Bay View Franchise Mortg. Acceptance Co.,

Under the express terms of the PSA, the $1,703,324.36 in accrued and unpaid contract interest and the $313,795.77 in unreimbursed Servicing Advances were properly included by the District Court in the Trust's damages award. (A-416). Although such amounts were advanced to the Trust by the master servicer for the Trust (who happened to be BOA), such advances were an obligation that the Trust had to reimburse to the master servicer from the Property sale proceeds, which the Trust did, plus interest that the master servicer charged on such advances. (A-5008-9, 7365, 7441-42). They were not paid to the Trust by BOA as the mortgage loan seller.

The District Court explained:

> [it is] not relevant that [the Trust's] loan servicer – which happened to be [BOA] – advanced interest and servicing expenses to [the Trust]. No matter what arrangements [the Trust] made with [BOA] as loan servicer, [BOA] had a preexisting contractual obligation to pay [the Trust] the purchase price, including accrued and unpaid interest, in the event of a breach. [BOA] wrongfully refused to fulfill that obligation. The advance that [BOA] paid to [the Trust] was not a partial satisfaction of the repurchase obligation; it was a separate transaction that incurred a corresponding obligation from [the Trust].

(SPA-39). Thus, the District Court correctly concluded that the $2,017,120.13 in accrued and unpaid interest and unreimbursed Servicing Advances was properly

---

2002 WL 818082, at *14-15 (S.D.N.Y. Apr. 30, 2002) (breach "triggered" the "Repurchase Price" remedy, calculated as set forth in the contract).

36

included in the Purchase Price calculation and compensable to the Trust as damages against the mortgage loan seller BOA.

    B.    <u>The Trust Has a Statutory Right to Prejudgment Interest</u>

The Trust is entitled to prejudgment interest pursuant to CPLR 5001(a). That Section provides, in pertinent part, "[i]nterest ***shall*** be recovered upon a sum awarded because of a breach of performance of a contract . . . ." CPLR 5001(a) (emphasis added). Thus, the right to prejudgment interest is a "statutory mandate." <u>Delulio v. 320-57 Corp.</u>, 472 N.Y.S.2d 379, 381 (N.Y. App. Div. 1984) (awarding prejudgment interest under CPLR 5001(a)); <u>U.S. Naval Inst. v. Charter Commc'ns, Inc.</u>, 936 F.2d 692, 698 (2d Cir. 1991) ("[A] plaintiff who prevails on a claim for breach of contract is entitled to prejudgment interest as a matter of right."). <u>See also</u> <u>Spodek v. Park Prop. Dev. Assocs.</u>, 96 N.Y.2d 577, 581 (N.Y. 2001) (awarding prejudgment interest under CPLR 5001(a) on both principal and interest, as such an award is consistent with "the plain language of the statute that mandates the award of interest to verdict in breach of contract actions . . . [and] also is consistent with our long-standing recognition that the purpose of awarding interest is to make an aggrieved party whole"). Prejudgment interest runs from the date of the breach until the date judgment is entered. CPLR 5001(b); <u>Spodek</u>, 96 N.Y.2d at 581.

The District Court correctly held that the Trust was entitled to prejudgment interest from August 24, 2009 (<u>i.e.</u>, the date the Trust notified BOA of its breach and

demanded repurchase) until April 24, 2014 (i.e., the date prior to entry of judgment) for a total amount of $14,321,679.50. (SPA-1-2, 35-36; A-7466). It concluded that simply because the Trust agreed that its damages in the event of a breach by BOA were calculated in accordance with the definition of the Purchase Price in the PSA, the Trust did not clearly waive its right to prejudgment interest: "[t]he parties' chosen remedy does not entail waiver of [the Trust's] right to statutory prejudgment interest." (SPA-33).

The District Court's holding is consistent with settled New York law, holding that a waiver of a statutory right must be "***clear, unmistakable and without ambiguity***." Civil Serv. Emps. Ass'n, Inc. v. Newman, 450 N.Y.S.2d 901, 903 (N.Y. App. Div. 1982) (emphasis added), aff'd, 61 N.Y.2d 1001 (N.Y. 1984). Indeed, a waiver constitutes "the intentional relinquishment of a known right with both knowledge of its existence and an intention to relinquish it." City of N.Y. v. State of N.Y., 40 N.Y.2d 659, 669 (N.Y. 1976) (internal quotation marks omitted). Accordingly, New York courts have held that waivers "cannot be inferred from doubtful or equivocal acts or language." E. 56th Plaza, Inc. v. Abrams, 458 N.Y.S.2d 953, 955 (N.Y. App. Div. 1983). Here, none of the terms of the MLPA or PSA, individually or collectively, reflects ***any*** intention by the Trust to waive its statutory right to prejudgment interest under CPLR 5001, let alone a clear, unmistakable and unambiguous intention as required by applicable law.

The District Court further grounded its decision to award prejudgment interest on the risk allocation that was built into the MLPA: "from the moment a proper repurchase demand was made, [the seller] – not [the buyer] – should have borne the risk . . . ." (SPA-33). It explained further:

> If [the Trust] had bargained away its right to prejudgment interest, there would be little incentive for [BOA] to cure or repurchase under any circumstances. [BOA] could roll the dice at minimal cost by forcing [the Trust] to file suit – if [BOA] 'lost,' it would still pay the same amount in damages.

(Id.). The District Court concluded that the parties did not supplant the prejudgment interest statutory scheme, because the MLPA does not compensate for the time value of money. (Id.).

Other courts in CMBS repurchase cases have rejected similar waiver arguments and awarded prejudgment interest based on breaches of contracts virtually identical to the PSA and MLPA here. See, e.g., U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Mkts., 2014 WL 4290642, at *3-4 (S.D.N.Y. Aug. 28, 2014) (rejecting waiver argument and awarding plaintiff trust prejudgment interest under CPLR 5001(a) upon a finding that the mortgage loan seller breached the mortgage loan purchase agreement and requiring the seller to repurchase the loan at the purchase price as calculated in the contract); Lehman Bros. Holdings, Inc. v. PMC Bancorp, 2013 WL 1095458, at *12 (C.D. Cal. Mar. 8, 2013) (awarding prejudgment interest in addition to the "Repurchase Price" and explaining that "New

York law provides for mandatory prejudgment interest on contract claims at a rate of 9% per annum"); <u>Lehman Bros. Holdings, Inc. v. Cal. Fin. Grp., Inc.</u>, 2011 WL 4375724, at *10 (C.D. Cal. Apr. 25, 2011) (same); <u>F.D.I.C. v. Key Fin. Servs., Inc.</u>, 1999 WL 34866812, at *12 (D. Mass. Dec. 23, 1999) ("Under New York law, in breach of contract matters, prejudgment interest is recoverable as a matter of right…the plaintiff's calculation of damages using a 9% rate of prejudgment interest statute was proper."), <u>aff'd sub nom.</u> <u>Resolution Trust Corp. v. Key Fin. Servs., Inc.</u>, 280 F.3d 12, 18-19 (1st Cir. 2002). As prejudgment interest is statutorily mandated and the Trust did not waive this statutory right, the District Court correctly concluded that the Trust did not waive its statutory right to prejudgment interest.

## IV. BOA's Arguments for Reversal of the District Court's Grant of Summary Judgment Lack Merit

### A. The District Court Did *Not* Conflate BOA's Origination Procedures with Customary Industry Standards

BOA asserts that, even if it deviated from its Origination Procedures, such a violation does not establish a breach of customary industry standards. Given the undisputed evidence in the record, BOA is mistaken.

There is no dispute that BOA's Origination Procedures were consistent with customary industry standards. (A-151; 917-18). Both sides' origination experts agree on this score. (<u>Id</u>; A-252-63). BOA also admits to this fact. (A-1795). Thus,

BOA's violation of its Origination Procedures does establish a breach of customary industry standards.[17]

BOA relies on two cases for the proposition that "numerous decisions" establish that a breach of internal guidelines does not by itself establish that customary industry standards have been violated. One of the cases in fact supports the District Court's decision, and the other one – an unpublished decision from Oklahoma – is inapposite. In <u>Wells Fargo Bank, N.A. v. LaSalle Bank Nat'l Ass'n</u>, 643 F. Supp. 2d 1014, 1031 (S.D. Ohio 2009), the court was asked: "Is evidence of LaSalle's failure to meet its own internal underwriting guidelines competent to prove it failed to meet industry standards?" In answering that question "yes," the court cited to and relied upon <u>LaSalle Bank Nat'l Ass'n v. Lehman Bros. Holdings, Inc.</u>, 237 F. Supp. 2d 618 (D. Md. 2002),[18] in which the court held that proof that the seller failed to follow their own underwriting guidelines was sufficient proof of breach of the relevant warranty to merit summary judgment against the seller. <u>Id.</u> Thus, the <u>Wells Fargo</u> decision is on all fours with the District Court's decision.

---

[17] BOA speculates that BOA's Origination Procedures **_might_** have been more stringent than customary industry standards, but BOA has no evidence that supports such conjecture. To the contrary, its own expert opined that BOA's Origination Procedures were **_consistent_** with customary industry standards. (A-917-18).

[18] BOA attempts to distinguish <u>LaSalle Bank</u> by arguing that the defendants' expert in that case, unlike Mr. Dwyer here, did not offer any "_opinion whatsoever_ as to whether defendant's underwriting practices 'were prudent and met customary standards.'" (BOA Br. at 37-38, n.21). That is simply untrue. The defendant's expert in that case (Thomas Vetrano) did in fact render such opinions. 237 F. Supp. at 630. Further, the opinion of BOA's origination expert that the Easy Note constitutes cash equity is based on a false assumption and is therefore unreliable.

41

The other unpublished decision from Oklahoma, <u>Wells Fargo Bank, N.A. v.</u>
<u>LaSalle Bank Nat'l Ass'n</u>, Case No. CIV-08-1125-C (W.D. Okla. Dec. 10, 2010),
lends no support to BOA. (A-4779-827). In that case, there was no discussion by
the parties or the court as to whether the internal guidelines at issue were consistent
with customary industry standards. In fact, unlike here, the plaintiff never advanced
this argument, much less presented evidence on the point. <u>See generally</u> <u>id.</u> Also,
because the court did not find that the seller's internal guidelines had been violated,
there was simply no need for it to determine whether a violation of such guidelines
established a violation of industry standards. <u>See generally</u> <u>id.</u> The Oklahoma
decision is inapposite, and it in no way detracts from the holdings by the District
Court and the courts in <u>LaSalle Bank</u> and <u>Wells Fargo</u>.

BOA also offers speculative conjecture regarding possible deviations or
departures from the Origination Procedures and posits that "[e]xceptions to
guidelines are common." (BOA Br. 38). Tellingly, BOA does not identify a single
exception or deviation that was approved by BOA's credit committee, which would
have authorized BOA to originate the loan at a LTC of 114%, with the Borrower not
contributing any cash equity and in fact profiting by $2.5 million in cash. BOA's
origination expert and lead underwriter both confirmed that BOA's Origination
Procedures required that any deviation by BOA from such procedures must be
flagged and approved by BOA's credit committee. (A-1966, 3066-67 at 24-27,

42

3922-23). This *ad hoc* litigation contention is devoid of any factual support in the record. In sum, BOA's Origination Procedures were consistent with customary industry standards, and BOA's violation of Section 105(A)(2) established a breach of Rep 39.

B.   The District Court Did *Not* Apply the Wrong Section of BOA's Origination Procedures

BOA's *lead* argument rests on its attempt to manufacture confusion and error on the part of the District Court where there is none. BOA contends that the District Court applied a requirement from an inapplicable provision of its Origination Procedures relating to re-financings to the relevant provision relating to acquisition loans. (BOA Br. 7). Specifically, BOA asserts that the District Court erroneously relied on Section 105(A)**(3)** of its Origination Procedures, not 105(A)**(2)**, in concluding that BOA was precluded from originating loans with a LTC ratio greater than 85% and without the borrower contributing 15% cash equity to the acquisition price. (BOA Br. 24-31).

*The District Court, however, never even cited to or quoted from the re-financings guidelines found in Section 105(A)(3).* Not once in the District Court's opinion is Section 105(A)(3) even mentioned. See generally SPA-3-26. Thus, BOA's assertion that the "District Court effectively conflated the two provisions" is pure fiction. (BOA Br. 31). BOA, not the District Court, has improperly injected Section 105(A)(3) into this appeal solely to sow confusion where there is none.

43

Section 105(A)**(2)** – the relevant section relating to acquisition loans – is the only section of BOA's Origination Procedures cited and quoted by the District Court. (SPA-14).  BOA's obfuscation tactic should be rejected.

Importantly, BOA actually *agrees* that, for acquisition loans such as the Loan at issue, Section 105(A)(2) required that:

(i)     the Surrey Loan "not exceed 85% of the contract of sale price," (BOA Br. 6); and

(ii)    "15% of the purchase price be provided by the purchaser [the Borrower – Surrey] and not by the bank" (BOA Br. 18).

*In fact, BOA readily admits that Surrey was required to have 15% of its own "skin in the game."*[19]  See BOA Br. 29, n.16 ("[T]hat section [Section 105(A)(2)] only requires that at least 15% of the purchase price be made up in a type of asset acceptable to the seller – be it cash, notes, or any other asset accepted by the seller, any one of which would, in fact, result in a borrower having 'skin in the game' or a form of equity in the financed property.").   Therefore, BOA's interpretation of

_____

[19]     **"Skin in the game" means cash**.       See    Investopedia, http://www.investopedia.com/terms/s/skininthegame.asp (last visited Nov. 20, 2014) (defining "skin in the game" as "referring to a situation in which high-ranking insiders use their own money to buy stock in the company they are running"); F.D.I.C. v. Prop. Transfer Servs., Inc., 2013 WL 5535561, at *14 (S.D. Fla. Oct. 7, 2013) (holding that borrower had no "skin in the game" because he did not himself make the monetary down payment); F.D.I.C. v. Law Office of Rafael Ubieta, P.A., 2012 WL 5307152, at *1 (S.D. Fla. Oct. 29, 2012) (explaining that to have "skin in the game" one has to fund the purchase price of an asset with "money from their own pockets"); Chew, 497 F. App'x at 562 (referring to the down payment money as the "skin in the game"); LNV Corp. v. Outsource Serv. Mgmt., LLC, 2014 WL 5106866, at *2 (D. Minn. Oct. 10, 2014) (explaining that requiring the borrower to fund a portion of the cost of the acquisition with $30 million of its own money is known as the borrower having "skin in the game").

8751939

Section 105(A)(2) is actually in accord with the District Court's interpretation that the Borrower was required to have 15% of its own "skin in the game."

BOA's sole disagreement with the District Court's conclusion was its refusal to find that 15% of Surrey's "skin in the game" was satisfied by the Easy Note – a debt obligation issued by the principals of Surrey (not Surrey), which BOA concedes was fraudulent.[20]  (BOA Br. at 12-13).  This refusal was not error.

### C.    BOA's Efforts to Create a Dispute of Fact Are Inconsistent with the Record

BOA contends that there is a dispute of fact as to the meaning of cash equity, and that the District Court erred in weighing the evidence on this issue.  BOA is wrong.  But for the litigation contention of BOA and the *ipse dixit* of its origination expert, there is no dispute as to its meaning:  cash equity means exactly what it says and requires cash.

BOA relies principally on the opinion of its origination expert as the "evidence," which supports BOA's assertion that the Easy Note constituted cash equity.  Specifically, Mr. Dwyer opined that a promissory note, provided by the principals of a borrower in their personal capacity, can, according to industry standards, also qualify as cash equity.  (A-1967).  Mr. Dwyer, however, failed to cite

---

[20] In light of this concession, it is outrageous for BOA to represent to this Court that:  "The [Easy] Note for $6.4 million was backed by the Carlin's significant personal assets as collateral for the down payment and ensured that all of the principals of the Borrower 'skin in the game.'" (BOA Br. at 33, n.17).

to any evidence in the record that supports his opinion. (Id.). ***In fact, BOA repeatedly admitted that, although the Easy Note was part of the structure, there was "NO cash equity" in the transaction.*** (A-515, 969, 972, 975, 983, 989). Thus, Mr. Dwyer's opinion actually conflicts with admissions by BOA's own employees involved with the origination of the Loan.

Furthermore, Mr. Dwyer's opinion about the Easy Note perhaps constituting cash equity is based on a critical ***false assumption***. In giving that opinion, ***Mr. Dwyer was asked to assume that Easy and Surrey were not affiliated and that the assignment between Easy and Surrey was arm's length***. (A-1939-40). BOA has conceded that Easy and Surrey were related and that the Easy Note was fraudulent. (BOA Br. at 12-13). Based on the actual facts, Mr. Dwyer did not, and could not, offer any opinion that the Easy Note constituted cash equity. (A-1939-40, A-4622 at 26). Thus, in addition to Mr. Dwyer's opinion lacking any factual support and conflicting with BOA's own admissions, it is completely unreliable given its reliance on an indisputably false assumption. See Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 269 (2d Cir. 2002) (where expert opinion "rested on a faulty assumption due to his failure to apply his stated methodology 'reliably to the facts of the case,' . . . [it] was not based on 'good grounds'" and was thus unreliable); Moore v. Int'l Paint, L.L.C., 547 F. App'x 513, 515-16 (5th Cir. 2013) (expert testimony not reliable where the underlying factual assumptions differed from

undisputed record evidence); <u>Bank of N.Y. Mellon Trust Co. v. Solstice ABS CBO II, Ltd.</u>, 910 F. Supp. 2d 629, 649-50 (S.D.N.Y. 2012) (expert opinion resting on a faulty assumption lacked probative value).

As for the other evidence BOA relies upon (<u>i.e.</u>, select excerpts from testimony of Baltz and Case), none of it creates any ***genuine*** dispute (much less any dispute) of fact as to the meaning of cash equity and whether the Easy Note qualifies as such. During the origination of the Loan, Mr. Baltz warned BOA that Surrey would walk away from the Closing with cash, which the Settlement Statement indisputably demonstrates that Surrey did, to the tune of $2.5 million. (A-969, 975, 953-58). Contrary to BOA's assertion, ***Mr. Baltz never testified that the Easy Note constituted cash equity.*** (A-2902 at 145:22 – A-2903 at 146:11). He initially testified that the only cash equity in the deal was Surrey's deposit of $700,000 (far less than the required 15%) (<u>Id.</u>), but Mr. Baltz ultimately conceded that Surrey did not contribute any cash. (A-515). His testimony is consistent with Mr. Fallick's admission that the "***NO cash equity was the icing on the cake of an already tough deal.***" (A-972).

Desperate, BOA relies on Michael Case, an individual who was not even involved in the origination of the Loan, making it impossible for his testimony to generate a ***genuine*** dispute of fact against the admissions noted above. Nevertheless, ***Mr. Case became involved in the Loan after it was originated***, and his job at BOA

47

was to unload the B-Note (not the A-Note, which is the Loan at issue) to investors in the B-Note market. The fact that Mr. Case considered the Easy Note to be cash equity is meaningless, because BOA has repeatedly admitted that there was "NO cash equity" in the transaction.[21] (A-972; see also A-515, 969, 975, 983, 989).

In sum, BOA's efforts to create a dispute of fact are simply inconsistent with the record and should be rejected.[22]

> D. The Trust Did Not Receive a Windfall when It Was Awarded Amounts that It Was Contractually Entitled to Receive

The PSA expressly provides that the Trust is entitled to receive as part of the Purchase Price calculation accrued and unpaid interest and unreimbursed Servicing Advances. (A-416). The District Court's decision to award such amounts to the Trust was appropriate.

Although it is true that the master servicer (who happened to be BOA) advanced the accrued and unpaid interest and Servicing Advances to the Trust, *it is equally true that the Trust was obligated to reimburse the master servicer from the*

---

[21] In fact, even the investors to whom Mr. Case tried to sell the B-Note recognized and informed Mr. Case that their reason for not being comfortable with the transaction was that the Borrower had no cash equity in it. (A-1365, 4116-17).

[22] BOA also relies on testimony from the Borrower's lawyer, Mr. Schochet, who was not even involved in the origination of the Loan, and as a lawyer he is not in the business of originating loans. (A-743). He testified that, in his view, he considered the Easy Note to be "similar to a purchase money mortgage" which is seller financing. (A-4033 at 109). But, even as acknowledged by BOA's own expert, Mr. Dwyer, the Easy Note was *not* seller financing. (A-914-15). Further, Mr. Schochet confirmed that no money was exchanged between Easy and Surrey, noting instead that there was a "theoretical advancement of money." (A-4033 at 108).

48

8751939

***Property sale proceeds for these amounts, which it did including the additional interest that the master servicer charged on such advances***.  (SPA-39; A-5008-5009, 7365, 7441-42).  BOA neglects to mention this significant fact.  Thus, contrary to BOA's inaccurate portrayal of the record, the Trust did not receive any type of double recovery.  In fact, if this Court were to deduct these amounts from the Trust's damages award, it would be BOA (not the Trust) that would receive a windfall, and the Trust would incur a significant loss.

The District Court also correctly observed that it is irrelevant that the master servicer (who happened to be BOA) advanced interest and services expenses to the Trust, because BOA (as the mortgage loan seller) had a "preexisting contractual obligation to pay [the Trust] the purchase price, including accrued and unpaid interest, in the event of a breach," and such advance by the master servicer "was not a partial satisfaction of the repurchase obligation; it was a separate transaction that incurred a corresponding obligation from [the Trust]."  (SPA-39).  The judgment entered by the District Court should not be reduced at all.[23]

---

[23] BOA's alternative argument that if it must pay the interest and Servicing Advances, it should be credited with $893,482.36 in Property revenues, can be disposed of easily.  BOA raised no objection to the Trust's calculation of unapplied funds for over ten (10) months, despite there being no change in such calculation, and has thus waived this argument.  (SPA 41).  Nevertheless, BOA points to no evidence that raises a genuine dispute of fact that $893,482.36 was not credited to BOA.  (Id.)  BOA's own Loan History document confirms that these revenues were in fact credited to BOA.  See A-7417 (When the five "Payment Reversal" amounts, which are located directly above the "Credit Unapplied" entry for $893,482.36, are added together and the "Reclassification" amount of $112,744.92 is deducted, BOA's own document shows that BOA received credit in the amount of $893,482.36.).  BOA is not entitled to double credit.

49

E.     There Was No Error by the District Court in Awarding the Trust
       Statutorily Mandated Prejudgment Interest

Contrary to BOA's assertion, the Trust did not waive its right to prejudgment interest in the PSA or MLPA.  Rather, the parties agreed in the MLPA that the Trust's sole remedy for a breach of a Rep that materially and adversely affected the value of the Loan was for the Trust to deliver a notice to BOA and demand cure or repurchase.  (A-283 at § 4(c); A-287 ("the obligations of the Seller set forth in this Section 4(c) to cure a Material Breach . . . constitute the sole remedies available to the Purchaser with respect to any Breach . . . .")).  The Trust's sole remedy was *not*, as BOA states, for the Purchase Price.  (BOA Br. 41).  As the District Court explained, "[u]se of the words 'sole remedy' is not code for 'I waive prejudgment interest.'"  (SPA-32).

Instead, for a contractual provision to operate to waive prejudgment interest, the parties must "chart their own course" and tailor a remedy that otherwise compensates the nonbreaching party for lost use of the money she is owed. J. D'Addario & Co. v. Embassy Indus., Inc., 20 N.Y.3d 113, 118-19 (N.Y. 2012). A party's waiver must be clear, unmistakable and without ambiguity.  See Katzman v. Helen of Troy Tex. Corp, 2013 WL 1496952, at *6 (S.D.N.Y. Apr. 11, 2013) (holding that a contract that contained a sole remedy provision did not contain a clear waiver to prejudgment interest and awarding prejudgment interest).

8751939

Unlike the agreement in J. D'Addario, the parties here did not "chart their own course" in the MLPA or PSA.  In J. D'Addario, the court held that waiver was clear because: (i) the escrowed amount was a specific sum of money designated by the parties as the "sole remedy"; (ii) the parties included a provision for the time value of money, i.e., interest on an escrowed amount; and (iii) the parties specified that the wronged party would retain "no further rights" once those liquidated damages – from the escrow account – were awarded.  20 N.Y.3d at 118-19.  Here, the parties did not set up an interest-bearing escrow account to be liquidated as damages in the event of a breach of the MLPA.  Nor did the Purchase Price to which the parties agreed provide for the accrual of interest on the amount awarded that would displace the time value of money function that prejudgment interest serves.[24]

Instead, the parties agreed that the Trust's measure of damages in the event that BOA refused to cure or repurchase is the Purchase Price calculation.  Crucially, the Purchase Price calculation does not contemplate or compensate for a failure to repurchase on demand; rather, it presupposes that the breaching party timely repurchases the Loan.  The Purchase Price, therefore, does not "supplant the [prejudgment interest] statutory scheme by creating [its] own plan to compensate [the Trust] for the time value of the purchase price if [BOA] wrongfully refused to

---

[24] The interest component of the Purchase Price is part of the debt owed by the Borrower with respect to the Loan.  Unlike J. D'Addario, it has nothing to do with compensating the Trust for the delay caused by BOA's refusal to repurchase the Loan.

repurchase." (SPA-33). <u>See also</u> <u>Dexia Real Estate</u>, 2014 WL 4290642, at *3 (holding that, although parties agreed that repurchase is the "sole remedy" available to the plaintiff trust, the parties did not devise an "alternative means of resolving the problem that statutory prejudgment interest serves to rectify: ***the economic hardship with delayed judgment, due to the time-value of money***") (emphasis added). The District Court properly held that the Trust was entitled to the time value of money from the date the Trust made its repurchase demand on August 24, 2009 until the District Court entered judgment. (SPA-35). <u>Accord</u> <u>Dexia Real Estate</u>, 2014 WL 4290642, at *3 (awarding prejudgment interest against mortgage loan seller in CMBS repurchase case); <u>PMC Bancorp</u>, 2013 WL 1095458, at *12 (same); <u>Cal. Fin. Grp., Inc.</u>, 2011 WL 4375724, at *10 (same); <u>Key Fin. Servs., Inc.</u>, 1999 WL 34866812, at *12 (same). In accordance with CPLR 5004, the District Court properly awarded the Trust prejudgment interest at the rate of 9% per annum.

## V. The District Court's Grant of Summary Judgment Is Supported by Additional Grounds

This Court may also affirm the District Court's grant of summary judgment on the issue of BOA's breach of Rep 39 on the alternative ground that BOA failed to close the Loan that it had approved.[25] BOA's Origination Procedures provide that

---

[25] Alternatively, the Court may also affirm the District Court's grant of summary judgment on of BOA's breach of Rep 39 because by failing to perform any due diligence to determine if the transaction between Easy and Surrey was arm's length and because the transaction was not arm's length, BOA indisputably deviated from customary practices. (A-156, 178; 262, 537-38, 1096-97, 1195-1207, 1616-17). Additionally, in "No Fraud" Rep 49, BOA represented and warranted,

"[t]he closing of the [Loan] should fully capture all terms representative of the Conduit Program and the specific Loan Approval." (A-158; 246, 260-61, 904). BOA admitted that this guideline required BOA to close the loan that had been approved. (A-158; 947).

It is irrefutable that the loan BOA approved in the CAP is not the loan that BOA closed. (A-160; 210-217, 246, 260-61, 506-508, 510, 514-15, 522-23, 526-29, 531-36, 541-43, 932-33, 953-58, 994-1051, 1210-1212, 1230-34). No one at BOA reviewed the Settlement Statement to confirm that it was consistent with the terms reflected in the CAP. (A-160; 210-217, 246, 260-61, 506-508, 510, 932-33, 945-46, 1616-17). According to BOA's Origination Procedures, the Senior Closer "***has primary responsibility for insuring that all funding conditions identified during the approval process are satisfied prior to funding the Loan***," (A-160; 903), but the Senior Closer on the deal, Andrew Baltz, admitted that he did not ensure that the loan BOA approved was the loan that was closed. (A-160; 506-508, 510, 514-15, 522-23, 526-29, 531-36, 541-43). Predictably, as closed, the Loan bore no resemblance to the loan BOA had approved in the CAP or described to investors.

---

in pertinent part: "Neither the Seller, the originator, nor any employee of agent of the Seller or originator has participated in any fraud or intentional material misrepresentation with respect to the Mortgagor, the Mortgaged Property or any guarantor." (A-172l 321). It is undisputed that BOA repeatedly made intentional material misrepresentations with respect to the Borrower, the Guarantor(s), the Loan and the Property to the Trust and other investors when it tried to sell the loan (i.e., that there was cash equity contributed by the Borrower, the amount of cash equity contributed by the Borrower, that Martin Carlin was a strength of the transactions). See supra Statement of Facts at Part E.

53

Compare A-996-1051 with 953-958. Indeed, contrary to the CAP, Surrey did not acquire the Property for $45 million or contribute any cash equity. (Id.) BOA concedes as much. (BOA Br. at 13). Thus, BOA did not close the purported transaction between Easy and Surrey.

The Settlement Statement instead reflects the terms of the Purchase Contract, which is that Surrey acquired the Property from Coolidge for $35,000,000 (plus some closing costs) and that Surrey received $2.5 million in cash. (A-152, 160; 552-650, 953-58). Because the Loan exceeded the acquisition costs, the Loan's LTC was approximately 114%. (A-161-62; 246-47; 953-58). BOA clearly deviated from its Origination Procedures and customary practices when it originated the Loan. For this additional reason, the District Court's grant of summary judgment on the issue of BOA's breach of Rep 39 should be affirmed.

## CONCLUSION

For the reasons stated above, the Court should affirm the decisions and judgment of the District Court.

8751939

Dated:     November 20, 2014

/s/ Gregory A. Cross
Gregory A. Cross
Colleen M. Mallon
VENABLE LLP
750 E. Pratt Street, Suite 900
Baltimore, MD 21202
Phone: (410) 244-7400
Fax:   (410) 244-7742
gacross@venable.com
cmmallon@venable.com

*Attorneys for Plaintiff-Appellee Wells
Fargo Bank, N.A., as Trustee for the
Registered Holders of Banc of
America Commercial Mortgage
Pass-Through Certificates, Series
2007-5, acting by and through Its
Special Servicer C-III Asset
Management LLC*

8751939

# CERTIFICATE OF COMPLAINCE WITH RULE 32(a)

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,847 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point, Times New Roman.


Dated:          November 20, 2014
                Baltimore, Maryland


                              VENABLE LLP

                              /s/ Gregory A. Cross
                              Gregory A. Cross
                              Colleen M. Mallon
                              750 E. Pratt Street, Suite 900
                              Baltimore, MD 21202
                              Phone: (410) 244-7400
                              Fax:   (410) 244-7742